# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### September 16, 2014 Session

## STATE OF TENNESSEE v. HOWARD HAWK WILLIS

**Appeal from the Criminal Court for Washington County**
**No. 28343    Jon Kerry Blackwood, Senior Judge**

_____

**No. E2012-01313-CCA-R3-DD - Filed March 13, 2015**

_____

A Washington County jury convicted appellant, Howard Hawk Willis, of two counts of premeditated first degree murder and one count of felony murder in the perpetration of a kidnapping. Following the penalty phase, the jury sentenced appellant to death on each conviction. The trial court merged the felony murder conviction into one of the convictions for premeditated first degree murder. On appeal, appellant asserts that: (1) the trial court erred in finding that appellant implicitly waived and forfeited his right to counsel and requiring him to proceed pro se at trial; (2) the trial court erred in denying appellant's motion to suppress his statements; (3) the searches of the residence and the storage unit were unconstitutional; (4) the trial court erred in denying appellant's multiple motions to continue the trial; (5) the trial court erred in staying appellant's funding and other privileges used in preparation for trial after this court granted an interlocutory appeal; (6) the evidence is insufficient to support the convictions; (7) the trial court erred in denying appellant's ex parte motions for expert services for a crime scene expert and a false confession expert; (8) the trial court failed to apply a higher standard of due process in all aspects of the case; (9) the trial court erred in admitting certain photographs; (10) the prosecutor made improper statements during closing arguments in both phases of the trial; (11) the trial court erred in instructing the jury during the guilt phase; (12) the aggravating circumstances upon which the State relied were not stated in the indictment; (13) the trial court erred in denying appellant's motion to preclude for-cause removal of jurors who were not death qualified; (14) Tennessee's death penalty statute is unconstitutional; (15) the trial court erred in failing to advise appellant with respect to his testimony during the penalty phase; (16) the trial court failed to make an adequate inquiry into appellant's competency to waive his right to present mitigating evidence; (17) the trial court erred in instructing the jury during the penalty phase; (18) the trial court erred in admitting victim impact evidence; (19) the proportionality review is unconstitutional; and (20) cumulative error warrants reversal. Following our thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

ROGER A. PAGE, J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR. and NORMA MCGEE OGLE, JJ., joined.

Hershell D. Koger, Pulaski, Tennessee (on appeal); Kathleen Morris, Nashville, Tennessee (on appeal); and Howard Hawk Willis, pro se (at trial), for the appellant, Howard Hawk Willis.

Herbert H. Slatery III, Attorney General and Reporter; James E. Gaylord, Assistant Attorney General; Anthony Clark, District Attorney General; and Dennis Brooks, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

Appellant was convicted of multiple counts of first degree murder for the October 2002 deaths of Adam Chrismer and Adam's wife, Samantha.[1] Appellant was indicted on premeditated first degree murder of Adam, premeditated first degree murder of Samantha, felony murder of Samantha in the perpetration of a kidnapping, felony murder of Adam in the perpetration of first degree murder, two counts of abuse of the corpse of each victim, and one count of abuse of the corpse of Sam Thomas, appellant's step-father. The State dismissed the charge of felony murder of Adam. The trial court ordered separate trials for the murder counts and the abuse of a corpse counts.

After multiple changes in counsel that resulted in long delays in the proceedings, the trial court found that appellant both implicitly waived and forfeited his right to be represented by counsel. The trial court ordered that appellant proceed pro se at trial and appointed advisory counsel. On interlocutory appeal, this court affirmed the trial court's order. *See State v. Willis*, 301 S.W.3d 644, 645 (Tenn. Crim. App. 2009). On remand, the trial judge, Judge Lynn W. Brown, recused himself from the case, and Judge Jon Kerry Blackwood was designated as the trial judge. The trial was held in June 2010.

## FACTS

### The State's Proof

---

[1] The victims and several witnesses share the same surname. For clarity, we will refer to them by their first names. By doing so, we intend no disrespect.

Patty Leming, Samantha's mother, testified that Samantha was born on April 21, 1986, and was sixteen years old when she was killed. Ms. Leming said that at some point, Samantha began living with Kelly Willis, who was one of Samantha's friends and appellant's daughter. Ms. Leming assumed that appellant was also living with them. Samantha visited Ms. Leming on a weekly basis. Ms. Leming said she only saw appellant if he brought Samantha to visit.

Ms. Leming testified that she last saw appellant on October 4, 2002. On that date, Ms. Leming, her boyfriend, and Samantha went to a Pizza Hut located on the border of Chattanooga and Georgia. Ms. Leming said she drank three glasses of beer but was not intoxicated. She also said that before their pizza arrived, Adam entered the restaurant and appeared tired. Adam slumped over on the table and told Samantha, "Howard said, let's go." Ms. Leming assumed that appellant had brought Adam and that appellant, Kelly, and Adam had been to the dog pound to retrieve Samantha's dog.

Ms. Leming said she saw a vehicle that appeared to be a red Jeep in the parking lot. While she was not certain, she believed the Jeep belonged to appellant. She also saw someone in the vehicle who looked like appellant. Ms. Leming stated that the vehicle was parked farther back in the parking lot, that it was "dusky dark" outside, and that the headlights of the vehicle were shining in the window. She saw the vehicle at the same time that Adam entered the Pizza Hut. Adam did not stay long. Samantha asked him where her dog was, and Adam told her that they did not retrieve it. Ms. Leming said Samantha "sort of flew off the handle and called [appellant's] daughter a b****." The victims then left with appellant, and Ms. Leming did not see the vehicle after they left.

Ms. Leming testified that she called Samantha's cellular telephone on October 5 but did not reach her. She said she had not had any prior difficulties contacting Samantha using that number. Ms. Leming continued to attempt to reach Samantha but was unsuccessful.

On cross-examination, Ms. Leming denied informing agents from the Tennessee Bureau of Investigation (TBI) that the victims left in a blue Jeep. She stated that from September 27 through October 4, 2002, the victims were living in Rossville, Georgia, with appellant and Kelly.

On redirect examination, Ms. Leming testified that following Samantha's death, she visited the trailer on Mohawk Drive in Rossville, Georgia, where the victims had recently moved. Ms. Leming said that the victims and appellant had rented the trailer and that the victims had lived there for approximately one week prior to their deaths.

Teresa Chrismer, Adam's mother, testified that Adam was born on August 26, 1985, and was seventeen years old when he died. Adam moved out of Teresa's home when he turned seventeen. Teresa met appellant through the victims in 2002 when he brought the victims to her home to visit. Teresa said appellant came to her home a few times. She did not like him, and they argued.

Teresa testified that she last saw Adam at his great-grandmother's house but that she could not recall the date. Teresa said Adam had found a job and was looking forward to his life with Samantha. Teresa recalled that the victims were moving into a trailer on Mohawk Drive. Teresa stated that she last spoke to Adam on October 4, 2002. He called her and was upset and crying. Teresa told him to come home, and he agreed to do so.

Teresa stated that after speaking to Adam on October 4, she tried to call him but could not reach him. On October 7 or 8, Teresa received a call from a detective in Bradley County who wanted to speak to Adam. Teresa said she became "frantic" after the call. She believed that something bad had happened to Adam because she had not heard from him.

Teresa testified that Adam had previously given her a number to use to reach him and told her that it was a "secret" number. Teresa called the number several times and left a message that it was important that he call her. On October 11, appellant called Teresa from that same number and asked her what she wanted. Teresa told appellant that she wanted to talk to Adam and asked where he was. Appellant said he had not seen the victims since they were setting up their trailer on Mohawk Drive. Teresa stated that she tried to keep appellant on the telephone for as long as she could while her husband called the police. She said she remained on the telephone with appellant for twenty to twenty-five minutes. Teresa could hear two women talking in the background but could not determine what they were saying. Appellant was trying to get them to stop talking. Teresa stated that appellant was "as cool as a cucumber" during the conversation.

Luther Earl Whitson testified that on October 11, 2002, he went fishing at Boone Lake in Washington County, Tennessee. He went to Winged Deer Park at the boat ramp to pick up a friend. He "threw down the trawl motor" and was preparing to fish when he saw a human head floating in the water approximately twenty yards from the bank. He called 9-1-1.

Edward Brownlow Baker testified that on October 12, 2002, while fishing in a tournament on Boone Lake, he saw a human hand floating in the water. He caught the hand in a fishing net and brought it to a bridge where he called 9-1-1 and met officers.

Jerry Taylor, a bus driver for the sheriff's office, testified that on October 12, 2002, he had taken a crew of inmates to clean a cemetery. Mr. Taylor said he received a call from his sergeant who instructed him to go to DeVault Bridge on Bristol Highway to meet with investigators. When he arrived, he was instructed to take his crew and walk the bank of the lake to search for body parts. After searching for fifteen to twenty minutes, they found a human hand in the water.

Isaac Nichols testified that in October 2002, he learned that a human head and hand were discovered in Boone Lake. He said that during that month, he, his nephew, and his daughter went fishing at the lake where they found the top of a skull behind a boulder. He called 9-1-1 and located the skull for officers.

Wilma Clay testified that she lived in Johnson City next door to Betty Willis,[2] appellant's mother. Mrs. Clay saw appellant, the victims, and appellant's daughter at the home beginning in April 2002 and on and off throughout the summer until September 2002. Mrs. Clay last saw the victims at the home in September 2002.

Mrs. Clay stated that during the early morning of October 5 or 6, she saw appellant standing outside Betty Willis's vehicle, a red Jeep, with his arm resting on the door smoking a cigarette. The red Jeep was parked on the side of the driveway and was filled with personal belongings. The appellant stood there for a few minutes, threw down his cigarette, picked up a black garbage bag from the back of the Jeep, and threw it on the ground. Mrs. Clay said she felt uncomfortable, so she reentered her home.

Mrs. Clay testified that later that day, when it was daylight, she went outside to retrieve her newspaper. She saw that the garage light at Betty's house was on and that the garage door was down. Mrs. Clay had not seen the garage light on previously.

On cross-examination, Mrs. Clay testified that she saw appellant on Saturday, October 5, 2002, at 5:30 a.m. She did not see any vehicles other than the red Jeep. Mrs. Clay said she did not see a blue Jeep that day and did not recall the last time that she had seen the blue Jeep. She acknowledged that neither she nor her neighbors got along with Betty.

James Robert Miller III, an attorney, testified that on September 27, 2002, he and his secretary went to the home of Betty Willis on Brentwood Drive on a routine business matter. When Mr. Miller parked in the driveway, he saw Betty standing outside in the yard. He also saw Adam exit the house through the front door and walk around the yard.

---

[2] The name of the appellant's mother is referred throughout the record as Betty Willis, Betty Hawk, Elizabeth Hawk, and Elizabeth Willis. For clarity, we will refer to her as "Betty Willis" or "Betty."

Mr. Miller stated that he entered the house and saw that the kitchen, bathroom, and living room were covered in debris. The State showed Mr. Miller a photograph of the house, and Mr. Miller said that the hardwood floor depicted in the photograph from the front of the house going toward the kitchen was not uncovered. Rather, he said that the floor was carpeted. Mr. Miller stated that when he left the house, the victims were playing video games on a television that appeared to be new.

Mr. Miller testified that at one point he went into the backyard where he saw Samantha talking on her cellular telephone. Samantha handed the telephone to appellant, who spoke into it and then handed it back to her. Samantha told Mr. Miller that she had come from Georgia to help clean the house.

On cross-examination, Mr. Miller testified that he was at the house for approximately forty-five minutes. He saw Samantha standing beside a blue Jeep and said that she had sandy or light brown hair. Samantha told him that she had met appellant at a Hardees' restaurant one or two weeks before.

Catherine Campbell testified that in October 2002, she was a manager of 24 Hour Self Storage Facility in Johnson City, Tennessee. Her office was located two blocks away from the storage units. The company rented the units remotely by telephone.

Ms. Campbell explained that a person who wanted to rent a storage unit was required to use the lobby telephone at the storage facility. The telephone connected to the main office. Ms. Campbell or one of the employees at the main office completed contracts using the information that the person provided over the telephone. The person also completed the same contract while speaking to the employee and was required to make a payment at that time. If the person paid using cash or a check, he or she was instructed to place the payment in a lockbox at the site along with the contract. Once payment was rendered, the person was provided with a temporary gate code until the person's permanent code could be entered into the system.

Ms. Campbell testified that on October 10, 2002, she rented Unit Number X47 during the mid-afternoon. Ms. Campbell spoke to a man over the telephone for a few minutes. She said the man sounded as if he were middle-aged or older. The man told Ms. Campbell that a woman wanted to rent a storage unit and that the unit would be in the woman's name. Ms. Campbell told the man that she would need to speak to the woman directly. The man then handed the telephone to a woman who identified herself as Betty Willis. Betty confirmed that she wished to rent a unit, and Ms. Campbell talked her through the paperwork and provided her with a temporary gate code. Betty paid with a check.

Ms. Campbell stated that later that evening, she retrieved the paperwork at the storage facility. The paperwork listed the name "Betty H. Willis" and listed the address as 104 Brentwood Drive, Johnson City, Tennessee. The check was made in the amount of $55.00. After Ms. Campbell deposited the check in the bank, it was returned due to insufficient funds. On cross-examination, Ms. Campbell testified that the facility did not have video surveillance and did not store information regarding who entered the facility.

Dr. Larry Miller, a professor and forensic document examiner for the Department of Criminal Justice at East Tennessee State University, was accepted by the trial court as an expert in handwriting analysis. Dr. Miller testified that in November 2003, Investigator Todd Hull with the Washington County Sheriff's Office requested that he examine documents that purportedly bore the handwriting of Emma Elizabeth Hawk, also known as Betty Willis. Dr. Miller was asked to compare the handwriting on the documents with Betty's known handwriting.

Dr. Miller testified that he examined a storage rental agreement form that was completed by a person by the name of Betty H. Willis. He concluded that the signature and other handwriting on the document were that of Betty. Dr. Miller also examined a check dated October 10, 2002, payable to 24 Hour Storage and determined that the writing, numerical formations, and signature were made by Betty.

Sergeant Kenneth Phillips testified that in October 2002, he was the Director of the Drug Task Force, which included Washington, Carter, Johnson, and Unicoi counties. On Friday, October 11, Major Link Higgins requested his assistance regarding a human skull found at Boone Lake. Sergeant Phillips stated that on the afternoon of Monday, October 14, Major Higgins requested that he investigate a lead regarding the identity of the skull, which involved two missing juveniles from the Chattanooga or Bradley County area.

Sergeant Phillips stated that he and an investigator from Bradley County went to the Washington County Detention Center and listened to tape recordings of telephone calls that appellant had made at the jail. Sergeant Phillips had listened to one or one and one-half of the tapes when he received a call from Investigator Hull who stated that it appeared that the lead regarding the missing juveniles was probably the most feasible lead. After meeting with Investigator Hull, Sergeant Phillips called Major Higgins and informed him of the information that he had received and said that they needed to act that night. They called in various law enforcement agencies, and Sergeant Phillips and Agent Tom Smith began drafting search warrants. One search warrant was for Betty Willis's home on Brentwood Drive, and the second search warrant was for the home of Marie Holmes, Betty's sister. Sergeant Phillips recalled that the backyards of the two homes were adjacent.

Sergeant Phillips testified that during one of the telephone calls that appellant made to Betty, she mentioned storage, and appellant told her to "shut up." As a result, Sergeant Phillips knew that they needed to find a storage building or unit. On October 15, officers learned that appellant and Betty rented a storage unit at a storage facility located at Buffalo Street. Sergeant Phillips said he had access to the storage facility because the sheriff's office rented a unit there. Sergeant Phillips and other officers walked around the facility "killing some time" while waiting for other investigators to identify the unit.

Sergeant Phillips stated that as he was walking around the facility, he came upon the unit for which he believed they had been searching. He believed he smelled rotting flesh from the unit. Sergeant Phillips said that at that time, he had been an officer for seventeen or eighteen years and had worked a number of murder scenes involving dead bodies in various stages of decomposition. One investigator with the Washington County Sheriff's Office and two or three officers from Bradley County were with Sergeant Phillips. These officers did not smell anything until they put their noses to the crack of the door of the unit. Sergeant Phillips observed eight to ten maggots coming out from under the door. He said that based upon his experience, he believed decomposing bodies were likely in the storage unit.

Sergeant Phillips testified that around the time that he discovered the unit, Investigator Hull called him and said that he had the number of the storage unit rented to the Willises. Sergeant Phillips told Investigator Hull that he believed that he had located the unit and confirmed that the unit number was X47. Sergeant Phillips stated that he and the other officers secured the unit and reported what they believed that they had found. Two patrol cars remained there all night to secure the scene. Sergeant Phillips said that there was a lock on the unit and that it was not opened while he was there.

Sergeant Phillips recalled that on Tuesday, October 15, 2002, he met with Wilda Willis, appellant's ex-wife, and that they went to the jail where Wilda met with appellant as officers recorded the meeting. Sergeant Phillips said that he heard the conversation while it was being recorded and believed that a transmitter was in the trash can.

Sergeant Phillips stated that Wilda and appellant met again the following night. Sergeant Phillips also stated that the second meeting was a "contact visit," or a visit where appellant and Wilda were in the same room, that was set up by either Major Higgins or the sheriff through the jail superintendent. Sergeant Phillips believed that a transmitter was again placed in the trash can, and he listened to the conversation. At one point, Sergeant Phillips heard appellant tell Wilda, "'I blew their brains out.'" Sergeant Phillips terminated the meeting shortly thereafter. He and an agent entered the room, and Sergeant Phillips

began reading appellant his rights. Before Sergeant Phillips could complete the reading of the rights, appellant stopped him and requested counsel. The interview was then terminated.

Sergeant Phillips testified that in accordance with his usual policy, he informed the jailers that they should watch appellant because he had admitted to two murders. Sergeant Phillips explained that he wanted to ensure that appellant did not injure himself and said that some officers refer to this as "suicide watch." He further explained that when an inmate is on suicide watch, the jailers take away his items of clothing so that the inmate cannot use them to hang himself. The inmate is provided with a paper gown. Sergeant Phillips said he was told that jailers implemented similar procedures with appellant. He did not see appellant for a few weeks after appellant's admission.

On cross-examination, Sergeant Phillips testified that he also learned of the existence of the storage unit while monitoring a conversation between Wilda and Betty. He did not listen to all of the tape recordings of telephone conversations between appellant and Betty. Sergeant Phillips said that he never saw the rental contract for the storage unit and acknowledged, when shown the contract, that appellant's name was not on the contract.

Sergeant Phillips was aware that appellant had requested an attorney on October 14 on an unrelated charge. He also heard a recorded telephone conversation between appellant and Betty during which they discussed retaining an attorney to represent appellant on charges that he had pending in New York.

Special Agent Rainer Drolshagen of the Federal Bureau of Investigation ("FBI") testified that in October 2002, he was stationed in Johnson City, Tennessee. Due to his experience working with the Washington County Sheriff's Office and his forensic collection background, Special Agent Drolshagen was called to assist in executing a search warrant at Betty's home.

Special Agent Drolshagen testified that a red Jeep was parked behind the house. He observed that the vehicle was very clean, which surprised him because the house was not clean. The carpet inside the vehicle was damp, and he noticed a foul odor in the vehicle. He believed the vehicle needed to be processed for bodily fluids and trace evidence.

Special Agent Drolshagen recalled that he entered the residence through the front door and walked into the living room. He observed beige carpet in the living room and a large spot on the living room floor where the carpet had been bleached. Special Agent Drolshagen said the den located at the rear of the house was in disarray. He saw white stains on the carpet that appeared to be paint and other materials on the carpet, including glass.

Special Agent Drolshagen stated that someone had removed a fair amount of carpet from the dining room and hallway area and that only a select portion of the carpet in the room was removed. He further stated that the carpet was cut away "haphazardly" and that the cuts on the carpet were not straight. Special Agent Drolshagen said that the house was not in a good condition and that there was a foul odor throughout the house. He observed flies and larvae in the house. He explained that they were searching for a body that had been moved. He further explained that when carpet had been cut in such a way, it was an indicator that the carpet may have been removed to conceal a crime or was used during the course of the crime.

Special Agent Drolshagen testified that he also assisted in searching the storage facility. He collected larvae or maggots at the front stoop. When he entered the storage facility, he observed two red or orange gas cans with a mixture of fuel in them. He also observed a blue tarpaulin and tools, including a hammer, a hatchet, and a pair of scissors coming out from underneath the tarp. Two beige plastic containers with light-colored lids were underneath the tarp. A bag containing cans of air freshener was on top of the containers. A similar air freshener container had been previously found at Betty's home. A yellow rope was used to tie down one of the containers. A stain was on the side of one of the containers where it appeared that fluid had come out and seeped down onto the floor. Larvae and pupae were on the floor near the containers. A male body was in the container that was tied with a yellow rope, and a female body was in the other container.

Special Agent Drolshagen testified that while collecting various samples of larvae and pupae, he conferred with Dr. Erin Watson, an entomologist. Special Agent Drolshagen noted the specimens could indicate the time of death based upon their life cycles. Dr. Watson informed Special Agent Drolshagen that her analysis also would require temperature readings because the temperature was relevant to the development of larvae. Dr. Watson requested that he take a four-day sample of the temperature from the storage unit. Special Agent Drolshagen purchased a scientific thermometer and obtained the high and low temperatures from the unit on January 9-12, 2003. He also checked the high and low temperatures for the majority of October 2002.

Special Agent Drolshagen testified that several layers of material were on top of the female victim. Her body was in a state of decomposition. Her head was tucked, and her hands were bound behind her body. A gag was in her mouth.

Special Agent Drolshagen stated that he recovered larvae and pupae samples from the container with the female victim. He observed and collected only pupae samples from the container with the male victim. He collected both live and dead samples. The dead samples were placed in alcohol to preserve them at their actual state when they were recovered. To store the live samples, Special Agent Drolshagen purchased vermiculite and ground beef,

placed them in a Styrofoam container, and punched holes in the top of the container. He placed the live samples in the container to allow them to continue to feed and remain alive for Dr. Watson's analysis.

Dr. Vince Pinyard, the county medical examiner for Washington and Unicoi Counties, testified that he received a call on a Friday night or early Saturday morning in October 2002 regarding the discovery of body parts in Boone Lake. Early that next morning, Dr. Pinyard went to the scene where he and deputies began searching for other body parts. The head had been taken to the forensic pathology laboratory by the time that he arrived. A hand was found while he was at the scene.

Dr. Pinyard testified that he received a call from investigators who stated that they had information that other body parts may be in a storage facility in Johnson City. Larvae or maggots were crawling around the unit, and it was determined that the specimens would not be present if organic material had not been in the facility to keep them alive. Dr. Pinyard went to the storage unit. He stated that before the door was opened, he observed larvae or maggots crawling around and smelled an odor coming from inside the storage unit. Investigators determined that they needed to request assistance from the TBI and sealed off and guarded the unit until TBI agents arrived the following day.

Dr. Pinyard said that after TBI agents collected evidence, he and Dr. Mona Stephens examined the contents of the containers in the storage unit. They decided to replace the lids of the containers to avoid disturbing the evidence until they transported them back to the forensic laboratory to process them correctly. Dr. Pinyard and two emergency medical technicians loaded the containers into the back of an ambulance. Because the forensic laboratory did not have radiology or x-ray equipment available, they transported the containers to the local hospital to be weighed and x-rayed. They then transported the containers to the forensic pathology department. Dr. Pinyard described the containers as heavy, bulky, and awkward to handle. He did not believe that he could have moved them by himself without spilling the contents.

Dr. Mona Gretal Case Harlan Stephens, a forensic pathologist, was accepted by the trial court as an expert in forensic pathology. She performed the autopsies on both victims. Dr. Stephens testified that she first became involved in the case when she was notified that a human head had been found in the area of Winged Deer Park. She was notified at night and went to the boat ramp where she observed a human head.

Dr. Stephens testified that Adam Chrismer was seventeen years old when he died of a close-range gunshot wound to the head. His dismembered head and neck, his hands, and additional pieces of his skull were recovered from a lake at separate times. Dr. Stephens said

the majority of Adam's decomposing body was recovered in a storage bin in a storage unit where Samantha's body was also found. Adam was identified based upon DNA comparison with his mother, fingerprint comparison, and mitochondrial DNA comparisons of his hands, head, and ribs. Dr. Stephens determined that Adam's manner of death was homicide and said that the pupae present in his storage bin suggested that he died before Samantha.

Dr. Stephens stated that a bullet entered in an area beneath Adam's chin. The bullet traveled through the skin, the pharynx, and the base of the skull. Dr. Stephens explained that the tissue above the base of the skull was largely lost and disrupted, so she was not able to show the path of the bullet beyond the disrupted base of the skull. The bullet was not recovered. Dr. Stephens observed stippling or powder tattooing 0.7 inches from the entry wound. She explained that stippling generally does not embed in the skin if the gun is fired more than two feet from the surface of the skin. As a result, Dr. Stephens characterized the wound as a near gunshot wound.

Dr. Stephens testified that Adam's head and hands were dismembered using a chainsaw. She determined that the separate piece of skull that was found in the lake matched some of the missing portion of Adam's skull. She stated that the separate piece of skull showed evidence of flat sides from the chainsaw activity and separations along the suture lines.

Dr. Stephens said that the container in which Adam had been placed had a yellow rope around it. Adam was wearing shorts and boxer-style undershorts. A black jacket also was in the container. A comforter with a blue background and a sunflower design on one side, a marble blue lining, and a synthetic polyester-type material as the filling was wrapped around Adam's body. A pink fleeced blanket with nylon ends or trim was wrapped around the comforter. The material and Adam's body were tied around the middle with a black nylon rope.

Dr. Stephens testified that the evidence was consistent with the materials' being wrapped around Adam's body before he was dismembered with the chainsaw. When Dr. Stephens examined Adam's head, she saw material in part of the gash on the right side of the head made by the chainsaw. Dr. Stephens said the material appeared to be some sort of polyester-type fabric batting used for quilting or found in the inside of a jacket or comforter. She also said the fabric was similar to the fabric found in the container. Dr. Stephens observed chainsaw markings on the black jacket.

Dr. Stephens stated that Adam's head had damage to the right side going down in an angled pattern that was in the same plane as the chainsaw marks to the front of his upper chest. Adam had a chainsaw mark at the inferior margin of his neck area that was similar to

the chainsaw mark on the left side of the torso. The chainsaw marks caused damage to the skin that looked like serrations in some areas and small parallel lines in other areas.

Dr. Stephens said Adam's left leg had been sawed through and folded back, but the soft tissues were still connected. The right femur had a series of saw marks, and the cut farthest from the foot went through the entire bone tissue. The legs were still attached by the skin, but the bones had been sawed through completely.

Dr. Stephens testified that if Adam had been wrapped in multiple layers when dismembered, it would have helped contain any bleeding or tissue fragmentation. She also testified that the chainsaw marks appeared to have been made post-mortem. She explained that as a result, bleeding would not have been excessive because there would have been no arterial spurting. Dr. Stephens noted bruising and darkening around the wound underneath the chin and said that tissues were damaged through the base of the skull. She explained that as a result, Adam was alive when he was shot and was deceased when he was dismembered.

Dr. Stephens testified that she observed maggots and brown pupae cases on the surfaces of the black jacket and the blanket. She collected them and provided them to Special Agent Drolshagen. Dr. Stephens did not find any of these specimen in the container where Samantha was found.

Dr. Stephens testified that Samantha was sixteen years old when she died from a gunshot wound to the head and a second "loose contact" gunshot wound. Dr. Stephens concluded that the manner of death was homicide. Samantha's nude decomposing body was found in a rental storage facility in a large plastic bin with her hands bound behind her back. Dr. Stephens stated that Samantha's ankles showed evidence of ligatures that had been in place while her blood was circulating.

Dr. Stephens said that the first gunshot wound was over the big knot on the back of the skull that forms the occipital protuberance. She also said that the wound was large and that she observed a great amount of soot around the wound. The bullet traveled downward and to the right toward the neck and upper shoulder area. A bullet fragment traveled through the scalp about where the hairline is located in the back of the neck. The other fragments traveled down farther into the neck where Dr. Stephens recovered them.

Dr. Stephens testified that the second gunshot wound was not as easily seen on the outside of the scalp. She said the bullet traveled farther up on the head in the back and farther to the left. The bullet traveled through the scalp and what would have been the brain. The brain was no longer present due to maggot activity. The bullet struck the base of the skull and caused an outward fracture. Dr. Stephens was unable to locate the bullet.

-13-

Dr. Stephens stated that two small rugs were found in the same container where Samantha's body was found. A pillowcase with a floral, yellow, and tan design was also found in the container. After Dr. Stephens examined the contents of the container, she was asked to go to Brentwood Drive on October 23, 2002. A pillowcase with the same design was found in a cabinet in the bathroom.

Dr. Stephens testified that she observed larvae or maggots of various sizes in the container with Samantha but did not observe any pupae. Dr. Stephens explained that the round pupae casings she found in the container with Adam represented the end stage before the specimen emerges as a fly. She further explained that the lack of pupae in the container with Samantha suggested that Adam died before Samantha.

Dr. Stephens said there was a black zip-tie around each of Samantha's wrists. Samantha's wrists were tied together by another zip-tie. Her ankles also had zip ties around them. Dr. Stephens stated that the coloration in Samantha's hands suggested that the zip-ties were around her wrists when she was still alive. Dr. Stephens found bruising on the front of Samantha's right leg, the back and outside of her right leg, the front of her chest, the inside of her right breast, and her right shoulder. Samantha had bruising on the inside of both of her feet that was consistent with the positioning of the zip-ties. There was a knotted cloth gag in Samantha's mouth, and Samantha had teeth missing that Dr. Stephens found in the container.

On cross-examination, Dr. Stephens testified that when she went to the storage unit, she saw that one of the containers was leaking "purge fluid" resulting in a large spot on the floor. She found a paper towel in the purge fluid and found a piece of glass in the paper towel. She also collected numerous fly samples. She preserved some of the samples in alcohol and some in a nutrient container that was provided by an FBI agent.

Dr. Stephens said that while she was at the Brentwood Drive address, a piece of material that matched the lining of the jacket that was in the storage container with Adam was found within the door frame in the garage. Dr. Stephens stated that the jacket was an XXL and likely would have been big on Adam. She recalled that so many items were piled up in the front bedroom of the Brentwood Drive address that it was difficult to walk into the room. The bed was turned over, and the room was not livable. The rest of the house was in disarray, and paint was splashed on the walls and the doors.

Dr. Stephens testified that she searched in the home for materials similar to those found in the containers. She also searched for obvious blood or tissue staining and bullet fragments in the home but did not find any.

-14-

Dr. Stephens was unable to determine what the material found in the skull was but said that the material was consistent with polyester batting. She noted that polyester batting was in the jacket and the comforter. She did not send the material to be tested and did not examine the chainsaw that was recovered.

Dr. Stephens testified that Samantha's hair was medium brown or red. Dr. Stephens explained that postmortem changes could have made the hair appear a bit redder and that her hair was in the purge fluid. Dr. Stephens stated that if Samantha's hair was blonde, it was very dark blonde.

Dr. Mark Koponen testified that in 2002, he was a deputy chief medical examiner for the Georgia Bureau of Investigation ("GBI"). The trial court accepted Dr. Koponen as an expert in forensic pathology. Dr. Koponen said a GBI agent asked him to perform a second examination of Samantha. He understood that the purpose of the second examination was to facilitate the transfer of information.

Dr. Koponen testified that during an x-ray examination, he found a bullet within Samantha's chest. He understood that the bullet was not found during the first autopsy because that office did not have x-ray capabilities. Dr. Koponen said three explanations for the bullet existed. The first explanation was that Samantha was shot in the chest. Dr. Koponen was not able to determine whether Samantha had a gunshot wound to the chest due to cuts made during the first autopsy. Dr. Koponen stated that the second explanation was that Samantha was shot in the head and that the bullet traveled down the hole where the spinal cord passes. The third explanation was that the bullet fell down to the chest when the body was manipulated due to extensive decomposition.

Dr. Koponen testified that he did not have access to the original autopsy performed by Dr. Stephens when he performed the second autopsy. He had since reviewed the original autopsy. He said that the likely explanation for the bullet was that it was originally within the cranial vault and fell down the spinal column as the body decomposed.

Captain Debbie Pattillo of the Johnson City Police Department testified that she participated in the execution of some of the search warrants at the Brentwood Drive address. She also attended the autopsy of Samantha's body. Captain Pattillo said that while at the autopsy, she saw a pillowcase that had been taken from the container and recognized it as matching a pillowcase that she had seen at the residence. Captain Pattillo and Dr. Stephens later went to the residence and found the matching pillowcase inside a drawer. Captain Pattillo stated that she searched the entire drawer and did not find any other pillowcases that matched the one that she seized from the home.

Officer Bill Burtt with the Bradley County Sheriff's Office testified that in October 2002, he was the captain of the criminal investigative division. He said that on October 4, 2002, appellant was scheduled to come to his office for an interview but did not show up. Rather, appellant called Detective Shaunda Efaw and said that he was unable to meet. Officer Burtt and Detective Efaw interviewed appellant on October 8, 2002. During the interview, the subject of the victims arose, and appellant said that they possibly were in Georgia and that he had last seen them on October 4.

Officer Burtt testified that following the interview, they were interested in speaking to the victims. Detectives went to Georgia to attempt to locate them. They spoke to Adam's mother, Teresa, in an attempt to determine his location, but she had not seen him. Officer Burtt spoke to Teresa by telephone after October 8 but was unable to locate Adam through her information. Officer Burtt said the conversations with Teresa occurred following his interview with appellant but before appellant's arrest.

Detective Shaunda Efaw with the Bradley County Sheriff's Office testified that she requested that appellant meet with her on October 4, 2002, but that he did not show up. She then scheduled an interview with him for October 8. Detective Efaw said that during the interview, appellant told her that he had last seen the victims on Friday, October 4 when he went to north Georgia to retrieve some flyers.

Detective Efaw said that on October 10, she received a message that appellant wanted to speak to her. When she returned his call, appellant told her that he last saw the victims on Mohawk Road on the day that he went to Georgia to retrieve some flyers. Detective Efaw stated that this was essentially the same story that appellant had told her on October 8.

Detective Efaw testified that on January 3, 2003, the Bradley County Sheriff's Office was working with Wilda Willis, appellant's former wife, in searching for a chainsaw. Officers searched for the chainsaw off I-75 in Bradley County, while Detective Efaw remained in the vehicle with Wilda. During that time period, Wilda received a telephone call from appellant, which Detective Efaw recorded. Other officers located the chainsaw.

On cross-examination, Detective Efaw testified that on October 8, 2002, appellant told her that he did not keep up with dates with regard to when he last saw the victims and that he would need to ask Wilda. Detective Efaw said that on October 11, she was in Washington County searching for the victims and arrested appellant pursuant to a federal warrant. Detectives Keith Fretwell and Bill Coultree were with her, and she requested assistance from Washington County officers. At the time of appellant's arrest, officers looked through the house where appellant was arrested as well as the house on Brentwood Drive.

-16-

Detective Efaw testified that on the night of October 11, she requested that a Jeep be towed. She said that there were two Jeeps and that she could not recall which Jeep was towed. She acknowledged that she did not have a warrant to tow the Jeep but had it towed based on instructions from her supervisors in Bradley County. Detective Efaw did not know why the Jeep was towed and never saw the Jeep again. She was aware that forensic testing was conducted on a Jeep. She stated that if the blue Jeep was towed, it was likely because it was the last vehicle in which the victims were seen.

Detective Efaw stated that either she or Captain Burtt called Wilda to their office on October 14, 2002, and that they spoke to her at approximately 9:00 p.m. Wilda said she was going to Greeneville, Tennessee, the following day. Detective Efaw did not recall whether Captain Burtt told Wilda not to go to Greeneville and to go to Johnson City instead. Detective Efaw did not recall the exact conversation but said that it was discussed that Wilda would go to Johnson City and meet with officers from the Johnson City Police Department.

Detective Efaw testified that she gave a recorder to Wilda to record telephone conversations between her and appellant. Wilda brought completed tapes to Detective Efaw, who then gave Wilda blank tapes. Detective Efaw said Wilda may have also purchased blank tapes on her own. Detective Efaw recalled at least one recorded telephone conversation between appellant and Wilda regarding a chainsaw. Detective Efaw heard appellant make a statement regarding his source of knowledge about where or why the chainsaw was at the location where it was recovered by officers.

Sergeant William Coultry with the Bradley County Sheriff's Office testified that in January 2003, he and other officers were asked to retrieve a chainsaw that had been disposed of off Interstate 75 in the northbound lane at mile marker seventeen. Sergeant Coultry said Wilda directed officers to that location. The chainsaw was located over a guardrail and seventeen to twenty feet from the bank.

Lieutenant Elizabeth Pope testified that in January 2003, she was the senior lieutenant assigned to the crime scene investigation unit with the Bradley County Sheriff's Office. She responded to a scene at I-75 to assist in the recovery of the chainsaw and transported it to the detectives' office. She logged the chainsaw into evidence and later gave it to Lieutenant Barry Tharpe, who transported the chainsaw to the TBI crime laboratory in Nashville.

Lieutenant Pope stated that she also assisted in the execution of a search warrant at the Brentwood Drive address. She recovered a school identification card for Adam and a receipt from Wal-Mart in the garage.

Lieutenant Barry Tharpe with the Bradley County Sheriff's Office testified that the sheriff sent him to Johnson City, Tennessee; Cleveland, Tennessee; and Georgia to attempt to locate the victims. Lieutenant Tharpe was not present when the chainsaw was discovered, but he later took photographs of the material that was on the chainsaw. He said he was in the storage unit when the containers were discovered and opened. He saw a jacket in one of the containers with material similar to the material on the chainsaw. Lieutenant Tharpe transported the chainsaw to the TBI crime laboratory.

Wilda Willis Gadd, appellant's former wife, testified that they married in 1992 and divorced in July 2002. They continued to have contact following the divorce. She said that on October 4, 2002, appellant came to her house with two other people in Betty Willis's red Jeep. Wilda stated that appellant sometimes drove a blue Jeep. Appellant entered Wilda's home, but the other two did not. Wilda said that because it was late in the evening and she was in a hurry, she did not pay attention to the two people with appellant. She further said that a female appeared to be in the Jeep and that a young man was standing outside the vehicle. Wilda's home was located in Fort Oglethorpe, Georgia, approximately forty-five minutes from Bradley County. Appellant returned to Wilda's home on October 8.

Wilda testified that in October 2002, she learned that appellant was arrested in Washington County. She spoke to appellant by telephone in the week leading to his arrest. On October 10 or 11, either the evening before appellant's arrest or the evening of his arrest, appellant called her. He told her that Patty Leming had been calling him wanting to know where Samantha was and stating that no one had seen Samantha. Appellant asked Wilda what he was supposed to do about the calls. Wilda asked appellant where the victims were. Appellant said that he did not know and that the victims had left Johnson City earlier that morning.

Wilda stated that during the evening of Friday, October 11 or the morning of Saturday, October 12, either Betty Willis or Marie Holmes called her and informed her of appellant's arrest. They asked her to attend federal court in Jonesborough on Monday. They implied that appellant was arrested over whether the blue Jeep or the red Jeep had been at Wilda's home on October 4.

Wilda testified that she went to Washington County on October 15 after learning of appellant's arrest. Appellant had called Wilda from Marie Holmes's telephone and asked her to visit him at the jail. Appellant told Wilda that he had information for her.

Wilda stated that officers from Bradley County requested that she meet with officers with the Johnson City Police Department regarding Betty Willis and Marie Holmes. On October 15, Wilda approached officers with the Johnson City Police Department and was

introduced to an officer with the Washington County Sheriff's Office. Wilda said officers initially requested that she talk to Betty and Marie while wearing a wire. Wilda stated that she agreed but also insisted on meeting with appellant. Officers provided Wilda with a recording device. She spoke to Betty and Marie on October 15 and met with appellant later that evening. Wilda maintained that she wore the wire of her own free will.

Wilda testified that she met with appellant at the jail, where they were separated by plexiglass. The plexiglass had holes to allow them to talk to each other. Wilda said that communication was difficult and that they had to speak up to hear each other. She further said appellant began providing her with information but then "backed off." Appellant asked her to return the following day with a tape recorder, a pad on which to write, and a pencil. Wilda told appellant that returning would be difficult. Appellant instructed her to hire a "fifty dollar attorney" and return to the jail with the attorney. Appellant further instructed her to persuade the attorney to present her as his paralegal so that she would be allowed in the room. Appellant told Wilda that he would then tell the attorney to leave the room so that appellant could talk to her.

Wilda stated that following her meeting with appellant, she told officers from the Washington County Sheriff's Office that she wanted to return and meet with appellant the next day. She met with appellant the following evening on October 16 in a private room. She brought a spiral notebook, pencils, and a small tape recorder, but she did not bring an attorney. She did not wear a wire during the meeting and knew that cameras were in the room. Wilda said her tape recorder did not record portions of the meeting because it was turned on and off during the course of the meeting. She explained that there were times when appellant wanted her to record what he was saying. Appellant then would turn off the recorder, and Wilda would turn it back on.

Wilda testified that appellant told her that he "blew [the victims'] brains out." Appellant stated that he cut Adam's head and hands off and threw them in a river. Appellant further stated that Samantha's body and the remaining portion of Adam's body were in a storage building. Wilda said appellant did not "point blank" provide a date on which he killed the victims. She stated that appellant discussed Sunday, October 6. She recalled that appellant showed no emotion when he discussed the killings. She said, "It didn't matter to him that they were dead at all." After the meeting, appellant continued to call Wilda several times a day.

The recording and a transcript of appellant's statements to Wilda on October 16, 2002, were entered into evidence. Appellant told Wilda, "I blew their brains out . . . . I just pulled the trigger right then and there on them." He stated that Samantha arrived at Betty's house on Saturday afternoon and was "acting real funny." Appellant said Adam arrived the

following morning and "kept acting funny." Appellant and Adam began a discussion that resulted in an altercation. Appellant stated that while they were "scuffling around" in Betty's bedroom, he found a pistol and shot Adam with it. Appellant said that Samantha was beside Adam and that appellant then shot her. Appellant stated that he severed Adam's head and hands and threw them in the lake close to Devault Bridge. He then placed Samantha's body and the remaining portion of Adam's body in a storage shed. Appellant told Wilda that he was unaware of what information that Betty had and that to his knowledge, Betty was "totally innocent in the whole matter."

Wilda testified that appellant was transferred to New York on the last Tuesday in October and that she met with him on the evening before he left. They met at the Washington County Sheriff's Office, and she did not wear a wire. Wilda stated that appellant asked her whether the victims' bodies had been found. Appellant continued to tell her what he did to Adam and how he cut Adam's body.

Wilda said appellant began calling her in December asking her to visit him in New York on New Year's Day. He told her that he would inform her of the rest of the truth and that she would have the answers to all of her questions. Wilda stated that after appellant arrived in New York, he began varying his stories regarding what had happened to the victims. At one point, appellant told Wilda that Betty Willis had killed them. He later said Samantha's brothers, Daniel and Richard, killed them. Appellant also said the Mafia had killed them.

Wilda stated that on January 1, 2003, she went to New York to meet with appellant at a federal prison. They met in the visitor's room where prisoners meet with their families and friends. Wilda was not allowed to wear a recording device during the meeting.

Wilda testified that during the meeting, appellant insisted that someone else had killed the victims and that he needed her to do various things for him upon her return home. Appellant informed her that Betty Willis had thrown out the chainsaw and told her where to find it. Appellant instructed Wilda to drive on I-75 north toward Chattanooga, past the Ooltewah exit, and toward the gravel road where eighteen-wheelers park. Appellant told Wilda to pull her car up to the guardrail and walk until she could not see her car. He said she would find the chainsaw to the right in the ditch. Wilda stated that appellant instructed her to take gasoline and rags with her to clean off any fingerprints from the chainsaw. Appellant further instructed her to take the chainsaw and some other objects, break into the home of Daniel Foster, Samantha's brother, in the Hunter Green trailer park, steal some of his clothes, wrap the items up in the clothing, hide them under the trailer, and have someone call the police and report a tip that the items were located there. Wilda said appellant stated that he did not report the information that he claimed to have learned from Betty to law enforcement.

Wilda did not indicate to appellant at that time that she was cooperating with law enforcement.

Wilda stated that she spoke to both Investigator Todd Hull and Detective Efaw while she was in New York. She met with them upon her return from New York. Officers then accompanied her to the location described by appellant and found the chainsaw. Appellant called Wilda before she arrived in Bradley County and told her to hurry up and locate the chainsaw. He called her while she was at the Bradley County Sheriff's Office. Appellant also called Wilda when officers found the chainsaw and told her that she should be at the location by that time. Wilda said appellant wanted to ensure that she did not take the chainsaw back to her house. Rather, he wanted her to clean it and hide it so that it would not be found until she gathered the remaining items. Wilda told appellant that she would follow his instructions. Bradley County officers provided Wilda with a device to record the telephone conversations.

Wilda testified that appellant called her throughout the day. He said he wanted her to search for items in Washington County and in Chattanooga near the Tennessee River. Wilda said that during the next few months, appellant called her at different times requesting that she locate various items. He sent her pictures and riddles. He also asked her to give Investigator Hull riddles and messages to assist in locating items faster. Wilda stated that at one point, appellant dictated a summary of the events that occurred in October 2002. She believed that appellant wanted her to type it and give it to the prosecutor and Bradley County officers so that they would know his side of the story.

Wilda said that when she met with appellant on October 16, 2002, appellant was not charged with the offenses. When she spoke to him in January 2003, appellant had been charged with murdering the victims.

On cross-examination, Wilda testified that during her marriage to appellant, Betty Willis was a constant source of trouble. Wilda said that Betty routinely threatened others' lives and that Wilda had to take out warrants against her.

Wilda recalled that on the morning of Saturday, October 12, 2002, appellant called her and requested that she attend a federal hearing in Greeneville, Tennessee, on Monday and provide testimony regarding appellant's driving a red Jeep and not a blue Jeep on October 4. On October 14, Detective Efaw called Wilda and visited her at her place of employment. Officers called her that evening and requested that she drive to Bradley County. Wilda and Wilda's friend, Joy Gadd, drove to Bradley County where Wilda met with Detective Efaw and Captain Burtt. Wilda said Captain Burtt instructed her to go to the Johnson City Police Department and speak to Debbie Barron before going to Greeneville. Wilda stated that

Captain Burtt told her to speak to Ms. Barron about the information that Wilda might have regarding Betty Willis and Marie Holmes. Wilda did not speak to Ms. Barron and did not recall the name of the officer with whom she spoke. She met with officers from the Johnson City Police Department for forty-five minutes to one hour. She was then directed to the Washington County Sheriff's Office where she met with Lincoln Higgins and Kenneth Phillips.

Wilda denied that Sergeant Phillips brought up the idea of her meeting with appellant while wearing a wire. Rather, she said she insisted on meeting with appellant in exchange for meeting with Betty and Marie. Wilda denied that any of the officers instructed her on the questions that she should ask appellant. She learned about the storage shed after speaking to Marie and Betty. Wilda remained in Johnson City overnight after her meeting concluded on October 15. Sergeant Phillips took Wilda and Joy Gadd to a hotel. Wilda said Joy Gadd either paid for the hotel or was given money for the hotel. Wilda stated that they may have been given money for food, but she was not sure. She met with Betty and Marie again the following afternoon. She then returned to the Washington County Sheriff's Office.

Wilda acknowledged that on December 21, 2002, she sent an e-mail to Gertrude Lark in which she stated that she planned to request that the district attorney general allow her to meet with appellant in person and that she was "going to push every button [she could] to get [appellant] to tell the truth about everyone." Wilda also acknowledged that she had numerous conversations with appellant during which he implicated Daniel Foster.

Wilda stated that when appellant came to her house on October 4, 2002, the female in the Jeep covered her head when Wilda walked outside. Wilda said the female appeared to have blonde hair but noted that it was dark outside.

Investigator Todd Davis with the Washington County Sheriff's Office testified that he went to different stores in Johnson City searching for containers similar to those in which the victims' bodies were found. He found identical containers at Wal-Mart. The Washington County Sheriff's Office purchased a container, and he verified that it was identical in color, size, and shape to the containers found in the storage unit.

Josh Hopkins testified that in October 2002, he was working at the Johnson City Wal-Mart in store loss prevention. He was responsible for monitoring the video system in the store to apprehend shoplifters and investigate internal theft. In October 2002, officers from the Washington County Sheriff's Office contacted Mr. Hopkins regarding the homicide of the victims and requested that he research the purchase of fifty-gallon Rubbermaid storage totes. Mr. Hopkins was able to locate the times in prior days when the containers were sold and provided a printout to the sheriff's office.

Mr. Hopkins said he located a receipt dated October 7, 2002 at 3:51 p.m. Based upon the receipt, officers requested to see three items: a hatchet, the container, and a pair of shoes. To Mr. Hopkins' knowledge, Wal-Mart was the only retailer at that time that sold that particular type of container. Officers also asked about an air freshener product and provided Mr. Hopkins with search parameters. Mr. Hopkins said he found the air fresheners on the shelf and ran a transaction history on the sale of the air fresheners.

On cross-examination, Mr. Hopkins testified that he did not research whether the containers were sold in Chattanooga or north Georgia. He acknowledged that he did not know who purchased the items listed on the receipt.

Investigator Todd Hull testified that he had been an investigator with the District Attorney General's Office since December 2003 and had been an investigator with the Washington County Sheriff's Office before that. Investigator Hull said that in October 2002, he was called to Winged Deer Park at Boone Lake to investigate the discovery of human remains. When he arrived, he saw a human head floating in the water. The head was brought ashore shortly after he arrived. Investigator Hull recalled that one hand was later found adjacent to DeVault Bridge and that the other was found upstream. Investigator Hull took fingerprints from the two severed hands.

Investigator Hull stated that officers with the Bradley County Sheriff's Office provided him with a missing person report on Adam from Walker County, Georgia. While investigating that lead, Investigator Hull became aware of appellant, who was incarcerated at that time on a separate charge.

Investigator Hull recalled that Dr. Stephens spoke to Dr. Arpad Vass, a scientist at the Oak Ridge National Laboratory, who conducted "time since death" tests. Dr. Stephens collected samples from the victims, and Investigator Hull transported them to Oak Ridge. Investigator Hull noted maggot activity at Brentwood Drive and sent a photograph of the activity to Dr. Erin Watson, an entomologist.

Investigator Hull testified that he contacted loss prevention personnel at Wal-Mart regarding air fresheners that had been recovered during the investigation. Special Agent Oakley McKinney with the TBI provided Investigator Hull with a break down of the air fresheners, including the type and scent. Investigator Hull said he gave Mr. Hopkins the five types of air fresheners that were found in the storage unit and asked him to research them. Officers recovered two air fresheners of one scent, two of a second scent, and one of a third scent. Mr. Hopkins reported that he was unable to find a purchase for five with that combination but that he found a purchase of six air fresheners on October 7, 2002, that included that combination of five. Investigator Hull requested the video surveillance tapes

from the dates in question. He noted that the quality of the tape was poor and said he was not able to obtain any clues from the video regarding the identity of the person who purchased the items.

Investigator Hull stated during his investigation, he learned that officers with the Bradley County Sheriff's Office had the blue Jeep towed from the home of either Betty Willis or Marie Holmes. When officers first executed a search warrant at Brentwood Drive, only the red Jeep was there.

Investigator Hull testified that on October 14, 2002, Betty's residence on Brentwood Drive and Marie's residence on Lowell Street were searched. The Brentwood Drive home also was searched on October 17 and October 23. During the time that search warrants were being executed, officers also were attempting to obtain information from Betty and informed her of the possibility that she could be charged. During the search of the garage at the Brentwood Drive address, officers found wedding photographs taken in August 2002 that depicted the victims, appellant, appellant's daughter Kelly, and her husband. Investigator Hull explained that Kelly and her husband were married in a dual ceremony with the victims.

Investigator Hull testified that appellant was formally charged with killing the victims on October 23, 2002. Investigator Hull served the process on appellant and read the charges to him. Investigator Hull stated that appellant did not have a reaction. Rather, appellant only asked who his attorney would be and whether he could have lunch since he missed it as a result of the meeting.

Through Investigator Hull, the State entered transcripts of telephone calls between appellant and Betty Willis while appellant was incarcerated. During a telephone call on October 14, 2002, Betty asked appellant what to do about the furniture and said that it could not be moved. Betty stated, "It's padlocked." Appellant asked her whether it was because of the check. Betty said that she did not believe so and that she did not have $55.00.

On cross-examination, Investigator Hull testified that when the maggots at the Brentwood Drive address were found, officers from the Johnson City Police Department informed him that the house had been vandalized and the refrigerator had been turned over. On redirect examination, Investigator Hull stated that Betty died several months prior to trial.

Investigator Holly Jamerson with the Washington County Sheriff's Office testified that she was present during the execution of some of the search warrants at the Brentwood Drive address. She collected a can of air freshener from the bathroom. Several cans of the same brand of air freshener were collected from the storage unit. Investigator Jamerson noted that the air freshener was listed on a Wal-Mart receipt as being purchased with other

items of interest.  She and other officers went to Wal-Mart and looked for items on a particular receipt.  Investigator Jamerson had to enlist the assistance of the loss prevention employees who were able to pull the numbers and items that matched the items listed on the receipt.

Investigator Jamerson said she and other officers searched the garage.  She recalled a "stench" in the garage that was "terrible" and made it difficult to work.  When officers raised the garage door, they found a red fabric swatch where the garage door came down and met the concrete.  Investigator Jamerson stated that officers also found packets of notes and letters, a yearbook, and personal mementos that belonged to Samantha in the garage.  The personal belongings were found next to photographs of appellant with the victims that had been taken by Olan Mills.  Investigator Jamerson also collected cigarette butts from Betty's room.

On cross-examination, Investigator Jamerson testified that the air freshener can was collected from the residence on October 23, 2002.  She acknowledged that two search warrants had been executed on the house prior to October 23.  She stated that items were strewn throughout the house.  The bedroom was difficult to enter because it was dirty and things were in the way.  The cigarette butts were found on a dresser in the bedroom.

On redirect examination, Investigator Jameson testified that on October 23, the house was substantially the same from the time that the search warrants were executed on October 15.  No items were moved in between those dates.  On recross-examination, Investigator Jameson stated that officers conducted a thorough search of the house while attempting to maintain the integrity of the scene.  She also stated that she was able to walk into the bedroom without moving things around and climbing over anything.

Lieutenant Steve Sherfey with the Johnson City Police Department testified that in October 2002, he went to a home on Brentwood Drive and assisted officers from the Washington County Sheriff's Office in the execution of a search warrant.  While checking the area around the residence, Lieutenant Sherfey found a Rizinay 7.655 automatic pistol and a magazine in the grass between the Brentwood Drive residence and another residence.  He said he found the pistol near a garage or outbuilding and did not know who owned the property on which the pistol was found.  He spoke to a neighbor who lived beside the Brentwood Drive residence, and the neighbor denied that he had lost a gun.  Lieutenant Sherfey testified that he also found "three .32 round . . . unfired bullets" on the ground with the pistol.

Larry Hendrix testified that he lived on Lowell Street in Johnson City for twenty-one years.  He recalled an occasion in October 2002 during which officers woke him up and

informed him that they were conducting a murder investigation. The officers stated that they had found a pistol behind his garage and asked if they could search the area. Mr. Hendrix consented to the search. The officers asked him if he owned the pistol, and Mr. Hendrix told them that he did not. Mr. Hendrix testified that he would not have left the pistol outside where a child could find it or where it could be damaged by the weather.

Lieutenant Thomas Smith with the Carter County Sheriff's Department testified that in October 2002, he was assigned to the First Judicial Drug Task Force and assisted in executing a search warrant at the Brentwood Drive address on October 17, 2002. Lieutenant Smith found a box of .32 caliber Winchester ammunition in the attached garage. The ammunition was in a paper bag on top of a cabinet or dresser. Lieutenant Smith said the bullets appeared to be round-nosed and were copper colored.

In 2002 and 2003, TBI Special Agent Oakley W. McKinney was a forensic scientist who specialized in latent fingerprints. The trial court accepted Special Agent McKinney as an expert in the field of latent fingerprints. Special Agent McKinney identified a blue tarp that was seized from the storage unit. He testified that the tarp was somewhat shiny and appeared to have never been used. He developed a latent fingerprint from the blue tarp, which he identified as appellant's right thumb print. He stated that he was "positive beyond all shadow of doubt in [his] mind" that the print belonged to appellant. He also noted a possible shoe track on the tarp.

Special Agent McKinney testified that he compared the fingerprint impression of the unknown deceased female with the known impressions of Samantha and determined that they were the same person. He also compared the fingerprint impressions of the unknown deceased victim's severed hands with the known fingerprint impressions of Adam and determined that they belonged to the same person.

On cross-examination, Special Agent McKinney testified that he developed latent prints on other items and determined that those prints did not belong to appellant. He was not able to identify the person to whom the prints belonged. He tested three cartridges found in an outbuilding and did not find any latent prints. He also examined a pistol recovered from a neighbor's house and did not find any latent prints.

Special Agent McKinney was unaware of when the tarp was purchased but said that it was not soiled as if it had been used for years. He acknowledged that he could not determine whether anyone other than appellant handled the tarp or when appellant touched the tarp. He also acknowledged that he did not know where the tarp had been located when appellant touched it.

TBI Special Agent James Russell Davis II, testified that he was a forensic scientist assigned to the microanalysis unit in the crime laboratory and that he analyzed trace evidence. The trial court admitted Special Agent Davis as an expert in the area of forensic analysis. Special Agent Davis assisted in the execution of search warrants at the residence on Brentwood Drive and the storage unit.

Special Agent Davis testified that he collected paint, glass, and carpet standards from the den located in the rear of the house on Brentwood Drive. He collected two types of glass from the den. Both were tempered glass or glass used in windows in vehicles. One type of glass had black paint on it. He also collected a small partial florescent light bulb from the den floor.

Special Agent Davis stated that he collected four different designations of glass from outside the door of the den. Some were tempered glass, and some were milk glass or glass that had a milky white color. He also collected a large quantity of milk glass from the den floor. He noted that the milk glass that he collected from the doorway of the den had built in features that were fairly visible, raised, and had bumps or dots.

Special Agent Davis testified that while he was at the storage unit, he collected a piece of carpet that was in the container with Samantha's body. He observed in the carpet splotches that appeared to be paint. He removed the paint from the carpet for use by another analyst who performed paint comparison. He also peeled paint from the glass collected from the residence.

Special Agent Davis found textured milk glass from the carpet that he analyzed and determined was indistinguishable from the physical and elemental characteristics of the milk glass that he collected from the residence. He explained that his finding meant that the glass had to have come from the same item or an item with the identical physical and elemental composition. He stated that the milk glass recovered from the carpet did not have measurable optical properties because it was translucent.

Special Agent Davis said he collected tempered glass from the carpet that he determined met the same criteria as the tempered glass from the residence. He also said a piece of glass collected from the container matched the optical, physical, and elemental properties of the bulb collected from the Brentwood Drive residence.

Special Agent Davis stated that he saw two five-gallon containers of liquid at the storage unit. He collected a smaller sample of the liquid because he did not want to transport that much material.

Special Agent Davis testified that he collected carpet samples from the Brentwood Drive address and attempted to determine whether the edges of the piece of carpet recovered from the storage unit matched any of the carpet from the residence. He was unable to do this, so he sent the carpet to a fiber analyst.

Special Agent Davis collected a piece of rope that was tied around the storage container where Adam's body was stored. He also collected a piece of rope from the Brentwood Drive residence. There were small pieces of electrical tape on the ends of the rope collected from the house and on one end of the rope from the storage unit. Special Agent Davis said he attempted to put the pieces of electrical tape from the ropes back together but was unable to do so. He determined that the tape on the rope from the residence and the tape on the rope from the storage unit had the same dimensions, were made out of the same material, and had the same sort of adhesive. Special Agent Davis attempted to match the cut ends of the rope together but was unable to do so. He stated that both ropes were corded, were the same color, and were made from the same material.

On cross-examination, Special Agent Davis testified that the yellow rope was a plastic-type rope that is made throughout the world. He noted that the ropes were made from the same material, had the same weave, and had the same black tape on them. He acknowledged that he had seen people put electrical tape around the end of a rope to keep it from unraveling.

TBI Special Agent Randall Nelson was assigned to the trace evidence unit at the TBI crime laboratory and had specialized training in the area of paint evidence and ignitable liquids. The trial court admitted Special Agent Nelson as an expert in the field of paint analysis and flammable materials. Special Agent Nelson testified that in October 2002, he was asked to examine several paint samples and determine their composition. He was also asked to determine whether the samples taken from a container matched samples taken from a residence. Finally, he was asked to examine samples of liquid and to identify them.

Special Agent Nelson explained that when he analyzed paint, he examined the color, texture, layer structures, and the type of paint. He determined the "binder composition" or the portion of the paint that holds the "paint stuff" together and acts as an adhesive to the surface upon which the paint is applied. He also examined the pigment composition or the material that gives the paint a particular color or characteristic.

Special Agent Nelson stated that he analyzed a sample of white paint that was removed from milky glass taken from one of the containers in the storage unit, a sample of white paint removed from a piece of carpet found in the container, and a sample of white paint removed from milk glass that was collected from the back of the Brentwood Drive

residence. He concluded that the white paint taken from the milky glass found in the container had the same color, texture, type, binder composition, and pigment composition as the white paint sample collected from the residence. He explained that as a result, the paint sample from the milky glass found in the container could have come from the same source as the white paint from the residence or another source with the same paint history. Special Agent Nelson also concluded that the white paint from the carpet had the same color, texture, type, binder composition, and pigment composition as the white paint sample collected from the residence. He stated that as a result, the paint sample from the carpet could have come from the same source as the white paint from the residence or another source with the same paint history.

Special Agent Nelson testified that he was asked to analyze two cans of liquid. He said his analysis of both containers revealed the presence of kerosene range dissilient. Liquids in the kerosene range include, but are not limited to, kerosene, number one fuel oil, jet aviation fuel, some types of charcoal starters, some types of torch fuels, some types of paint thinners, some types of solvents for insecticide, and some types of lamp oils. Special Agent Nelson stated that the liquid samples were flammable.

On cross-examination, Special Agent Nelson testified that the paints did not appear to have been applied to a surface but were more likely the result of a spill. He stated that because the texture of the paint was rough and bumpy, it was difficult to determine whether the paint was glossy or flat. He also stated that all of the paint cans that were filled with that one batch during the manufacturing process would be the same and that the amount of paint cans filled with that batch would be numerous.

Dr. Arpad Vass, a senior research scientist at Oak Ridge National Laboratory, was admitted as an expert in "time of death" methodology. Dr. Vass testified that he was provided tissue samples related to the investigation into the victims' homicides. The samples were in plastic zip-lock bags and were on ice. Dr. Vass noted the importance of storing the tissue on ice, explaining that the cold temperatures slowed down the decomposition process. He stated that his role was to determine the length of time since the victims died based upon a chemical analysis of the tissues.

Dr. Vass testified that the soft tissue of the human body is composed of four classes of compounds. The first category is proteins, which make up about 40% of the body mass in terms of soft tissue. The building blocks of protein are amino acids. The second category is nucleic acids, which is genetic material in the cells of the body. The third category is polysaccharides, which are long carbon structures such as sugar or glucose. The fourth category is lipids or fats, which are more varied in the body. Dr. Vass explained that decomposition tended to break large complex macromolecules, proteins, and polysaccharides

into their building blocks. This decomposition is completed through enzymatic action using the same types of enzymes that digest food.

Dr. Vass stated that he searches for and identifies the building blocks of the cytoplasm of the cell and quantifies the amount of building blocks in each cell. He explained that each organ has a unique ratio of these building blocks and that the amount of building blocks present is dependent upon three things: temperature, the type of tissue, and the water content. Dr. Vass noted that because the liver has many enzymes, the rate of decomposition in the liver will be faster than heart or kidney tissue. He also noted that the higher the water content in the organ, the faster the decomposition rate.

Dr. Vass testified that he took a small portion of the tissue sample that he received and ground it in a tissue grinder. He stated that this grinding broke down the membranes in the cells and released the cytoplasm where the building blocks were located. Using a centrifuge, he then spun out all of the cell membranes and cell components that were not useful. He siphoned off the fluid that contained the building blocks. The building blocks then went through a chemical process where they were prepared to be injected onto a gas metagraph mass spectrometer. The instrument identified and quantified the amount of building blocks in the sample.

Dr. Vass said he generally chose five organs in the body on which to conduct the analysis. In this case, however, he only received liver and kidney samples from each victim. He believed additional samples were not collected due to the trauma to the victims' bodies. He said this did not affect the results except that the postmortem interval was not quite as narrow as it could have been.

Dr. Vass testified that Samantha's kidney and liver samples were identical in terms of the number of building blocks for which he was searching. Once he analyzed the identity and number of building blocks, he compared the different building blocks to each other within each organ. Dr. Vass said that the liver has high enzymatic content, which is important in analyzing early decomposition events, and that kidney tissue does not have as many enzymes or water, which is important in analyzing later decomposition events. Dr. Vass identified the amino acids that were important and determined the range value, which corresponded to cumulative degree hours ("CDH"). He explained that CDH is on a twelve-hour time scale and is more sensitive than a daily time scale. He then compared the building blocks of the various organs to the CDH values to determine a range. Dr. Vass said the ranges of Samantha's liver and kidneys were identical. He estimated that Samantha's time of death was between October 6 and October 8, 2002.

Dr. Vass testified that the values of Adam's kidney were essentially identical to Samantha's values. Dr. Vass stated that these identical values established that his temperature calculations were correct. It further established that the trauma in the area of the liver and kidneys was relatively insignificant. More severe trauma would have affected the result. Dr. Vass noted that Adam's liver results were much higher than any of the other samples. Dr. Vass explained that the liver is a good indication of the earliest time since death and that Adam's liver was more decomposed than the other tissue samples that he analyzed. Dr. Vass stated his analysis of Adam's liver sample revealed that Adam died much sooner than Samantha. Dr. Vass estimated Adam's time of death as between October 4 and October 8, 2002.

On cross-examination, Dr. Vass testified that his report included temperatures that were collected at the storage facility in January 2003. He stated that he needed to know the temperatures at the crime scene. Because the time in which the victims had been discovered had passed, he had to collect the data regarding the temperatures at that time from the National Weather Service Station. Dr. Vass used the temperatures collected at the crime scene and compared them to the National Weather Service data to obtain a collection factor. He applied the collection factor to what he believed to be the temperatures at the storage unit at the time in which the victims were discovered based upon the National Weather Service data.

Dr. Vass testified that the high and low temperatures for each day were recorded. He considered the temperatures in the storage facility beginning on October 4 because that was the day on which the victims were last seen alive. Dr. Vass stated that the fact that the storage facility was not rented until October 10 had no bearing on his conclusions. He did not know how or where the victims' bodies were stored prior to October 10.

Dr. Vass stated that three groups of temperature data were used: (1) the temperatures from the storage unit; (2) the temperatures from the morgue where the victims' bodies were maintained following their discovery; and (3) the temperatures of the samples after Dr. Stephens collected and froze them. Dr. Vass said that enzymatic activity essentially ceased at the temperature at which Dr. Stephens froze the samples and that as a result, the freezing of the samples had no influence in the decomposition rate. Dr. Vass also said that "as far as [he was] aware," the temperature data in the storage facility was correctly adjusted for changes that might have occurred.

Dr. Vass testified that if the victims were killed in north Georgia rather than Johnson City, he believed that they were killed together since the kidney samples were identical. The CDH range would have been the same but the dates may have been different. He said the data would have continued to show that Adam was killed first. Dr. Vass stated that it was

highly unlikely that Adam died within a few hours of Samantha due to the large difference between Adam's liver sample and kidney sample. Dr. Vass also stated that the fact that Adam's kidney sample matched Samantha's kidney and liver samples indicated that they tracked each other in terms of the environmental temperatures in the place where their bodies decomposed.

Dr. Vass testified that he could not determine how his report would differ had the victims been seen in north Georgia on October 6 without temperature data. He said the CDH values would not have changed.

Dr. Erin Watson, an entomologist, was accepted by the trial court as an expert in entomology and estimation of time of death. Dr. Watson studied flies to estimate the time of death. She testified that blow flies, flesh flies, and musket flies generally arrived the earliest. She stated that those specimens that arrived the earliest in theory would be established with the corpse the longest and would be the closest estimation of the minimum amount of time since death. This amount of time relates to the minimum amount of time that those insects could have gotten to the body and associated themselves with the body or laid eggs.

Dr. Watson testified that if flies arrived first, they laid their eggs in natural orifices such as the eyes, the ears, the nose, the mouth, the anal or vaginal regions if exposed, and any bodily wounds. Once the flies laid eggs, the life stages attached to temperature because they are cold-blooded organisms. Dr. Watson said the temperatures are referred to as ambient temperatures because the rate of development of the flies is associated with their micro habitat and temperature.

Dr. Watson stated that in analyzing the time since death, she first identified the specimen. She then referred to published data regarding the specimen's development rates. She next determined the life stage of the specimen. Dr. Watson said that once a fly lays eggs, the eggs become larvae or maggots, then pupae, and finally a mature fly. The flies have three feeding "instars" and then bed down to form pupae. Once they become pupae, they undergo a coloring or tanning of the outer skin. Finally, she examined the ambient temperature associated with the crime scene. When conducting her analysis, Dr. Watson needed specimens that were both alive and dead. She said it is easier to identify the species and stage of development if the specimen is alive. Dr. Watson spoke to Special Agent Drolshagen prior to and during the collection of the evidence.

Dr. Watson viewed photographs of the house on Brentwood Drive and stated that due to the trash and potentially leftover food, a small fly infestation was likely. Dr. Watson viewed another photograph of the residence that she said showed blow fly pupae and

dehydrated fly larvae. She said blow flies are most often associated with decaying animal material. Rotting food attracts smaller flies such as the phorid.

Dr. Watson testified that the storage unit was very well-sealed for the most part. Rope was coming out of one of the containers, and the lid had lifted just enough that a few fly larvae had exited. Live fly larvae were collected and sent to Dr. Watson. Dr. Watson stated that she allowed the larvae to mature into adults and discovered that they were blow flies. She noted that the floor of the storage unit was clear and that only five larvae were collected from the floor. She explained that if the storage unit did not have a fairly well-sealed door, flies would have entered the unit because they have a very keen sense of smell. Dr. Watson believed she would have seen more insect activity on the cement floor had they been able to get in and out of the unit. She noted blood spatter coming out of the container where Adam's body had been found. She stated that if the flies had been able to readily enter the storage unit, they would have been "lapping up" those fluids.

Dr. Watson testified that the fly specimen in the container with Adam's body originated from the house. She explained that this did not mean that the blow flies were in the house prior to Adam's death. Rather, it meant that before the container was sealed, the insect evidence associated with the body was in the container. Dr. Watson said the rate of decay or the amount of tissue that had been consumed was very minimal. No empty pupae casings or newly emerged adults were found. If they had emerged from the pupal case but could not get out of the container, officers would have noted dead flies in the container at the time of collection.

Dr. Watson stated that when fly larvae are feeding on tissue, they are in a developmental stage and will remain close to the tissue to continue to feed. When the larvae are ready to migrate away in the prepupal stage, they are still in the third instar but have stopped eating. They try to find somewhere to bed down and form the pupal case. Dr. Watson said there were pupae all within the container with Adam's body, and the pupae were in different stages. There were prepupal and third instar larvae feeding, but they were in all the layers of the fabric.

Dr. Watson said the majority of the flies in the container with Samantha's body were still in the feeding stage. She stated that the container with Samantha's body did not have the same collection of insect evidence as the other container. Dr. Watson said this indicated that the insect evidence in the container with Samantha's body was in a younger developmental stage. When the lid of the container with Samantha's body was removed, the fabric did not have the obvious fly larvae migrating around the top surface, and the container had no evidence of the presence of pupae developing into the adult fly. Dr. Watson noted that the center layer of the container with Samantha's body had blow fly larvae that were

-33-

actively feeding. Some blow fly prepupal that were migrating were collected in another layer of fabric.

Dr. Watson testified that a great amount of soft tissue was remaining on Samantha's body. She explained that one of the key forces for decomposition of tissue is the consumption of the tissue by fly larvae. Tissue in the head region will normally be seen if no additional flies are arriving and the maggot mass is not increasing. Dr. Watson said that if there had been no barrier to those flies, the head would have been skeletonized, and more tissue would have been consumed.

Dr. Watson testified that the lack of pupae in the container with Samantha's body demonstrated a time difference between the two containers. The bodies were in the same storage unit, were in the same type of container, and had wounds to the head. Dr. Watson said that as a result, she would have found numerous similarities in the containers had there not been a time difference between when the bodies were available to the insects.

Dr. Watson stated that Samantha's body and the fabric above her body had Phoridae pupae, which are small flies associated with different types of organic, vegetative, or animal material. Blow fly pupae in different colors and ranges of different days were in the container with Adam's body. Dr. Watson said no blow fly pupae were in the container with Samantha's body. Dr. Watson also said the blow fly pupae associated with the house most likely migrated from a soiled food source.

Dr. Watson testified that the ambient temperatures were obtained from the Tri-Cities Airport, which was twelve to fifteen miles away. Internal temperature data was recorded from the storage unit, and Dr. Watson made a correction factor based upon the ambient temperature provided by the Tri-Cities Airport. She said the correction factor was approximately seven degrees warmer in the container in the storage unit than outside the storage unit. She noted that it was October and much cooler outside. She stated that the fluctuation from outside the storage unit was less than it would have been in the summer when the inside of the metal storage unit would have been much warmer.

Dr. Watson estimated Adam's time of death as between October 6 and October 8, 2002. She said Adam possibly could have died as early as October 5. Dr. Watson estimated Samantha's time of death as between October 7 and October 10, 2002. Dr. Watson said, "There is no doubt in my mind that Adam was killed before Samantha." She also said there was approximately one and one-half days difference between the time that Adam was killed and Samantha was killed.

On cross-examination, Dr. Watson testified that when she spoke to Special Agent Drolshagen in 2002, she instructed him to collect temperatures at the storage facility. She said that the storage unit was already sealed off and that the container had been removed from the unit. Dr. Watson stated that the unit was not re-opened until January 2003 and that Special Agent Drolshagen was able to enter the unit at that time and record the temperatures.

Dr. Watson was unaware that the storage unit was not rented until October 10, 2002. She believed that the victims' bodies were placed in the containers shortly after their deaths due to the limited amount of insect activity. The containers were physical barriers against additional flies getting near the bodies and laying eggs.

Dr. Watson testified that had the victims been seen alive in north Georgia on October 6, this factor would not have had a great bearing on her opinions regarding temperature conversions. She used a correction factor for the difference between the temperature inside the storage unit and the temperature from the airport. She did not take into account the containers resting on concrete because she did not feel that was an issue. On redirect examination, Dr. Watson testified that Special Agent Drolshagen recorded temperatures at the storage unit at 3:00 p.m. each day from January 9 to January 12, 2003.

TBI Special Agent Don Carman, a forensic scientist in the firearms identification unit, was accepted by the trial court as an expert in the field of ballistics. Special Agent Carman testified that he received one box of Winchester .32 automatic caliber ammunition. The box contained thirty-nine .32 caliber automatic full metal jacket cartridges. All but two of the cartridges were manufactured by Winchester, and the remaining two cartridges were manufactured by Remington.

Special Agent Carman testified that he examined the ammunition in conjunction with three other unfired cartridges found at another location to determine whether any linkage or possible similarities in the manufacturing marks existed. Special Agent Carman examined the bunter mark impressions on the base of the cartridges. He explained that bunter marks appear in different forms and that the bunter marks on the cartridges that he examined were parallel markings. He stated that Winchester could produce more than 100,000 cartridges per day before changing out the bunter. He also stated that the bunter markings change over a period of time as the bunter is working. He determined that the cartridges found with the pistol and the cartridges in the box were hit by the same bunter tool.

Special Agent Carman testified that he analyzed a semi-automatic pistol and a magazine that held approximately nine cartridges. He said the pistol was very old and that he was unable to identify the manufacturer. He believed the pistol was of Spanish origin but acknowledged that he was unsure. He said he loaded the gun with four Winchester .32

caliber cartridges and shot them into a test tank. Special Agent Carman identified the bullet retrieved from Samantha's body. He examined the bullet in conjunction with the test bullets that he fired with the pistol. He determined that the bullet found in Samantha's body was fired from that pistol.

TBI Special Agent Bradley Everett testified that he was assigned to the serology/DNA unit. The trial court accepted him as an expert in the fields of forensic serology and forensic DNA testing. Special Agent Everett conducted DNA testing on a cigarette butt collected from the residence at the Brentwood Drive address and found that the DNA profile on the cigarette butt was consistent with the DNA of a female offspring of Patty Leming.

Special Agent Everett stated that he conducted DNA testing on three other cigarette butts from the Brentwood Drive address. He designated the cigarette butts as A, B, and C. He said that the DNA profile on cigarette butt A was consistent with the DNA profile of the female offspring of Patty Leming. The DNA profile from cigarette butt C was a mixture of more than one person. The major contributor was consistent with the DNA profile of a male offspring of Teresa Chrismer. Special Agent Everett did not have sufficient information to identify the second contributor. The DNA profile from cigarette butt B was also a mixture of more than one person. The DNA profile was consistent with a mixture of the contributor from cigarette butt A and the major contributor from cigarette butt C.

Special Agent Everett testified that he received a Sears Craftsman sixteen-inch electric chainsaw for testing. He swabbed different areas of the saw in an attempt to collect a sample. He stated that the presumptive test indicated the presence of blood and that additional tests indicated the presence of human DNA. He did not obtain a DNA profile due to an insufficient amount or degraded DNA. He noted that the chainsaw was rusty and that the same environmental factors that rusted the chainsaw also degraded the DNA. He explained that dirt or grease also will inhibit the process of obtaining a DNA profile and stated that the swabs that he collected were very dirty.

On cross-examination, Special Agent Everett testified that he tested the red Jeep and did not find anything linking appellant to the Jeep. He also tested the blue Jeep and determined that stained fabric on the driver's side had appellant's blood on it. Special Agent Everett said he did not find anything in either Jeep linking them to the victims.

Special Agent Everett testified that he conducted DNA testing on an envelope addressed to Betty Hawk. The DNA profile obtained from the envelope was consistent with the DNA of a female offspring of Patty Leming. Special Agent Everett noted that the envelope was postmarked October 8, 2002.

Special Agent Everett said that debris was on the chainsaw but that he did not visually identify any of the material as tissue. He did not find any of the victims' blood on appellant's shoes or clothing or on any of the items that he tested from the Brentwood Drive address.

TBI Special Agent Linda Littlejohn testified that she was employed in the microanalysis section and examined evidence related to fiber comparisons, physical comparisons, and shoe print comparisons. The trial court accepted Special Agent Littlejohn as an expert in these areas. Special Agent Littlejohn stated that she compared a sample of a jacket removed from a body that was in a container with a piece of fabric that was collected from the floor of a garage. She determined that the characteristics of the two samples were consistent and that they had a common origin.

Special Agent Littlejohn examined numerous pieces of fabric and fiber bundles that were on a chainsaw. She determined that the material had characteristics that were consistent with the jacket from the container and that they could have had a common origin.

Special Agent Littlejohn compared a piece of carpet collected from the Brentwood Drive address with a piece of carpet collected from inside a container. She determined that they had consistent characteristics. She stated that the pieces could have had a common origin or could have come from another type of carpet.

Special Agent Littlejohn analyzed a partial shoe print found on a tarp. She compared it to a pair of shoes from Betty Willis and a pair of shoes from appellant. Special Agent Littlejohn said that the shoes were inconsistent with the partial shoe print with respect to tread design. She also said that as a result, neither pair of shoes could have made the print.

**Defense Proof**

Dr. Robert Allen testified that Betty Willis was his patient and was hospitalized on September 15, 2002. Dr. Allen said that Betty felt that she was being watched, was very anxious, and was not sure where she was. He referred to Betty's behavior as "psychotic."

Dr. Allen testified that in 2002, he lived two houses down from Betty. He said that in mid-September, he entered her home and saw that it had been "ransacked." Slogans were spray painted on the wall in a foreign language. The appliances were turned over, and the toilets were damaged. The refrigerator had been turned over, and there were food particles, insects, and maggots on the floor. Dr. Allen stated that the house was not livable and that Betty was having trouble getting the insurance company to cover the damage. She had Dr. Allen look at the house and write a letter to the insurance company describing its condition.

On cross-examination, Dr. Allen testified that although Betty had anxiety issues, she usually was not as paranoid or as irrational as she was during her hospitalization. He stated that Betty had issues with many of her neighbors but that he seemed to get along well with her.

Appellant recalled Special Agent Drolshagen as a witness. Special Agent Drolshagen testified that Dr. Watson requested that he record temperatures at the storage unit in January 2003. He did not recall her asking him to record the temperatures when he collected the larvae in October 2002.

Special Agent Drolshagen testified that he purchased a thermometer that measured temperature and humidity and placed it on the floor of the storage unit where the containers had been. He left the thermometer there for twenty-four hours, went to the storage unit for four straight days, and noted the high and low temperatures for each twenty-four-hour period. The thermometer was not removed from the storage unit, and Special Agent Drolshagen had the only key to the padlock and was the only person who had access to the unit.

Dr. Neal Haskell, an international forensic entomology consultant, was accepted by the trial court as an expert in forensic entomology. Dr. Haskell testified that a "major fatal flaw" in Dr. Watson's analysis was her attempt to correlate the temperatures from the weather station with the temperatures from the storage unit during a completely different season of the year with different temperatures, solar inputs, and other environmental considerations. Dr. Haskell stated that as a result, he did not know at what temperatures that the insects were growing.

Dr. Haskell testified that Dr. Watson erred in using only four data points of temperature measurements from the storage unit when a full weather cycle had not been completed. He explained that the temperatures were taken when the ambient temperatures were declining. A cold front had moved through, and insufficient data was collected to obtain the upswing of the temperatures after the cold front had passed.

Dr. Haskell stated that Dr. Watson used a correction factor in calculating the temperature that the victims' bodies were subjected to in the storage unit for days during which the bodies were not actually in the storage unit. Dr. Haskell explained that an entomologist needs to know the temperatures at the micro-environment where a body is stored and not just the weather station ambient temperatures. He further explained that if an entomologist does not know where the body was stored and the range of temperatures to which the insects were subjected, he or she cannot estimate the length of time that the body was there. He was unsure that there was any evidence of where the victims' bodies were

stored prior to being placed in the storage unit. He said that as a result, the analysis could not be completed.

Dr. Haskell said Dr. Watson used the specific species Megaselia scalaris data for an unidentified fly of that family. Dr. Haskell noted 250 or more species of that family existed. He said it was inappropriate for Dr. Watson to use a data set for a specimen when she did not identify the specific species. He also said that it was important to have the species identified so that the correct growth data tables would be used. If the entomologist does not know the species, he or she cannot use the data from another species of the same group.

Dr. Haskell testified that when Dr. Watson recorded the hatching of new flies, she did not record the temperatures at which the flies grew and development progressed. He said that as a result, he had no way of determining how far along into the stages of development that they were. He estimated that they were at the earlier part of the puparia stage. He stated that at eighty degrees, it would take fourteen and one-half to fifteen days for a black blow fly to develop from an egg to a fly. At sixty degrees, it could take twenty-eight to thirty days. He said that as a result, temperatures are critical in judging the rate of growth. He stated that while he did not view the specimens collected, he was confident that Dr. Watson correctly identified two blow flies and assessed their life stages.

Dr. Haskell testified that Dr. Watson calculated 104.8 degree days for assessing the life stage of the puparia of the black blow fly. Dr. Haskell stated that degree days are generally given in ranges. He also stated that the range of degree days for the puparia was between 130 and 140 and up to 160 to 180. Dr. Haskell said that Dr. Watson was "way off" from what the calculated numbers should have been and that he did not know how she calculated her value.

Dr. Haskell testified that Dr. Watson assumed that the phorid fly arrived immediately following death. Dr. Haskell stated that extensive research has established that the phorid fly arrives later in the progression of decomposition. He said several days would have had to have passed before the fly arrived. He explained that there can be a difference between the time of death and the time of insect colonization. Dr. Watson, however, assumed immediate colonization. Dr. Haskell stated that "it is absolutely impossible to give a reliable and trustworthy estimate of when these bodies were colonized based on temperatures and the insects that are involved." He testified that if the insects had colonized on meats and other food from the refrigerator prior to the victims' deaths, he did not believe that an entomologist could differentiate between the flies that originated from the meat and other food and the flies that originated from the bodies. Dr. Haskell disagreed with Dr. Watson's statement that even if the bodies were only in the storage unit since October 10th, it did not have any effect on her analysis.

On cross-examination, Dr. Haskell acknowledged that he did not examine any of the evidence other than the reports and did not view the samples that were collected. He said that had he viewed the samples, he may have been able to provide an opinion regarding the intervals between the deaths of the victims.

Dr. Haskell testified that his primary issue with Dr. Watson's analysis involved the temperatures. He said it would have been more important to take the temperatures in October 2002 when the bodies were discovered. When he finds temperature discrepancies, he generally waits until the anniversary date or close to it to take temperatures. As a result, he would have waited until the following October and a number of additional Octobers to measure the temperatures.

Dr. Haskell stated that Dr. Watson did not use ambient temperatures in her analysis. Rather, he said she used ambient temperatures and a correction factor based upon the temperature readings in January and for the entire period without taking into account the days that the victims' bodies were not in the storage unit. Dr. Haskell acknowledged that he was not provided with everything that Dr. Watson had provided to the jury in explaining her analysis, including a table regarding temperatures in October 2002. He stated that had he had access to all of the tables that Dr. Watson prepared, it could have made a difference in his opinion regarding her analysis. Regardless, Dr. Haskell did not believe that he could say that the victims were killed at different times.

Dr. Haskell testified that the metal walls in the storage unit could have made the temperatures in the unit considerably warmer than the ambient temperatures. He also testified that if the victims' bodies were in the house where flies were present due to the decaying food, the flies would have reached the bodies quicker.

Dr. Haskell testified that Dr. Vass's work was also dependent upon the temperatures. Dr. Haskell said that if the temperatures were flawed, Dr. Vass's analysis also would have been problematic. Dr. Haskell stated that he knew Dr. Vass and respected his opinion.

On redirect examination, Dr. Haskell testified that in determining the temperatures in the storage unit, various factors must be considered, including the type of roof, the location of the unit in the facility, whether the unit faces north or south, any insulation, the flooring, and whether the renter in the next unit operates a heater. Dr. Haskell said that as a result, Dr. Watson could not properly calculate the temperature to which the bodies were exposed using the temperatures at the airport.

Pamela Marsh testified that she was a manager of a trailer park and rented a trailer to the victims on or about September 23, 2002. A few days after the victims moved in, Mrs.

Marsh and her husband helped them move a sofa bed into the trailer. Mrs. Marsh said that around 6:30 p.m. on October 4, 2002, Adam came to her house and used the telephone. Adam was standing outside on the porch talking on the telephone when Mrs. Marsh heard him say, "[M]omma, I want to come home." Mrs. Marsh shut the door so that Adam could have his privacy. Mrs. Marsh stated that at approximately 10:30 p.m. that evening, Adam came to her house and turned in the keys to the trailer. Adam told her that he had a sick grandmother in Virginia and that they planned to move in with her. Mrs. Marsh said she later learned from Adam's mother that Adam did not have a grandmother in Virginia. Mrs. Marsh stated that while Adam was talking to her and her husband outside on the porch, their security light came on. A vehicle pulled up, and the security light shined into the window of the vehicle. Mrs. Marsh said she saw appellant sitting in the vehicle. She told an investigator that the vehicle was either blue or gray and that she did not know whether the vehicle was a truck, van, or Jeep.

On cross-examination, Mrs. Marsh testified that she was unsure of the date on which the victims moved the sofa bed into the trailer but that she believed that it was September 28. When she assisted them in moving the sofa bed, she saw that the victims had quite a few things inside the trailer. Following the victims' disappearance, Mrs. Marsh returned to the trailer to clean it out so that she could rent it to someone else. She said the sofa bed, a chair, a mattress, and "little knick-knack things" were still in the trailer.

Mrs. Marsh testified that she told officers that appellant was with the victims when they rented the trailer. She also told officers that they looked at the trailer and said they wanted to rent it. She said she learned from the victims that they were married and instructed them to return to sign a contract. Mrs. Marsh informed officers that while the victims reviewed and signed the lease, appellant walked around the trailer and inspected the property. Appellant walked behind the dumpster and into the woods. Mrs. Marsh also informed officers that Samantha went outside and got $190.00 for the deposit from appellant. Adam, Samantha, and appellant then left together.

Mrs. Marsh stated that while she had said that Adam was at her house around 10:30 p.m., she noted that it was dark outside. She noted that in early October, it becomes dark at around 6:00 or 7:00 p.m. When Adam left with appellant, Mrs. Marsh did not see anyone else with them. Mrs. Marsh said that although she later learned that the vehicle that appellant was driving did not belong to him, she saw appellant's face twice inside the vehicle.

Investigator Keith Fretwell with the Bradley County Sheriff's Office testified that in October 2002, he came to Washington County to assist other investigators from Bradley County and to serve a federal warrant on appellant. Investigator Fretwell stated that if he had previously testified that appellant was arrested on the night of October 11, 2002, he does not

-41-

disagree. He did not recall hearing that appellant asked for an attorney at the time of his arrest.

Brandon Chancy testified that in 2002, he worked on Betty Willis's jeep and observed her ability to pick up heavy objects. He saw Betty pick up a container filled with tools, chains, and ropes. Mr. Chancy said the container was so heavy that he could not lift it. He also said that Betty was approximately seventy-one years old at the time.

Mr. Chancy stated that in 2002, his name was on the title to a blue Jeep Cherokee, which was impounded by Detective Efaw around the same time that appellant was arrested. Mr. Chancy said that it took approximately five years for the officers to release the Jeep and that they did not find any evidence in the Jeep to use in their case. He stated that around the time that the Jeep was impounded, a large side window was broken out of it. He used a blue tarp to cover up the "busted" window. When the tarp was not used, he folded it and kept it in the cargo area.

On cross-examination, Mr. Chancy testified that the window in the Jeep was broken out in August 2002. He only covered the window when it was raining. He acknowledged that the tarp was exposed to dirt, wind, and other environmental elements. Mr. Chancy said the tarp remained in the Jeep until it was impounded. He further acknowledged that he was married to appellant's daughter.

Appellant recalled Larry Scott Miller as a witness. Mr. Miller examined a letter and an envelope in 2003 at the request of the Washington County Sheriff's Office. He stated that the letter was authored by Samantha and identified the writing on the envelope as belonging to Samantha.

On cross-examination, Mr. Miller testified that he was unable to determine when the letter was written. He explained that such a determination required ink dating, which is highly unreliable. He also did not know who mailed the letter. He stated that according to the postmark, it was mailed on October 8, 2002, from Chattanooga.

Thomas John Hathcock testified that he last saw Samantha on Tuesday, October 8, 2002, three days before the victims were reported missing, at the trailer that he, Daniel Foster, and Alisha Foster had rented in Hunter Hill Trailer Park in Rossville, Georgia. On cross-examination, Mr. Hathcock testified that he was not present when the victims' parents completed missing person reports. Rather, he learned that the victims were missing from a news report. Mr. Hathcock stated that when he saw Samantha, her hair was blondish-brown with more blonde than brown. He said that Samantha dyed her hair often and that it could have been light brown.

-42-

Steve Holmes, appellant's cousin, testified that the majority of his contact with Betty Willis was unpleasant. He said that when Betty moved in with his grandmother, he did not allow his daughter to visit his grandmother when Betty was there. Mr. Holmes stated that Betty was a very violent person and that he had to disarm her on two prior occasions. He recalled that when he was in his late teens, Betty threatened to kill his mother and grandmother. Mr. Holmes and his father went to the apartment where Betty was living to disarm her. The second occasion occurred at the Brentwood Drive address when Mr. Holmes was twenty-four or twenty-five years old. Mr. Holmes said Betty put both him and his father against the wall before they were able to disarm her.

Mr. Holmes testified that Betty's behavior never changed. He recalled when appellant moved away from the area for a short time. Mr. Holmes said that when appellant came to visit, appellant avoided Betty. Mr. Holmes also said that Betty was prescribed medicine for schizophrenia but did not take it often.

Brenda Holmes, Mr. Holmes's wife, testified that one to five days following appellant's arrest in October 2002, Betty Willis came to her house and said that appellant had asked for a few items. Betty requested a television set, bolt cutters, a saw, and a dolly to load heavy items. She also wanted to borrow Mr. Holmes's tool box. Mrs. Holmes believed that Betty needed many of the items to clean her house. Mrs. Holmes said she did not allow Betty to borrow anything because she knew that Betty would not return them.

Mrs. Holmes testified that Betty's arms were scratched and that Betty appeared to be in shock and scared. Betty was in a hurry to complete the tasks requested by appellant. Mrs. Holmes described the scratches as bloody and scabbed over. Betty told Mrs. Holmes that before appellant's arrest, she and appellant were arguing over something that she did not want appellant to do. Betty also told Mrs. Holmes that appellant had a "hot temper."

Mrs. Holmes stated that two large gas cans that they kept in the garage were found to be missing. One can contained gasoline, and the other can contained kerosene. Mrs. Holmes did not see Betty take them. Mrs. Holmes testified that Betty was paranoid and schizophrenic and that she never saw Betty take medication.

On cross-examination, Mrs. Holmes testified that Betty did not specifically request bolt cutters but requested "big wire cutters." Betty also said she wanted to move her refrigerator. Betty told Mrs. Holmes that there was blood on her carpet and that she did not know how it got there. Betty also stated that maggots were on the carpet. Mrs. Holmes said this conversation occurred around the same time that the news reported the discovery of body parts at a lake.

On redirect examination, Mrs. Holmes testified that appellant called her a few times while he was incarcerated. Mrs. Holmes said appellant was able to use a telephone where the calls were not recorded. She stated that when he called, the telephone number of an office appeared on her caller "ID." Most of appellant's calls to her were after October 2002. Appellant also had friends call and leave messages.

Marc Caudel, the defense investigator, testified that he contacted Mrs. Holmes the night prior to her testimony. Mrs. Holmes told him that Betty came to her home one or two days following appellant's arrest. Mrs. Holmes stated that Betty appeared disheveled and anxious and had scratches on her arms. Betty wanted to borrow multiple items, such as a dolly, a power saw, bolt cutters, and an assortment of other tools. Betty also mentioned that she wanted to get a television for appellant. Mrs. Holmes said she called her husband, who was working in Alabama, and he told her not to give Betty any of the items. Mr. Caudel testified that Mrs. Holmes did not tell him that Betty stated that she was there at appellant's direction or that Betty said appellant had a bad temper. Mrs. Holmes did not mention to Mr. Caudel how Betty got the scratches. Mrs. Holmes just described the scratches to Mr. Caudel and said that Betty had blood on her.

Mr. Caudel stated that Mrs. Holmes expressed her displeasure in testifying. She told Mr. Caudel that she would not testify to help the defense. As a result, Mr. Caudel had to subpoena her to secure her presence at trial.

Appellant recalled Investigator Todd Hull who testified that appellant was incarcerated beginning October 11, 2002. On October 14, Sergeant Phillips and a detective from Bradley County monitored telephone calls, and recordings of the calls were obtained later in the month. Investigator Hull said telephone calls made in the holding cell area were recorded. He did not believe that inmates would be allowed to make telephone calls from the booking desk. He did not recall any telephone calls that appellant made from the jail that were not monitored. Investigator Hull stated that during the calls that officers knew that appellant made, he never heard appellant instruct Betty Willis to gather any tools.

On cross-examination, Investigator Hull testified that the padlock that was on the storage unit was removed using a set of bolt cutters. He said that when officers did not have a combination or key to a padlock, they generally used bolt cutters to cut through the lock. On redirect examination, Investigator Hull stated that he was unaware of appellant's asking Betty to cut a lock off.

Officer Petty Allen testified that in 2002, he was employed at the Washington County Detention Center. He stated that pod C9 was a lockdown pod where the inmates remained on lockdown twenty-two hours per day. During the two hours that the inmates were not on

lockdown, they could use the telephone. Officer Allen stated that in 2002, the jail used an Ever-Com telephone system and that most telephone calls were recorded. He also stated, however, that the inmates found ways to manipulate the system so that their calls would not be recorded. He said inmates could use the telephones in the office when they needed a bondsman, there was a death in the family, or there was an immediate emergency.

On cross-examination, Officer Allen testified that the inmates were unable to make a collect call to a cellular telephone number. As a result, the inmates would call someone on a landline and have the person make a three-way call for them. Officer Allen stated that the telephone system did not always record the third-party calls. It was a flaw in the system in 2002 that had since been corrected. He explained that when a third-party call was being made, the caller "ID" of the third party would show a telephone number other than the number from the jail. He said that as a result, it was possible that appellant could have talked to people without being recorded.

### State's Rebuttal Proof

The State recalled Patty Leming as a witness. Ms. Leming testified that she last saw Samantha on October 4, 2002. When Ms. Leming first saw Samantha that day, Samantha had blonde hair. Samantha used Ms. Leming's hair dye to dye it almond brown.

Following Ms. Leming's testimony, the State rested. The jury convicted appellant of premeditated first degree murder of Adam Chrismer, premeditated first degree murder of Samantha Chrismer, and felony murder of Samantha in the perpetration of a kidnapping. The trial then proceeded into the penalty phase.

### Penalty Phase

Teresa Chrismer, Adam's mother, testified that Adam was kind, did impressions, and enjoyed painting. She said everyone loved him. Teresa stated that when she learned of Adam's death, her "world fell apart." Following Adam's death, she was unable to return to her job as a vendor at flea markets and remained at home due to fear. Teresa stated that she sought treatment from a psychiatrist and received counseling following Adam's death. She also stated that her other children were angry and frustrated.

Patty Leming testified that Samantha was her only daughter. She said Samantha was happy, did well in school, and loved animals. When Ms. Leming learned of Samantha's death, she passed out and fell off of her porch. Ms. Leming stated that following Samantha's death, she received treatment from a psychiatrist and counseling on a monthly basis. She also

stated that she was schizophrenic and very depressed. Ms. Leming was not able to return to her job cleaning houses.

The State also recalled Investigator Todd Hull to present photographs. The State then rested. Appellant waived any presentation of mitigating evidence.

At the conclusion of the penalty phase, the jury found the following aggravating circumstance beyond a reasonable doubt with regard to appellant's conviction of premeditated first degree murder of Adam Chrismer: appellant knowingly mutilated the victim's body after death. *See* Tenn. Code Ann. § 39-13-204(i)(13) (Supp. 2002). With regard to appellant's convictions of premeditated first degree murder and felony murder of Samantha Chrismer, the jury found the following aggravated circumstances beyond a reasonable doubt: (1) the murder was especially heinous, atrocious, or cruel, in that it involved torture or serious physical abuse beyond that necessary to produce death; (2) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of appellant or another; (3) appellant knowingly committed the murder while having a substantial role in committing first degree murder of Adam Chrismer; and (4) appellant knowingly committed the murder while having a substantial role in committing or attempting to commit kidnapping. *See id.* at (i)(5), (6), (7). The jury also found that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt and imposed a sentence of death for each conviction.

The trial court then merged appellant's convictions of premeditated first degree murder of Samantha and felony murder of Samantha. The trial court denied appellant's motion for new trial, and this appeal followed.

## ANALYSIS

Appellant asserts that: (1) the trial court erred in finding that appellant implicitly waived and forfeited his right to counsel and requiring him to proceed pro se at trial; (2) the trial court erred in denying his motion to suppress his statements; (3) the searches of the residence and the storage unit were unconstitutional; (4) the trial court erred in denying appellant's motions to continue the trial; (5) the trial court erred in staying appellant's funding and jail privileges used in preparation for trial after this court granted an interlocutory appeal; (6) the evidence is insufficient to support the convictions; (7) the trial court erred in denying appellant's ex parte motions for expert services for a crime scene expert and a false confession expert; (8) the trial court failed to apply a higher standard of due process in all aspects of the case; (9) the trial court erred in admitting certain photographs; (10) the prosecutor made improper statements during closing arguments in both phases of the trial; (11) the trial court erred in instructing the jury during the guilt phase; (12)

the aggravating circumstances upon which the State relied were not stated in the indictment; (13) the trial court erred in denying appellant's motion to preclude for-cause removal of jurors who were not death qualified; (14) Tennessee's death penalty statute is unconstitutional; (15) the trial court erred in failing to advise appellant with respect to his testimony during the penalty phase; (16) the trial court failed to adequately inquire into appellant's competency to waive his right to present mitigating evidence; (17) the trial court erred in instructing the jury during the penalty phase; (18) the trial court erred in admitting victim impact evidence; (19) the proportionality review is unconstitutional; and (20) cumulative error warrants reversal.

## ISSUE I.  FORFEITURE/WAIVER OF RIGHT TO COUNSEL

Appellant contends that Judge Brown erred in finding in 2008 that appellant had implicitly waived and forfeited his right to counsel.  Appellant also contends that Judge Blackwood erred in denying appellant's pro se motion to appoint counsel, in denying appellant the opportunity to present proof in support of his motion, and in finding that he did not have the authority to appoint counsel following this court's opinion affirming Judge Brown's ruling.

The circumstances leading to Judge Brown's 2008 ruling were summarized by this court on appeal as follows:

> The trial court initially appointed two lawyers to represent the indigent defendant.  Lead counsel had practiced for 36 years and had handled approximately 20 capital cases.  None of his clients had been placed on "death row."  In the defendant's case, counsel filed numerous and extensive motions supported by legal memoranda.  The motions included a motion to suppress upon which the trial court conducted a lengthy evidentiary hearing.

> *First change of counsel*

> With the trial scheduled for April 11, 2005, the defendant, acting pro se, moved the court on March 14, 2005, to discharge his counsel and to appoint new counsel.  On the same day, both attorneys moved to withdraw, alleging that the "attorney client relationship has deteriorated to such an extent that the attorneys should be permitted to withdraw" and that they had "encountered constant difficulty in obtaining the cooperation of the defendant in the preparation of the defense."  Counsel further alleged:

The defendant has consistently refused to cooperate in providing requested information. He has insisted that the attorneys pursue factual investigations unrelated to this case; . . . that they file unrelated lawsuits against individuals involved in this case. T he defendant has insisted that the attorneys obtain evidence for him to review and then refused to review the evidence. He had demanded that he receive medical treatment and then refused to accept the treatment when it was provided. He has instructed defense investigators to conduct investigations not specifically authorized by the attorneys and to withhold information from the attorneys. He has accused some associated with the defense investigation of working for the State. His conduct in regard to the efforts of the attorneys to prepare this case can be best described as "stone-walling."

On March 15, 2005, the trial court conducted an extensive hearing in which it reviewed each of the 55 complaints the defendant had leveled against his attorneys. The court expressed concern that lead counsel and co-counsel had worked on the case for one and one-half years. The court, after reviewing the defendant's complaints one by one, found them to be baseless and denied the defendant's motion to discharge counsel. At one point in the dialogue with the defendant, the trial judge remarked that ultimately the defendant may be "representing [himself] in this." The judge opined that the defendant had shown that he was "virtually impossible to communicate with."

On March 18, the court conducted further hearing on counsels' motions to withdraw. The judge stated that both lead counsel and co-counsel were very experienced, effective lawyers and indicated that "the whole problem [was] caused by [the defendant]." The judge further commented,

[I]t appears to the court that what he is doing—he's manipulative. He's looking—he's come within less than a month of a trial date, and he wanted things reheard [on the motion to suppress] he couldn't get heard. He managed to do that through the back door. . . . But, he is coming close to forfeiting his right to counsel. This court is not going to continue appointing counsel forever. . . . [T]he court finds in this case that [the defendant] has unreasonably requested counsel to

withdraw. At this point I don't think the court has any option but to allow [counsels'] motion to be relieved as counsel.

. . . .

[If] I were the parent of . . . either of [the victims], . . . I would think the system is absolutely crazy; that—that somebody in [the defendant's] shoes can manipulate the system; can refuse to acknowledge what the law is; refuse to assist counsel; refuse to answer questions; refuse to look at evidence; and refuse to acknowledge the controlling authority in the law and—result in—in manipulation of the system and his case being continued because of new lawyers. The problem with the situation is that the court finds that [counsel] just cannot under the requirements of the ethics of the profession represent him, even though, it is entirely his fault.

Thus, the trial court granted counsels' motion to withdraw and appointed the First District Public Defender to represent the defendant. The trial court then had the defendant sworn and asked him, "[D]o you understand that—that if you cause the conflict with your next set of lawyers that you may very well [be] representing yourself?" The defendant responded, "I do." The court then addressed a series of questions to the defendant as a means of assuring that he understood the implications of defending a capital murder case without representation of counsel.

The trial court canceled the April 11, 2005 trial setting.

*Second change of counsel*

On April 4, 2005, the First District Public Defender moved to withdraw, citing conflicts of interests among members of the defendant's family and assistant public defenders. On April 5, 2005, the trial court granted this motion and appointed the Second District Public Defender to represent the defendant.

*Third change of counsel*

On the same day, April 5, 2005, the Second District Public Defender moved the court to vacate the appointment order on the grounds that the trial

-49-

court was not authorized to appoint "a district public defender outside of their specific district." The trial court agreed and appointed new lawyers to represent the defendant.

*Fourth change of counsel*

On May 25, 2005, the newly appointed attorney moved to withdraw on the basis of serious illness in his immediate family. On May 31, 2005, the trial court granted the motion and appointed two other lawyers to serve as new counsel.

In August 2005, the trial court reset the trial for January 30, 2006.

*Fifth change of counsel*

On September 28, 2005, the defendant's lead counsel moved to withdraw from the case on the ground that a conflict of interests had emerged when the defendant filed a complaint against counsel with the Board of Professional Responsibility ("BPR"). The court conducted a hearing on November 7, 2005. Lead counsel, who had practiced law for 21 years, stated that the defendant had claimed in a complaint to the BPR that counsel had not read the discovery materials in the case. Counsel characterized the defendant as "a blatant prevaricator" and added, "This is the type of behavior that [the defendant] persists in. You try to get information out of him you can't get information out of him." Co-counsel stated that the filing of the complaint with the BPR had brought the case to a "standstill." The trial judge commented, "[I]t appears that [the defendant] is manipulating the system, but, it still doesn't leave the court any—any choice, at least, at this point. The motion to withdraw is granted."

The court then admonished the defendant that if he "create[d] another conflict then [he was] going to be representing [himself]." In its order granting the withdrawal motion, the trial court stated that "the attorney/client relationship between lead counsel . . . and the [d]efendant . . . has deteriorated to the point where lead counsel's zealous representation of the [d]efendant is extremely difficult if not impossible." The court appointed new lead counsel. The two lawyers then representing the defendant filed an extensive, supplemental battery of motions.

The trial remained scheduled for January 30, 2006, but at some point, the trial court reset the trial for September 19, 2006.

*Sixth change of counsel*

On August 8, 2006, lead counsel moved to withdraw citing "irreconcilable conflict"; however, counsel apparently agreed to withdraw the motion in consideration of the defendant's dismissing a "complaint" he had filed against counsel. The trial court ordered a mental health evaluation of the defendant and continued the trial until October 24, 2006.

On October 9, 2006, the mental health evaluators in Kingsport filed with the trial court a letter in which they reported that they were "unable to properly evaluate [the defendant, who] did not cooperate with the evaluation process as he insisted on speaking to his attorney prior to the assessments." The evaluators expressed "no confidence that rescheduling this evaluation would yield a different outcome." On October 13, 2006, the trial court ordered that the defendant be sent to Middle Tennessee Mental Health Institute in Nashville (MTMHI). The October trial date was continued. In November and December 2006, MTMHI reported to the trial court that the defendant "is capable of adequately assisting in his defense in a court of law . . . [,] that he does understand the charge pending [against] him . . . [,] and [that he] is able to advise counsel and participate in his own defense." MTMHI noted that the defendant "was not willing to participate in some of the evaluation processes" although the "evaluation staff did have a great deal of observational data during the inpatient assessment." Essentially, MTMHI concluded that a defense of legal insanity was not supportable, that the defendant evinced no evidence of organic brain damage, and that he was of average intelligence.

In March 2007, the trial court set the case for trial on October 29, 2007.

*Seventh change of counsel*

On March 19, 2007, both lead counsel and associate counsel moved to withdraw from the case, citing "irreconcilable conflicts" and the defendant's filing a complaint against both attorneys with the BPR. The defendant also moved the trial court to discharge his lawyers.

In the March 19, 2007 hearing, the trial court urged the defendant to have "a prayer meeting" with his attorneys. The judge directed comments to the defendant:

> I'm not going to go on appointing one lawyer, after another lawyer, after another lawyer. If I find that you're the one causing the conflict then you're stuck, and you're much more likely to get the death penalty if you try to represent yourself. It is an extremely stupid thing to do. But, we've been through the law on this before. If the court finds that appointment of additional counsel is futile then that's where you are.

At this point, the court declined to rule on counsels' motion to withdraw and the defendant's motion to discharge counsel.

On October 8, 2007, both attorneys filed motions to withdraw indicating that the defendant had "fired" the attorneys and had, on October 4, "refused to speak with counsel [or] co-counsel." The record reflects no immediate ruling on these motions.

Although the trial began on October 29, 2007, the proceedings were suspended during jury selection when the jury pool was depleted.

On February 7, 2008, the defendant filed a motion to have his lawyers removed. On April 16, 2008, the defendant's lead counsel moved to withdraw alleging that "the relationship between the [d]efendant and [c]ounsel has deteriorated to such a degree that [counsel] can no longer act as a zealous advocate."

The trial court conducted a hearing on April 17, 2008. The defendant informed the court that he had "mailed out" lawsuits against both lead counsel and co-counsel to the United States District Court in Greeneville. The defendant said, "And since this is filed I really don't think there's much controversy. I don't think they can continue—continue under any circumstances."

The defendant was then sworn and testified that his lawyers were ineffective because they failed to file motions for "search warrants [and] for expert witnesses" and that they had failed to "file[ ] for various other investigative things to be done." The defendant called witnesses, including

co-counsel on the case, to try to impugn the affidavit supporting a search warrant. This effort, aimed at showing counsels' ineffectiveness, was, in a word, ineffectual.

Lead counsel explained that pursuing the motion to suppress sought by the defendant would have been "a terrible mistake" because it tied him "to a potential crime scene. We felt that—that the more we distanced him from that, that would be the better strategy." Counsel explained, however, that the defendant had ceased talking to counsel about issues in the case.

Addressing counsels' motions to withdraw, the trial court agreed that the defendant's filings against his attorneys both with the BPR and in the federal district court posed conflicts for counsels' continued representation of the defendant. The trial court granted counsels' motions to withdraw and held that the defendant had forfeited his right to counsel. The court stated,

> So, it appears he's waived his right to counsel because he's persistently demanding counsel of his choice and he refuses to cooperate. He refuses to talk to you all, refuses to communicate. He has refused to talk to the experts to evaluation, and—this is quite serious. [Denying the appointment of further counsel] should be done only when it gets to the point that appointing additional counsel would be futile. . . . [H]e knows how to put [the case] off again. He knows to file a complaint to the Board of Professional Responsibility about his lawyers, and he knows he can sue his lawyers. But, he—he hasn't shown the court that [the lawyers] have even begun to do anything other than what was in his best interest. So, the conclusion the court reaches . . .is that [the defendant has] egregiously manipulated the constitutional right to counsel resulting in delay, disruption and it's prevented the orderly administration of justice.

*Willis*, 301 S.W.3d at 646-50.

On July 9, 2009, this court filed its opinion affirming the trial court's order on interlocutory appeal. *See id.* at 652. The Tennessee Supreme Court denied appellant's application for permission to appeal on November 23, 2009. The mandate was issued on December 9, 2009.

On January 27, 2010, appellant filed a pro se motion to appoint counsel. Judge Brown subsequently recused himself, and Judge Blackwood was designated to hear the case. During a hearing on March 16, 2010, the trial court denied the motion stating that the issue had already been litigated in this court.

The State asserts that appellant's claims are barred by the law of the case doctrine. "[U]nder the law of the case doctrine, an appellate court's decision on an issue of law is binding in later trials and appeals of the same case if the facts on the second trial or appeal are substantially the same as the facts in the first trial or appeal." *Memphis Publ'g Co. v. Tenn. Petroleum Underground Storage Tank Bd.*, 975 S.W.2d 303, 306 (Tenn. 1998). This doctrine "applies to issues that were actually before the appellate court in the first appeal and to issues that were necessarily decided by implication," but the doctrine does not apply to dicta. *Id.* (citation omitted). The doctrine "is not a constitutional mandate nor a limitation on the power of a court" but "is a longstanding discretionary rule of judicial practice which is based on the common sense recognition that issues previously litigated and decided by a court of competent jurisdiction ordinarily need not be revisited." *Id.* (citations omitted). Application of the doctrine promotes finality, efficiency, consistent results, and obedience to appellate decisions. *Id.*

There are three "limited circumstances" that may justify a departure from the law of the case doctrine and subsequent reconsideration of an issue decided in a previous appeal:

> (1) the evidence offered at a trial or hearing after remand was substantially different from the evidence in the initial proceeding; (2) the prior ruling was clearly erroneous and would result in a manifest injustice if allowed to stand; or (3) the prior decision is contrary to a change in the controlling law which has occurred between the first and second appeal.

*Id.*

Appellant contends that the trial court erred in requiring him to proceed pro se at trial and that this court's opinion upholding the trial court's order was "clearly erroneous." In affirming the trial court's order, this court reasoned:

> The trial court found that the spate of conflicts with appointed counsel was the defendant's fault. It warned the defendant on multiple occasions that his persistence in engendering conflicts that led to changes in counsel would result in his representing himself in the case. When the trial court ordered the first change of counsel, it engaged the defendant in an extensive voir dire of his understanding of the imminence, difficulty, and risks of self-representation.

Despite the trial court's warnings and explanations of the law, the defendant persisted in intentional conduct that prompted the disqualification of counsel. In these circumstances, the trial court was justified in holding that the defendant had implicitly waived his right to counsel.

Furthermore, the record supports a finding of forfeiture. The trial court found that the defendant used the tactic of suing his lawyers or filing complaints against them with the Board of Professional Responsibility as a means of coercing the court into discharging counsel and that the pattern was for the tactic to be employed as trial dates approached. The trial court gave the defendant ample opportunity to show via argument, documents, and testimony that he was justified in complaining about counsel's performance. Nevertheless, the defendant neither articulated nor established any basis for complaint against any of his attorneys. Additionally, the record shows that the defendant refused to communicate with counsel and to cooperate with mental health evaluators. His conduct was egregiously manipulative and abusive of the judicial process; it warrants a finding that he forfeited his right to counsel.

*Willis*, 301 S.W.3d at 652. Appellant has failed to establish that this court's holding was "clearly erroneous."

Moreover, after the case was remanded, appellant failed to allege evidence or circumstances that were substantially different from the circumstances that existed during the initial proceedings. On appeal, appellant failed to specify what change in circumstances warrant reconsideration of this court's initial holding. In his motions for appointment of counsel filed after remand, appellant sought to reargue the alleged deficiencies of prior counsel, raised issues of ineffective assistance of appellate counsel, and relied upon an "interest of justice-oversight" argument for which he offered no supporting authority. None of these claims constitute changed circumstances that qualify as an exception to the law of the case doctrine.

Finally, appellant has not established that this court's prior decision is contrary to a change in controlling law. Rather, appellant relies upon the Tennessee Supreme Court's decision in *State v. Carruthers*, 35 S.W.3d 516 (Tenn. 2000), the same case upon which this court relied in affirming the trial court's decision in appellant's initial appeal. *See Willis*, 301 S.W.3d at 650-51. Accordingly, appellant's claims are barred by the law of the case doctrine.

-55-

## ISSUE II.  DENIAL OF MOTION TO SUPPRESS STATEMENTS MADE TO WILDA WILLIS

Appellant contends that the trial court erred in denying his motion to suppress his statements to Wilda Willis.  He maintains that his statements were obtained in violation of the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution and Article I, sections 8 and 9 of the Tennessee Constitution.

### A.  Suppression Hearing on November 30 and December 1, 2004

On July 29, 2004, appellant filed a motion to suppress his statements to Wilda Willis on October 15 and 16, 2002; his telephone calls to Wilda while he was housed in Washington County; his telephone calls to Wilda while he was housed in New York; and his statements to Sergeant Phillips and Investigator Hull on October 24 and 25, 2002.  A suppression hearing was held on November 30 and December 1, 2004, during which the following proof was presented.

### 1.  State's Proof

Detective Efaw testified that she, Detective Keith Fretwell, and Detective Bill Coltree traveled to Washington County on October 11, 2002, to serve a federal warrant on appellant.  When they arrived, they contacted officers with the Johnson City Police Department, and the officers assisted them in serving the warrant.  They arrested appellant on October 11 at the home of his aunt, Marie Holmes.  Detective Efaw stated that she was investigating a missing persons case involving Sam Thomas, appellant's stepfather.  The officers were attempting to locate the victims regarding their knowledge of Mr. Thomas's whereabouts.

On cross-examination, Detective Efaw acknowledged that the warrant was issued from a federal district in New York and directed any federal law enforcement officer to arrest appellant.  She testified that to her knowledge, an officer with the U.S. Marshal's Service was not present when appellant was arrested.  She did not contact federal authorities and was unsure whether the U.S. Marshal's Service was aware of the warrant. Detective Efaw stated that Captain Burtt contacted the agency to obtain the warrant and that the warrant came directly to the Bradley County Sheriff's Office.

Detective Efaw acknowledged that the warrant indicated that Detective Fretwell executed it.  She was not aware of whether Detective Fretwell questioned appellant and said that she was in the police vehicle at the time.  She stated that appellant did not request counsel in her presence.  While she acknowledged that she traveled to Washington County

because she was interested in locating the victims, she did not believe that she showed photographs of the victims to appellant shortly after his arrest.

On redirect examination, Detective Efaw testified that while investigating Mr. Thomas's disappearance, she learned that Mr. Thomas's credit cards had been used. Mr. Thomas's family informed her that they did not believe that Mr. Thomas would have used the credit cards at the locations where they were used. Mr. Thomas's family later reported that appellant had them. Detective Efaw said she learned this information prior to October 11, 2002.

On recross-examination, Detective Efaw testified that Mr. Thomas's body was later discovered. She said that appellant had Mr. Thomas's credit cards and that she was not aware of Mr. Thomas's giving them to appellant. She stated that as a result, appellant was the subject of investigation.

Captain Burtt testified that he learned that appellant was on bond for cocaine charges in federal court. Captain Burtt contacted Assistant U.S. Attorney Steve D'Alessandro in New York to obtain additional information and to report the situation in Bradley County. Captain Burtt told him that appellant's stepfather was missing and that foul play was suspected. Captain Burtt also reported that appellant had used Mr. Thomas's credit cards after Mr. Thomas disappeared. Mr. D'Alessandro requested copies of the evidence so that he could have appellant's bond revoked. Captain Burtt sent Mr. D'Alessandro the credit card report and a photograph of appellant and the victims using the credit card.

Captain Burtt stated that he sought to have appellant arrested to ensure the safety of the public and not in order to interview appellant. He said that the arrest warrant was served on a Friday and that appellant was already scheduled to come to Bradley County for an interview on Monday. Captain Burtt had also spoken to appellant on a previous occasion.

On cross-examination, Captain Burtt testified that he received the warrant on October 11, 2002, by facsimile. Later that evening, he sent three officers to deliver the warrant to the Johnson City Police Department to serve. Captain Burtt did not attempt to deliver the warrant to a federal official and did not send the warrant to the U.S. Marshal's Service in Chattanooga. He explained that Mr. D'Alessandro informed him that he attempted to contact the U.S. Marshal's Service in Johnson City but was unable to reach anyone.

On redirect examination, Captain Burtt testified that one of his investigators interviewed four people in Chattanooga who stated that appellant was attempting to obtain false identification and possibly flee to Costa Rica. Captain Burtt explained that as a result, there was a chance that appellant would not attend the interview on Monday. Captain Burtt

believed that it was best to execute the warrant rather than take the chance that appellant would flee prior to his scheduled interview.

On recross-examination, Captain Burtt stated that he believed that appellant told officers that he was in Johnson City. Detective Efaw called appellant the evening prior to his arrest to confirm that he was in Johnson City.

Detective Fretwell testified that on October 11, 2002, he and other officers went to Washington County and served a federal warrant on appellant at his aunt's house. Detective Fretwell said that he did not interview appellant and that appellant did not make any statements to him. He denied that appellant requested counsel. Appellant was upset about the arrest and was cursing. Detective Fretwell advised appellant of the warrant and the basis for his arrest.

On cross-examination, Detective Fretwell testified that another officer approached appellant, handcuffed him, and placed him in the back of the patrol car. He could not recall which officer did this and did not know what transpired between that officer and appellant before he approached.

Detective Fretwell testified that at the direction of his lieutenant, Brian Quinn, he assisted other officers at the Johnson City jail by listening to telephone calls that appellant made to outside parties. Detective Fretwell could not recall whether he listened to any calls between appellant and Wilda Willis. He listened to calls between appellant and Betty Willis and between appellant and Marie Holmes in an attempt to locate Sam Thomas.

On redirect examination, Detective Fretwell testified that he and other officers were searching for the victims in order to question them regarding Mr. Thomas. The victims were not presumed to be missing or dead at that time.

Major Lincoln Higgins of the Washington County Sheriff's Office testified that he was the supervisor over the criminal investigative division. On October 15, 2002, Investigator Kevin Peters with the Johnson City Police Department contacted Major Higgins regarding Wilda Willis, who had traveled there from Bradley County. Major Higgins had instructed Investigator Peters to send Wilda to his office.

Major Higgins testified that Wilda arrived at approximately 9:30 a.m. or 10:00 a.m. He said Wilda wanted to visit appellant, her ex-husband, in the Washington County Detention Center and volunteered to wear a recording device. Major Higgins called Sergeant Phillips, a member of the Washington County Sheriff's Office who was also assigned to the

First Judicial Drug Task Force. Sergeant Phillips and Agent Matt Thompson with the drug task force brought an audio recording device.

Major Higgins stated that he did not request that Wilda come to his office other than during the call from Johnson City. He said he did not know who she was. He also said that Wilda did not appear to be under any force or duress and that he did not make any threats in an effort to persuade her to cooperate. He stated that Wilda did most of the talking and volunteered her cooperation.

On cross-examination, Major Higgins testified that on October 15, 2002, he was aware that appellant was in jail and that officers from the Bradley County Sheriff's Office had been in Washington County investigating appellant. Major Higgins said appellant was a possible suspect in the missing persons case of Mr. Thomas and the murders of the victims. Major Higgins made contact with Bradley County officers when they came to serve the federal warrant on appellant. They discussed the missing persons case and that officers suspected appellant had some connection to it. Major Higgins stated that after appellant was arrested, Bradley County officers never approached him about being allowed to question appellant. Major Higgins believed that the U.S. Marshal's Service instructed him to contact them before anyone interviewed appellant.

Major Higgins testified that officers from the Johnson City Police Department directed Wilda to the sheriff's office and that Wilda came to his office alone. She said a friend was waiting in her car. Major Higgins said Wilda identified herself and stated that she was interested in talking with appellant regarding the disappearance of her uncle, Mr. Thomas. She wanted to learn what had happened to her uncle and was willing to wear a wire to record the conversation. Wilda commented that she had spoken with a Bradley County officer who told her to go to Washington County. Major Higgins stated that Wilda was primarily interested in learning what had happened to her uncle, who had been missing since September 2002.

Major Higgins said he did not contact the U.S. Marshal's Service before he arranged the meeting between Wilda and appellant. He acknowledged that on the morning of October 15, 2002, appellant was taken before a federal magistrate in Greeneville and then brought back to the facility. Major Higgins stated that he explained to Sergeant Phillips what Wilda wanted to do and left him in charge of the process. Major Higgins assigned the task to Sergeant Phillips due to his expertise in placing wires or recording devices. He believed that Sergeant Phillips gave Wilda money for food and a hotel room.

Major Higgins believed that officers from Bradley County listened to recordings of appellant's telephone calls but was unsure of when they did so. He was unaware of whether appellant asked for an attorney during the conversations.

On redirect examination, Major Higgins testified that he was called out to Boone Lake at the Winged Deer Park boat ramp where a human head had been found. On October 15, a forensic pathologist found a BB or a small shot and some scars on the head. The scars on the head were confirmed by Adam's mother. At that point, the bodies had not been recovered.

Sergeant Phillips testified that on October 15, 2002, he received a call to go to the sheriff's office and meet Wilda Willis. Major Higgins advised him that Wilda was appellant's ex-wife and was going to assist in the investigation. Wilda first met with Betty Willis and Marie Holmes. Sergeant Phillips said that Wilda requested that she be allowed to contact appellant. Agent Matt Thompson from the drug task force placed the wire on Wilda. Sergeant Phillips denied coercing Wilda, threatening her, or making her promises in exchange for her cooperation and said he was not aware of anyone else doing so. He stated that Wilda appeared to be willing to cooperate.

Sergeant Phillips testified that someone called the jail administrator and arranged a visit between Wilda and appellant. The meeting occurred in an area of the detention center where plexiglass separated the visitors and inmates and they communicated through either a telephone or a hole in the glass. The meeting was recorded.

Sergeant Phillips stated that during the initial meeting, Wilda and appellant discussed arranging a meeting the following day. Appellant told Wilda to bring a "fifty dollar attorney" and pretend that she was the attorney's paralegal. Appellant said he would talk to Wilda after they sent the attorney to the bathroom.

Sergeant Phillips testified that officers arranged for Wilda to have a contact visit with appellant at the detention center on October 16. They met around 8:00 p.m. Wilda took a tape recorder in the room at appellant's request. Agent Thompson placed a transmitter in a trash can, and officers listened to the conversation as it occurred. Sergeant Phillips stated that there were times during the meeting when appellant would either instruct Wilda to turn off her recorder or turn it off himself. The meeting lasted approximately thirty minutes or less.

Sergeant Phillips said that when Wilda came out of the room, she was excited and in disbelief. She kept repeating that she wanted to find the body of Sam Thomas, her uncle.

Sergeant Phillips recalled that Wilda had flyers regarding Mr. Thomas's disappearance taped to the windows of her car.

Sergeant Phillips testified that after speaking to Wilda, he and another agent entered the visitation room to interview appellant. As Sergeant Phillips began advising appellant of his rights, appellant requested counsel. The officers immediately stopped the interview. Sergeant Phillips said he was in the room with appellant for less than one minute.

Sergeant Phillips said he spoke to Jim Bowman, an attorney, on either Friday or Monday after October 16. Mr. Bowman said that he was representing appellant and that the officers could not talk to appellant anymore. Sergeant Phillips stated that he was never contacted by anyone from the federal public defender's office or any attorneys from New York.

On cross-examination, Sergeant Phillips testified that Wilda told him that she was there to find out who killed her uncle and that she wanted to go to Marie Holmes's house. Sergeant Phillips also stated that during the conversation, he suggested the possibility of Wilda's speaking to appellant. He asked her whether she would be willing to talk to appellant, whether she believed appellant would talk to her, and whether she would be willing to wear a wire.

Sergeant Phillips testified that on Monday night, October 14, he listened to recordings of telephone calls that appellant made from the jail in an attempt to obtain evidence regarding the case. Sergeant Phillips acknowledged that he listened to a conversation between appellant and Betty Willis where two attorneys, Dick Pectol and Roger Day, were mentioned. Appellant told Betty to contact Mr. Pectol. Betty said she was going to Mr. Pectol's office at 3:00 that afternoon to offer him the rest of the insurance money to defend appellant. Sergeant Phillips said he understood that appellant was attempting to contact an attorney. He, however, believed that appellant was attempting to contact an attorney for the federal charge.

Sergeant Phillips stated that he understood that appellant requested that Wilda bring a "fifty dollar attorney" to the next meeting as a "ruse" to get her back to meet with him. Wilda agreed to attempt to retain an attorney. Sergeant Phillips said he did not speak with Wilda regarding whether she planned to retain an attorney, and Wilda did not bring an attorney with her the following day.

Sergeant Phillips testified that he asked Wilda to stay overnight in Johnson City following her meeting with appellant on October 15. The sheriff's office paid for lodging and meals for Wilda and Joy Gadd on October 15 and October 16.

-61-

Sergeant Phillips said he spoke to either Major Higgins or the sheriff to arrange for Wilda to meet with appellant at the jail on October 15. Sergeant Phillips stated that the purpose of arranging the visit was to investigate homicides of Adam, Samantha, and Mr. Thomas. He was not familiar with the visitation policy at the jail, but he knew that special arrangements had to be made through either Major Higgins or the sheriff. Sergeant Phillips did not believe that he listened to any other recordings of telephone conversations following the October 15 meeting. To his knowledge, appellant's telephone conversations were still being monitored and reviewed.

Sergeant Phillips testified that when appellant told him that he wanted an attorney following his meeting with Wilda, he understood that the request was related to the homicide investigation because appellant had just admitted to two homicides. Sergeant Phillips understood that at that point, appellant did not want to talk to him without counsel present. Sergeant Phillips said he did not attempt to interview appellant between October 11 and October 16. To his knowledge, no one else had attempted to interview appellant during that time. He was unaware of appellant's requesting an attorney at the time of the arrest.

Sergeant Phillips testified that when the interview stopped, he had told officers at the jail that they should watch appellant because he just confessed to two homicides. When he spoke to appellant later, appellant mentioned that he was placed in an isolation cell in the booking area. Sergeant Phillips said he was unaware at the time that this had occurred.

On redirect examination, Sergeant Phillips testified that Wilda was not given money for working as an informant. She was given money for food and lodging. Sergeant Phillips recalled that Wilda and Joy Gadd did not bring a change of clothing and may have been given money to purchase clothes.

Sergeant Phillips stated that he did not have the authority to order a particular placement of an inmate in the detention center. Rather, he could only make requests or suggestions. He explained that he commented to a lieutenant or sergeant that appellant should be watched because appellant had just admitted to two homicides and he was concerned for appellant's well being. Sergeant Phillips said he had made similar comments in other homicide cases.

Sergeant Phillips testified that during the call where appellant and Betty Willis discussed Mr. Pectol, they also discussed appellant's arraignment following his arrest and the fact that there were no charges. Sergeant Phillips stated that a violation of probation or parole was the only charge that appellant and Betty mentioned. Sergeant Phillips said he never took any action to stop appellant from obtaining an attorney.

Wilda Willis testified that she and appellant divorced on July 9, 2002. On September 5, 2002, Wilda's seventy-three-year-old uncle, Sam Thomas, disappeared. Wilda contacted the Bradley County Sheriff's Office looking for her uncle. Detective Efaw called her, and Wilda met with Bradley County officers on three occasions before going to Washington County.

Wilda stated that Betty Willis, Marie Holmes, and appellant called her several times requesting that she attend appellant's federal hearing. On October 15, Captain Burtt asked her to go to the Johnson City Police Department and speak with officers. Wilda said that Captain Burtt did not order her to go to Johnson City and that no one coerced her to go. Upon arriving in Johnson City, she spoke to Officer Peters. Officer Peters asked if she was aware that body parts had been found in a river, and she was not. Wilda asked about appellant. After meeting with officers for several hours, they asked her to go to the Washington County Sheriff's Office.

Wilda said that upon arriving at the Washington County Sheriff's Office, she met with Captain Higgins. She stated that she asked him about appellant's situation because she did not know what was occurring. Wilda learned that appellant's bond on his federal charges in New York was going to be revoked. Captain Higgins asked Wilda what she knew about Betty Willis and Marie Holmes. Wilda testified that she asked to speak with appellant because he had called her and requested that she meet with him. She said she offered to tell officers everything that she learned from appellant. Wilda stated that no one spoke to her directly about wearing a wire. Agent Thompson placed a wire on her before she went to Marie's home to speak to Betty and Marie. Wilda said the wire remained on her when she met with appellant at the detention center. She maintained that no one forced her to wear the recording device and that she went to the jail freely to talk to appellant.

Wilda testified that on October 15, 2002, she met with appellant for ten to fifteen minutes and that they were separated by glass. Appellant told her that he wanted to meet with her the next day. Wilda told appellant that she did not know whether she could return the following day but that she would do whatever she could to get back into the detention center to meet with him. Appellant told her to bring a notebook and a tape recorder when she returned. Wilda said Appellant instructed her to pay an attorney fifty dollars to get her into the detention center so that he could meet with her face to face and not through a window. Wilda also said appellant asked her to have the attorney tell the jailers that she was his paralegal. Appellant stated that he would then ask the attorney to leave the room.

Wilda stated that appellant "had no use for the attorney. He wanted—he clearly said he wanted to speak to me. The attorney was just a way to get me in there faster without having a bunch of red tape to go through." Appellant told her that he would answer all of

her questions. Wilda said she had questioned appellant about Mr. Thomas and the victims. She stated that learning what had happened to her uncle was first and foremost in her mind. She acknowledged that she had taped missing person flyers with photographs of Mr. Thomas on her car.

Wilda said that after meeting with appellant, she met with Sergeant Phillips. She acknowledged that Sergeant Phillips gave her money to pay for a hotel room but denied that he gave her money for clothes or necessities. Joy Gadd was with her.

Wilda testified that on the evening of October 16, she returned to the detention center with a tape recorder and a notebook. She was placed in a private room. She set the recorder on top of the table for appellant to see. Wilda stated that appellant turned off the recorder at times and that she turned off the recorder at times at his request. She said she always told appellant when she turned the recorder back on. Wilda and appellant met between thirty minutes to one hour. She stated that appellant told her that he "blew [the victims'] brains out." When she left the meeting, she was shaken up and could not believe what appellant had told her.

On cross-examination, Wilda testified that Detective Efaw requested that she come to the Bradley County Sheriff's Office in the late afternoon or early evening of October 14. Captain Burtt advised her of her rights. Wilda stated that this was the second occasion on which the officers advised her of her rights. While she denied that it frightened her, she acknowledged that "[a]nytime you get your rights read to you, you're scared." The officers asked her whether she knew what was occurring. Wilda believed that the officers were referring to Mr. Thomas's disappearance and told them that she did not know any more than they did.

Wilda testified that she had planned to attend appellant's hearing in federal court in Greeneville the following day. She understood that the hearing was to begin at 9:00 a.m and said that her initial plan was to leave Bradley County around 4:00 a.m. She stated that Bradley County officers made it clear that they expected her to go to Johnson City first and speak to Debbie Barron. Wilda believed that the officers wanted her to speak to Johnson City officers regarding Betty Willis and that it was in her best interest to comply with their request. She said her conversations with Bradley County officers only concerned Mr. Thomas's disappearance.

Wilda said that when she arrived in Johnson City, Officer Barron was not available, so she met with Officer Peters. Officer Peters did not know with whom she was supposed to meet. While she was waiting, an officer walked into the room and told her that they found a human head and hands. Wilda questioned whether the evidence was related to Mr.

Thomas's disappearance. She said she had received a letter from Samantha that led her to believe that the victims were involved in Mr. Thomas's disappearance.

Wilda testified that she and Joy Gadd followed Officer Peters to the Washington County Sheriff's Office. Officer Peters introduced Wilda to Captain Higgins and remained in the meeting for some time. Wilda said that officers asked her to go to the homes of Betty and Marie and that she agreed to do so. She also said the purpose of going to their homes was to assist in the investigation of the disappearances of Mr. Thomas and the victims. The officers instructed her to not ask Betty and Marie any questions and to just let them talk.

Wilda denied that the officers asked her if she was willing to talk to appellant and wear a wire. She said she insisted that she meet with appellant. Wilda was wearing the wire when she left Marie's house, and it remained on her when she went to the jail. She stated that no one asked her to wear the wire when she met with appellant but that it was just assumed that she would wear one.

Wilda testified that appellant called her from the jail on two or three occasions between October 11 and October 15. She believed the calls were recorded. She did not recall appellant's asking her to obtain counsel for him. She acknowledged that on October 15, appellant asked her to obtain counsel to get her into the jail and that she told him that she would do what she could. Wilda said she contacted Betty and Marie, both of whom were supposed to obtain counsel to assist her in getting into the jail. Wilda made no other attempts to obtain counsel.

At that time, Wilda was unaware of jail regulations pertaining to visitation. She asked Sergeant Phillips and other officers to arrange a visit, and they agreed to do so. She suspected that some other recording device was in the room when she met with appellant on October 16. No time limits were placed upon the length of the visit, and Wilda did not believe that she signed a visitor's log.

Wilda recalled that following the meeting, she went into a room with other officers and that she was asked whether she believed what appellant had told her. She believed that Sergeant Phillips asked whether appellant was suicidal but that she did not recall her response. Following the meeting, Ms. Gadd drove Wilda's car home. Wilda rode with Brian Quinn, a Bradley County officer, to Bradley County.

On redirect examination, Wilda denied that anyone forced her to wear a recording device. She said officers put a wire on her just for her meeting with Marie and Betty. Wilda stated she did not specifically agree to wear it while meeting with appellant but simply left it on when she met with him. She did not remove the wire or ask that it be turned off. She

explained that she did not know what was happening and questioned whether it was an advantage to wear it. She said she planned to tell the officers what appellant told her during the meeting anyway.

Wilda testified that appellant called her frequently from the jail. Appellant was transferred to New York around the first of November and continued to call her from New York. Officers from Bradley County gave Wilda a tape recorder to record her telephone conversations with appellant. Wilda gave the tapes of the conversations to officers in Bradley County and Washington County, and the officers gave her blank tapes in return. Wilda stated that when appellant called her, there was a recording warning her that calls were monitored and might be recorded. She said appellant asked her to record their telephone conversations regarding a timeline that he was preparing. Wilda typed the timeline at appellant's request. Wilda estimated that appellant made hundreds of calls to her from New York. He instructed her to relay messages to officers in Washington County and Bradley County.

On recross-examination, Wilda denied that she ever called appellant and maintained that appellant always called her. She said Bradley County officers furnished her with a tape recorder in October or November 2002. She returned it because she had her own recorder. She stated that Bradley County officers requested that she record the conversations but that they did not provide a reason for the request.

Wilda testified that she spoke with appellant several times a day after October 16. She acknowledged that by October 18, she knew that appellant had counsel and that she did not inform appellant that she was gathering evidence for the police. Wilda also acknowledged that on October 18, she and appellant possibly had a conversation during which they discussed appellant's attorney and counsel's advice that he not speak to law enforcement. Wilda continued to question appellant about the case after he was indicted on October 23 and reported those conversations to the police.

Wilda stated that she went to New York to visit appellant in prison at the request of appellant and his aunt. She went to New York twice in January 2003 and twice in the spring of 2003. She said that before she went, she conferred with law enforcement officers, and they told her not to go. Upon returning, she reported what she had learned to the officers. While in New York, Wilda met with appellant in an open room where other inmates were visiting with their families. Wilda stated that after the October 16 meeting, appellant asserted his innocence.

Wilda testified that during the meeting on October 16, appellant gave her two locations where she might find Mr. Thomas's body. When Wilda returned to Bradley County

following the meeting, she and officers went to a mountain in Walker County, Georgia, to search for Mr. Thomas's body. Before they arrived in Walker County, appellant called Wilda's daughter two or three times providing another location to search and asking that Wilda call him immediately. Appellant requested that Wilda have Walker County Sheriff Steve Wilson with her. Officers from Bradley County and Walker County arranged for her to talk to appellant while they were on the mountain. Wilda stated that the call was arranged by the officers at appellant's request. Appellant asked Wilda where she was. She told appellant that she was on the mountain and that Sheriff Wilson was with her. She said appellant instructed her to go several miles back down the mountain and told her where to find Mr. Thomas's body. Wilda stated that officers found Mr. Thomas's body a few minutes after her conversation with appellant ended.

On redirect examination, Wilda testified that after October 16, no one from the Washington County Sheriff's Office, the Johnson City Police Department, or the District Attorney General's Office asked her to make further contact with appellant. Wilda said that they discouraged it and that a representative from the District Attorney General's Office instructed her to stop accepting appellant's calls.

Wilda testified that appellant called her a few days before Christmas 2002 and asked her to come to New York. She told him that she could not because she was working. Marie Holmes called Wilda and offered to pay her way if she would go to New York on January 1, 2003. Wilda stated that they insisted that she go because appellant would give her all the answers regarding the murders of the victims and Mr. Thomas. Wilda said that as a result of her meeting with appellant in New York, the chainsaw was recovered on January 3, 2003, along Interstate 75 just inside the Bradley County line.

Officer Lawrence Haws testified that he was employed at the Washington County Detention Center where appellant was housed in October 2002. Officer Haws said that on October 24, 2002, around noon, appellant approached him and said that he had fired his attorney. Appellant asked Officer Haws to contact Major Brenda Downes because he wanted to speak to Sergeant Phillips and Wilda. Officer Haws stated that before appellant was indicted, he was only being held as a federal prisoner.

Investigator Todd Hull testified that on October 14, 2002, he was at the jail fingerprinting the severed hands that were recovered when Major Higgins called him. They had learned from Captain Burtt that appellant was arrested on federal charges on October 11. Investigator Hull contacted a federal law enforcement officer who confirmed that appellant was a federal prisoner and commented on the interviewing of federal prisoners. Investigator Hull contacted Special Agent Drolshagen and asked him about the protocol for interviewing federal prisoners. Special Agent Drolshagen informed him that he believed that officers

could interview appellant so long as they did not discuss the federal charges. Special Agent Drolshagen said he would call a U.S. Attorney for verification.

Appellant was indicted by the grand jury on October 23, 2002, and Investigator Hull served the presentment to appellant that morning. Investigator Hull stated that on October 24, 2002, Major Brenda Downes informed him that appellant told a pod officer that he no longer had counsel and wanted to speak to Wilda and Sergeant Phillips. Investigator Hull spoke to Rob Gibbs, a supervisor at the U.S. Marshal's Service, who gave him permission to interview appellant. Investigator Hull also spoke to a prosecutor at the District Attorney General's Office. The prosecutor and U.S. Attorney Dan Smith prepared a Sixth Amendment waiver of rights form. On October 24, appellant executed Fifth Amendment and Sixth Amendment waiver of rights forms.

Investigator Hull testified that the appellant's interview was not recorded. Rather, Investigator Hull took notes as the interview transpired. The interview lasted two days. Investigator Hull said that the goal was to take a written statement from appellant at the conclusion of the interview. Appellant, however, terminated the interview before a written statement could be taken, and the interview was reduced to a synopsis.

Investigator Hull testified that the interview on October 24 lasted for two hours. Appellant terminated the interview because his back was hurting and said he would continue the interview the following night. Investigator Hull said appellant did not request counsel and asked that the officers return the following day. On October 25, Investigator Hull and Sergeant Phillips returned to interview appellant. Appellant executed both the Fifth Amendment and Sixth Amendment waiver forms again.

Investigator Hull testified that appellant informed them that his mother, Adam Chrismer, and Daniel Foster killed Mr. Thomas and implicated him. Appellant stated that he had become suspicious about the items that he had placed in a storage unit at his mother's request. He informed the officers that he returned to the storage unit and opened the containers. He said that as a result, his fingerprints may be on some areas of either the containers or the tarp. Sergeant Phillips asked appellant whether he was aware of any DNA that might be found. Appellant replied that he had consensual sex with Samantha approximately three times since August 2002 with the last time being on October 6. During the interview, Sergeant Phillips asked appellant whether they should believe his story. There was an exchange of words, and appellant said that if they did not believe him, there was no reason to continue the interview. Appellant then terminated the interview prior to giving a written statement.

Investigator Hull testified that he first became aware that appellant had counsel when he was advised that Jim Bowman had been retained to represent appellant during the investigation and until the indictment was returned. Investigator Hull said he never heard appellant request counsel.

Investigator Hull stated that he listened to recordings of telephone calls that appellant had made during which appellant indicated that he was aware that officers were listening. During a call where there was some static, the person whom appellant called asked what the noise was, and appellant responded, "Todd needs a new tape recorder." Appellant also said, "[H]ey, Todd change the batteries in the tape recorder." Investigator Hull said appellant made similar references in other calls, but Investigator Hull did not recall the specific details.

On cross-examination, Investigator Hull testified that on October 11, 2002, a fisherman found a severed head floating in Boone Lake. On October 12, two hands were discovered. On October 14, Investigator Hull received information from Captain Burtt that Mr. Thomas was missing, that appellant was in jail in Washington County, that two juveniles were missing, and that Bradley County officers wished to conduct an investigation. On October 14, the head was tentatively identified as that of Adam Chrismer. Investigator Hull said that at that point, appellant became the primary suspect. During the evening of October 14, Sergeant Phillips and Detective Quinn monitored telephone calls at the jail, and Investigator Hull spoke to Special Agent Drolshagen. Wilda arrived on the morning of October 15 and met with appellant while wearing a wire. On October 16, the bodies were found in the storage shed, and Wilda and appellant met for a second time. Sergeant Phillips attempted to advise appellant of his rights, and appellant requested counsel.

Investigator Hull did not recall the date on which he learned that Mr. Bowman was representing appellant. He served the presentment at 11:15 a.m. on October 23. Appellant responded by asking who his attorney would be and whether he could have a sandwich because he had missed lunch. Investigator Hull stated that he did not believe that Mr. Bowman represented appellant any longer because Mr. Bowman was only retained to represent appellant until he was indicted and because appellant asked who his attorney would be.

Investigator Hull could not recall reviewing a call between appellant and Betty Willis that occurred on October 14 during which appellant told Betty to contact Dick Pectol, an attorney. He also could not recall reviewing a call between appellant and Wilda's daughter on October 15 during which appellant said that he needed to speak to Wilda and to an attorney. Investigator Hull could not recall reviewing a call between appellant and Betty on October 15 during which Betty said that Mr. Pectol could not get to appellant's case for thirty to forty-five days and appellant instructed Betty to bring Roger Day, an attorney, the

-69-

following day. No one informed Investigator Hull of appellant's call to Marie Holmes on October 15 during which appellant said that Wilda was coming and bringing an attorney. Investigator Hull stated that it was important to know the context in which the conversations regarding counsel were made. He said the conversations could have related to the federal charges.

Investigator Hull had no prior knowledge of the meeting between Wilda and appellant on the night of October 15. He said that as an investigator, he did not have the authority to issue orders to officers at the detention center. The detention center was a separate entity.

Investigator Hull testified that the purpose of the visit between Wilda and appellant was to obtain information. Investigator Hull said that while it was standard policy to brief Wilda before the meeting, he did not know what instructions were given to Wilda before she met with appellant. He did not have any contact with Wilda on October 15. He acknowledged that the meeting was set up by someone at the sheriff's office and that a meeting was arranged for the following day. He understood that only trustees received contact visits and that certain procedures must be followed to receive a contact visit. He was unaware of whether Wilda followed that procedure. Investigator Hull acknowledged that someone from the State controlled where and when the meeting occurred and how it occurred to a certain extent. He also understood that Sergeant Phillips terminated the meeting on October 16 after appellant became hostile.

On redirect examination, Investigator Hull testified that he was unaware that Betty Willis ever called the police and told them that Mr. Pectol represented appellant. He was unaware of Mr. Pectol's ever calling and stating that he represented appellant. Investigator Hull said appellant never said he had an attorney or that he wanted to speak to Mr. Pectol. The attorneys mentioned in the conversations between Betty and appellant never called to say that they were representing appellant.

The State recalled Detective Efaw as a witness. She testified that on January 3, 2003, Wilda called her and said that she had just returned from New York and needed to speak to her. Wilda gave Detective Efaw several locations where evidence might have been located. At the first location, they searched for a chainsaw, and at the second location, they searched for a gun. Wilda said that appellant told her that when she found the chainsaw, she was to wipe the handles with a rag and gasoline or lighter fluid and then store the items under the trailer of Daniel Foster, Samantha's brother. Detective Efaw testified that while Wilda was in her presence, Wilda received a call from appellant and that the call was recorded using a device on her cellular telephone.

## 2. Defense Proof

Appellant testified that he was aware of an investigation involving his step-father, Sam Thomas, prior to October 11, 2002. During the course of the investigation, appellant was interviewed at the Bradley County Sheriff's Office once and by Detective Efaw one or two additional times. Appellant could not recall whether he had an interview scheduled for the Monday after his arrest but said that it was possible.

Appellant testified that on October 11, 2002, he was arrested at the home of his aunt, Marie Holmes, in Johnson City. He said he opened the door and saw officers with the Johnson City Police Department. He stated he was told to lie face down on the sidewalk, was searched, was handcuffed, and was told to sit on the sidewalk. He did not know the name of the uniformed officer who arrested him. Appellant said the officer questioned him regarding where the victims were and whether he knew what they looked like. Appellant told the officer that he knew what the victims looked like but that he did not know where they were. He said he was shown photographs of the victims, and he identified them. He also said that as the officer began to ask him another question, he told the officer that he wanted an attorney. Appellant stated that the officer did not question him further.

Appellant testified that someone brought clothes for him. He said that Detective Efaw asked him if she could go through his mother's house and told him that the officers had looked through Marie's house. Appellant also said that Detective Efaw stated that she wanted the blue Jeep towed and that she saw a red stain in the cargo area. At the time, appellant had pending charges in a federal court in New York and was out on bond for those charges. Appellant stated that he was told that officers had a warrant to revoke his bond in his federal case. He stated that no one asked him about whether he was using Mr. Thomas's credit cards.

Appellant testified that when he requested counsel, he was told that he could have an attorney once he was transported to the jail. Appellant was booked into the jail, and the officers asked him general questions. Appellant stated that he requested counsel and informed the officers that he had been told that he would receive an attorney when he arrived. He also stated that he was told that he could make a telephone call from the pod. He explained that he wanted counsel in relation to the questions that he had been asked about the victims.

Appellant stated that he was not allowed to make a telephone call that evening but was allowed to do so the following day, which was a Saturday. He said he made several telephone calls attempting to reach an attorney. He maintained that he attempted to call the District Public Defender's Office, Mr. Pectol, and Mr. Bowman. However, he was unable

to reach anyone. He stated that when he called other individuals on October 14, he was doing so in an effort to obtain counsel.

Appellant testified that he was taken to federal court in Greeneville on October 15 where he was appointed counsel for the federal charges. He said he was satisfied with that attorney.

Appellant testified that he expected to meet with Wilda on October 15. He said he had asked Wilda to try to obtain counsel for him and to go to Greeneville with him. He explained that Wilda had information relevant to his arrest and the investigation in Bradley County. Appellant did not have advance notice of the meeting on October 15 and said he was surprised that he was allowed to meet with Wilda "in person." Appellant explained that he had read the handbook for the detention center and learned that an inmate was required to wait for more than one week before the inmate could have a visitor. He further explained that after seven days, the inmate was allowed to complete a visitor's form, which then had to be processed.

Appellant stated that during the October 15 meeting, he instructed Wilda to return the next day with counsel. He explained that he had been unsuccessful in obtaining counsel, that he wanted to talk to an attorney, and that he wanted Wilda to be able to get into the jail to see him. Based upon Wilda's response, appellant believed that she would return with counsel. He said that while he was incarcerated in Washington County, he was only allowed one visit per week for one hour. He stated that other than his visit with Wilda on October 16, his counsel, and investigators, he had never had a face-to-face contact visit with anyone.

Appellant testified that Sergeant Phillips entered the room following Wilda's visit on October 16. The meeting took place in the attorney visitation room, which was not on the same floor as the regular visitation room. Sergeant Phillips said he wanted to speak to appellant, and appellant responded that he wanted an attorney. Appellant said that Sergeant Phillips took him to the booking area, put him in a concrete cell with no bunk, and instructed him to take off his clothes. Appellant also said that it was cold and that he was brought a paper gown to wear. He remained in the cell until the following afternoon.

Appellant testified that while in the cell, he was told that Wilda wanted him to call her. He said he was allowed to use a telephone on a desk in an office. He called a cellular telephone number that he did not recognize. Wilda answered the call and said that she was at a fire station on Lookout Mountain.

Appellant testified that he was then allowed to go to another cell to use the jail telephone. He stated that he called his daughter and instructed her to call the U.S. Attorney

-72-

in Brooklyn, New York, and tell the attorney that when he requested counsel, he was stripped and put in a cell. Appellant explained that he wanted his clothes and a blanket. He said he also "sneaked" a call to an attorney in New York and told the attorney that when he requested counsel, he was stripped and thrown into a cell.

Appellant stated that at some point, he called Mr. Bowman and asked Mr. Bowman to represent him. Mr. Bowman agreed to represent appellant until he was indicted and did not charge him a fee. Appellant said that other than his appearance in federal court on October 15, he did not appear in court regarding the homicides or the credit card use. When Investigator Hull served the capias and a copy of the murder charges, appellant asked him who his attorney would be and when he would obtain counsel. Appellant stated that he did not feel that he had counsel at that point and was not able to afford counsel. He was transferred to New York on October 29. Appellant said that before that time, he was not brought before a state court judge to be arraigned on the charges, was not offered counsel, and was not asked about whether he would need appointed counsel.

Appellant testified that he had heard that Wilda was cooperating with the police and was turning over recordings of their telephone conversations to them. He explained that he continued to talk to Wilda because he did not believe the source of the information and because he had requested counsel. Appellant said that Wilda denied that she was assisting law enforcement and that notwithstanding their divorce, he still trusted Wilda.

On cross-examination, Appellant testified that on October 16, 2002, Wilda met with him and brought a tape recorder and legal pad at his request. Appellant acknowledged telling Wilda that he "blew [the victims'] brains out."

Appellant believed that when Sergeant Phillips walked in after the meeting with Wilda, Sergeant Phillips started to read his *Miranda* warnings, but appellant could not specifically recall. Appellant acknowledged that he did not inform Sergeant Phillips that he had repeatedly requested counsel and that no one had listened to him. Appellant said it was clear that he had repeatedly requested counsel. At that point, he was unaware that Wilda had cooperated with authorities. He acknowledged that when he made telephone calls using the inmate telephones, a recording clearly stated that the lines were subject to monitoring.

Appellant testified that after he was served with the capias, he approached Officer Haws and requested to speak to Sergeant Phillips and Wilda. Appellant acknowledged that on October 24, 2002, Investigator Hull and Sergeant Phillips advised him of his Fifth and Sixth Amendment rights and that he spoke to them for several hours. Appellant stopped the meeting because his back was hurting. The officers restated appellant's rights when they returned the following day. Appellant acknowledged that he spoke to the officers freely at

that point.  He stated that there was a point during the meeting when he believed that Sergeant Phillips was "twisting" his words.  As a result, appellant stopped the interview and requested counsel.  He said he was never asked to sign a statement or a synopsis.

Appellant did not dispute that Mr. Bowman informed the State on October 18 that he was representing appellant.  Appellant said he did not realize that Wilda was telling the authorities everything that he said until after he was transferred to the federal facility in New York.  Wilda denied cooperating with authorities to record their meetings on October 15 and 16.  Appellant did not know the date on which he learned about Wilda's cooperation but said that it was close in time to when he returned to Washington County.  Before being transferred to New York, appellant learned that Wilda was cooperating in a limited manner with the police.  He acknowledged that he was convicted in New York for conspiracy to distribute cocaine.

Major Brenda Downes, the detention administrator for the Washington County Detention Center, testified that Investigator Hull, Sergeant Phillips, and Major Higgins were not under her supervision.  She stated that of the three officers, only Major Higgins had the authority to issue orders to an employee at the detention facility.

Major Downes testified that volunteers, attorneys, bondsmen, and those who were not employees of the detention center were required to sign a special visitor's log.  Regular visitors, however, were not required to sign the log.  Rather, the receptionist noted the visits on the inmate's visitation list.  Major Downes said that in 2002, there was a five-day waiting period before an inmate could receive a visitor.  She also said that an employee was required to be present for contact visits, and a reason must have been given for a contact visit between an inmate and a relative.  Major Downes did not recall visits being arranged for appellant on October 15 and 16 but stated that she would not have been consulted regarding a contact visit for appellant.

On cross-examination, Major Downes testified that it was not against policy for an investigator to bring another individual along when interviewing an inmate.  She noted a provision in the inmate handbook relating to visits with family members who live more than one hundred miles away.  She said that if a person represented herself to be an inmate's spouse, she would receive a visit.

Major Downes testified that if an inmate requested counsel, the policy is not to procure an attorney for the inmate.  Rather, the policy was to allow the inmate to use the telephone and make a collect call in an attempt to reach an attorney.

Gary Cutshall, a licensed clinical social worker, testified that in October 2002, he was employed by Frontier Health Crisis Response and evaluated inmates who had been placed on suicide watch to determine whether they should remain on suicide watch. Mr. Cutshall evaluated appellant at the jail on October 17. Mr. Cutshall was told that appellant was placed on suicide watch due to statements that he had made to guards. When Mr. Cutshall questioned appellant, he denied making the statements. Mr. Cutshall was not able to interview the guard who had said that appellant made the statements. Mr. Cutshall stated that appellant was in a cold, concrete holding cell in the booking area where inmates on suicide watch were placed to ensure their safety. Mr. Cutshall determined that appellant should be removed from suicide watch but should remain under supervision outside the general population.

Starr Nave, a legal secretary at the District Public Defender's Office, testified that in October 2002, she received two to four collect calls from appellant, who was at the detention center. She did not recall the dates on which appellant called, and she did not accept the calls. She explained that the office policy was not to accept calls from inmates until the attorney who was representing the inmate was in the office. Ms. Nave stated that no attorney in the office was representing appellant. She recalled that she informed Jeff Kelly, an attorney in the office, that appellant had called and that she learned that the office had a conflict preventing the office from representing appellant.

Jeff Kelly, an assistant district public defender, testified that shortly after appellant's arrest, his secretary informed him that appellant had tried to call the office. Mr. Kelly learned from his secretary that appellant had attempted to call on another occasion as well. Mr. Kelly stated that after speaking to the District Public Defender, he did not accept appellant's calls and did not speak to him.

Mr. Kelly testified that he may have received a call from an assistant federal defender in New York. As a result, Mr. Kelly was under the impression that appellant was in the Greene County Jail. Mr. Kelly stated that because he was concerned that he might be representing appellant in the future, he called the Greene County Public Defender's office and asked them to meet with appellant at the jail and advise him not to make any statements to law enforcement. They called Mr. Kelly back and said that appellant was not in the Greene County Jail. Mr. Kelly had no further contact with appellant.

Mr. Kelly said that on two occasions while he was in court, appellant's mother asked him to speak to appellant. He explained to her that it was early in the prosecution and that his office was not appointed to represent appellant. The policy in the office was to refrain from getting involved in a case until the court appointed one of them. At one point, Mr.

Kelly mentioned to Mr. Bowman that someone should intervene and speak to appellant about not making any statements.

The defense recalled Wilda Willis, who testified that Investigator Hull arranged for appellant to call her on one occasion. She said the call occurred either during the week of October 20, 2002, or the following week. Investigator Hull called, spoke to her, and gave appellant the telephone. Wilda acknowledged that according to the transcript of the conversation, the call occurred on October 28. During the call, appellant said, "I'll explain everything and why when I—when I see you." Wilda responded, "Todd's doing everything he can to get me in. He made the arrangements for this call you—you made today. I know. I mean, there's a reason I can tell you, you can trust these guys."

Assistant District Attorney General Janet Hardin testified that Mr. Bowman came to her office on a Friday afternoon and informed her that he represented appellant and that he did not want anyone to talk to appellant. General Hardin said she did not dispute that the meeting occurred on Friday, October 18, 2002. General Hardin then informed the prosecutor assigned to appellant's case.

### 3. Rebuttal Proof

The State recalled Major Downes as a rebuttal witness. Major Downes testified that she reviewed telephone records to determine whether appellant called Mr. Pectol or Mr. Day on October 11, 12, or 13. She said none of the calls made to Mr. Day were from Cell C-7, where appellant was housed at the time. There were a total of nineteen calls made to Mr. Day, and Mr. Day had the calls permanently blocked. Only two calls were made to Mr. Pectol, and they were made from the booking area. The records did not identify who made the calls. The defense recalled appellant as a witness. Appellant testified that when he was initially arrested, he believed that he was housed in Cell C-9 and was moved to Cell C-7 on October 17 after his clothes were returned to him.

The State recalled Major Downes as a witness. Major Downes testified that no calls were made to Mr. Day or Mr. Pectol on October 11, 12, or 13 from Cell C-9.

### 4. Trial Court's Findings

At the close of the proof, the trial court noted the discrepancies between the testimonies of Wilda and Investigator Hull regarding whether any calls were initiated by Investigator Hull. The court noted that due to the number of calls involved in the case, it had become "massively confusing to the people involved, as well as, the court." The trial court credited Wilda's testimony and found that appellant "is just plain not telling the truth." The

court noted that although appellant testified that he expected Wilda to bring counsel to represent him on October 16 when she came with a tape recorder and a legal pad, his testimony is contrary to the tape-recorded meeting. The trial court found that appellant's request for a "fifty dollar lawyer" was not a genuine request for counsel but was a ruse to enable appellant to meet with Wilda.

The trial court denied appellant's motion to suppress his statements to Wilda during the meetings on October 15 and 16, 2002. The court found that appellant initiated the contact and wanted to speak to Wilda. The court also found that the reasons for *Miranda* did not exist because appellant "spoke freely to his ex-wife whom he trusted." The court noted that there was no police-dominated atmosphere, compulsion, or pressure. Appellant instructed Wilda to bring the tape recorder and controlled the tape recorder during the meeting on October 16. The court found that appellant freely and voluntarily made the statements. The trial court further found that appellant requested counsel when he refused an interview with Sergeant Phillips following appellant's meeting with Wilda on October 16.

The trial court also denied appellant's motion to suppress his statements during his calls to Wilda. The court noted that Wilda wanted to discover what had happened to her uncle. All of the calls were initiated by appellant. The court noted that Wilda continued accepting appellant's calls against the advice of law enforcement. Wilda went to New York when law enforcement officers told her not to do so. The trial court found that Wilda acted independently and was driven by her own purposes. The court noted that appellant was told that his calls were subject to monitoring and recording when the calls were placed. The court found that appellant had no expectation of privacy in his calls made from the jail. The court also found that appellant voluntarily initiated the calls and that no false statements were made to induce the calls.

The trial court recognized that after appellant was indicted on October 23, 2002, he had a right to counsel under the Sixth Amendment. The court found that appellant was aware of that right and stopped the interrogation by asserting that right. The court found that appellant's calls to Wilda, a private party, were voluntary acts.

The trial court granted appellant's motion to suppress his statements to Investigator Hull and Sergeant Phillips during the interview on October 24 and 25, 2002. The trial court found that although the appellant knowingly and voluntarily gave the statements, he did not affirmatively waive his *Miranda* rights before doing so. The trial court acknowledged that while there was evidence that appellant signed waiver forms, there was not evidence that he read the documents and made an affirmative waiver of his rights.

## B. Subsequent Proceedings

On May 31, 2007, appellant filed a second motion to suppress the statements that he made to Wilda Willis, raising the same or similar arguments that he raised during his 2004 suppression hearing. Appellant also raised a due process claim. During a hearing on August 27, 2007, the trial court again denied the motion to suppress. On September 25, 2007, the trial court entered an order denying the motion. The court found that appellant was not entitled to an evidentiary hearing because the matter had been previously determined and that appellant's statements to Wilda were freely and voluntarily given. The trial court also found that before giving his statements to Wilda, appellant had invoked his rights under *Miranda* but that *Miranda* did not apply when a statement was given to a trusted friend.

In November 2009, appellant filed a pro se motion seeking to suppress his statements to Wilda Willis. During a hearing on March 16, 2010, Judge Blackwood denied the motion. Judge Blackwood entered an order stating that he had reviewed the record and found no error in the prior judge's rulings. Judge Blackwood found no basis to re-litigate the issues that had been determined previously.

On May 5, 2010, appellant filed a motion to reconsider the motion to suppress the statements and the telephone conversations. Appellant alleged that he had new evidence establishing that Wilda Willis was an agent of the State and that he was denied his right to counsel.

A hearing was held on May 19, 2010, during which the trial court allowed appellant to present additional witnesses. Lieutenant Bradley Tharpe of the Bradley County Sheriff's Office testified that he assisted in preparing a report of the investigation regarding Sam Thomas from October 14 through 17, 2002. He stated that according to the report, Wilda and her friend Joy Gadd arrived at the sheriff's office on Tuesday morning, October 15. Lieutenant Tharpe was awakened and asked how to handle Wilda's visit. He advised Washington County officers that Wilda had more information about the family than anyone else.

Lieutenant Tharpe testified that according to the report, Wilda had talked to appellant on October 15 and that he asked her to return the following day with a tape recorder and a "fifty dollar lawyer." According to the report, appellant wanted to talk to Wilda and planned to either send the attorney out of the room or speak to her in the attorney's presence. Wilda met with appellant on October 16. The investigative report stated, "We did not send an attorney with her for obvious reasons." Lieutenant Tharpe explained that the "obvious reason" was that they were prohibited by law from sending someone in the room with Wilda to pose as an attorney.

Captain Burtt testified that Detective Efaw called him at his home one night and said that Wilda Willis was coming to the office in Bradley County. He did not recall whether he instructed Detective Efaw to contact Wilda that afternoon and request her to come to the office. Captain Burtt was present during an interview with Wilda, but he did not recall the date of the interview. He said that if he interviewed Wilda, he also advised her of her *Miranda* rights. He did not understand why his advising Wilda of her rights would have scared her.

Captain Burtt testified that it would not have necessarily been reported to him that a call was made that included pertinent information that contradicted interviews that he had conducted in Rossville, Georgia. Captain Burtt said that Detective Efaw was the case agent and that much of the information was being reported directly to her. He did not recall interviewing Pamela Marsh, Patty Leming, or Teresa Chrismer. He also did not recall how he learned that the victims were last seen in a blue Jeep.

Investigator Hull testified that on Monday, October 14, 2002, he met with officers from Bradley County and received a copy of the missing persons report of Adam Chrismer. Later that same day, the head that had been recovered was tentatively identified as that of Adam. Investigator Hull said that when the Bradley County officers arrived, several of them began preparing a search warrant affidavit. The first search warrant was executed late in the night of October 14.

Investigator Hull recalled that Patty Leming stated that she last saw the victims on October 4, 2002, at Pizza Hut. Investigator Hull could not recall whether Ms. Leming said that the victims were in a blue Jeep, a red Jeep, or just a Jeep. He also did not recall how he learned that appellant was in a blue Jeep. He did not have any information indicating that Ms. Leming's statement was false.

Investigator Hull testified that he did not know when he received an investigative report prepared by Detective Tom Trotter from Walker County, Georgia. According to the report, Teresa Chrismer told Detective Trotter that Captain Burtt called her on October 11 and informed her that the victims had been using Mr. Thomas's credit cards. Investigator Hull did not investigate Mr. Thomas's disappearance or the credit card usage. Detective Trotter also stated that he contacted Captain Burtt on October 13 and that Captain Burtt said he had been to Rossville, Georgia, to speak to witnesses and search the trailer on Mohawk Street. Captain Burtt told Detective Trotter that appellant denied seeing the victims since they left Johnson City but that appellant was driving the vehicle in which the victims were last seen on October 4.

Investigator Hull testified that someone from the State controlled where the interviews between Wilda and appellant took place and how they occurred. Investigator Hull was present when Steve St. John, an investigator for the defense, interviewed Wilda in the District Attorney General's office. Investigator Hull recalled that Wilda stated that appellant was at her house in a red Jeep to pick up flyers of Mr. Thomas, but Investigator Hull did not recall the date. He said that if Wilda stated that the date was October 4, he would not have had any reason to doubt that. He said that further investigation would have been necessary had appellant been in a completely different vehicle. He noted that the issue was whether appellant was in a red or blue Jeep and that people often get colors of vehicles confused.

Sergeant Phillips testified that he did not recall anyone telling him that appellant had entered a plea in a federal case. He also did not recall that prior to meeting with Wilda, appellant had been taken to federal court and had been appointed counsel. Sergeant Phillips was unaware that after appellant requested counsel on October 16, he was booked, stripped of his clothes, and placed in a cell. Sergeant Phillips said he only told the detention officers to watch appellant because he had admitted to two homicides. He also said it appeared that appellant was placed on suicide watch.

On May 24, 2010, the trial court entered an order denying appellant's motion. The trial court found that appellant failed to present any new evidence that was material to the issue or offer any new legal authority.

### C. Analysis

The evidence presented during the suppression hearings and at trial established the following timetable of events relevant to the issues raised regarding appellant's statements to Wilda Willis.

| Date | Event |
|---|---|
| October 11, 2002 | Appellant was arrested on a federal warrant for violating the terms of his release on pending federal charges in New York. |
| October 15, 2002 | Appellant was taken before a federal magistrate regarding the federal warrant and was appointed counsel. Appellant and Wilda met at the jail, and Appellant instructed Wilda to return the following day. |
| October 16, 2002 | Appellant and Wilda met at the jail, and Appellant confessed to killing the victims. After the meeting, Sergeant Phillips attempted to interview appellant, and appellant requested |

| | counsel. |
|---|---|
| October 18, 2002 | Mr. Bowman informed the State that he was representing appellant regarding the investigation into the victims' deaths. |
| October 23, 2002 | Appellant was indicted for the victims' murders. |
| October 29, 2002 | Appellant was transferred to New York on the federal charges. |
| January 1, 2003 | Appellant and Wilda met at the federal prison in New York. |
| January 3, 2003 | The chainsaw was recovered by police based upon information appellant provided to Wilda. Wilda was speaking to appellant over the telephone when police recovered the chainsaw. |

### 1. Statements on October 15 and 16, 2002

Appellant asserts that the trial court erred in denying his motion to suppress his statements to Wilda Willis on October 15 and 16, 2002. According to appellant, the statements were taken in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution and Article I, section 9 of the Tennessee Constitution.

On review, an appellate court may consider the evidence presented at the suppression hearing and at trial in determining whether the trial court properly denied a pretrial motion to suppress. *State v. Henning*, 975 S.W.2d 290, 297 (Tenn. 1998) (citations omitted). The trial court's findings of fact "are binding on appeal unless the evidence in the record preponderates against them." *State v. Meeks*, 262 S.W.3d 710, 722 (Tenn. 2008) (citing *State v. Berrios*, 235 S.W.3d 99, 104 (Tenn. 2007)). The trial court's conclusions of law and its application of the law to the facts are reviewed de novo without any presumption of correctness. *Id.* (citing *State v. Hayes*, 188 S.W.3d 505, 510 (Tenn. 2006)). The prevailing party "'is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Talley*, 307 S.W.3d 723, 729 (Tenn. 2010) (quoting *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions regarding "the assessment of witness credibility, the weight and value of evidence, and the resolution of evidentiary conflicts are entrusted to the trial court." *Meeks*, 262 S.W.3d at 722 (citing *State v. Scarborough*, 201 S.W.3d 607, 615 (Tenn. 2006)).

## a. Fifth Amendment Claim

Appellant contends that officers failed to advise him of his *Miranda*[3] rights when he was arrested on October 11, 2002, that he invoked his right to counsel on multiple occasions before he met with Wilda on October 15 and 16, and that Wilda was acting as an agent for the State when she met with him.

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." *See Malloy v. Hogan*, 378 U.S. 1, 6 (1964) (holding that the Fifth Amendment's protection against compulsory self-incrimination is applicable to the states through the Fourteenth Amendment). Article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." "The significant difference between these two provisions is that the test of voluntariness for confessions under Article I, [section] 9 is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." *State v. Crump*, 834 S.W.2d 265, 268 (Tenn. 1992).

The Tennessee Supreme Court recently held that "the self-incrimination protections of the Fifth Amendment and Tenn. Const. art. I, § 9 are not triggered when a private citizen who is cooperating with the police elicits a confession from a suspect during the early stages of a criminal investigation." *State v. Fred Chad Clark, II* __ S.W.3d __, No. M2010-00570-SC-R11-CD, 2014 WL 5801658, at *9 (Tenn. 2014) (citing *State v. Henry Floyd Sanders*, __ S.W.3d __, No. M2011-00962-SC-R11-CD, 2014 WL 5801665, at *14 (Tenn. 2014)). While recognizing that the exclusionary rule is designed to deter future police misconduct, our supreme court stated that there is no police misconduct to be deterred when a private citizen obtains a statement from a suspect while cooperating with the police. *Id.*; *Henry Floyd Sanders*, __ S.W.3d at __, 2014 WL 5801665, at *14. Rather, "when a victim (or a victim's relative or friend) goes to the police and then, with police assistance, elicits a confession from a suspect, the suspect has simply misplaced his trust in a confidant." *Fred Chad Clark, II*, __ S.W.3d at __, 2014 WL 5801658, at *9. "The United States Constitution provides no protection for those who voluntarily offer information to a confidant." *Henry Floyd Sanders*, __ S.W.3d at __, 2014 WL 5801665, at *14 (citation omitted). "In 'misplaced trust' cases, courts generally assume the informant is a state agent, and find that voluntary statements made to an informant do not warrant constitutional protection." *Fred Chad Clark, II*, __ S.W.3d at __, 2014 WL 5801658, at *9 (citing *Henry Floyd Sanders*, __ S.W.3d at __, 2014 WL 5801665, at *10).

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

An involuntary confession, however, is inadmissible. *Id.* In determining whether a confession was voluntarily given, the court must decide whether the confession was "the product of a rational intellect and a free will." *Id.* (quotation marks omitted). The primary issue is "whether a suspect's will was overborne so as to render the confession a product of coercion." *Id.* (quotation marks omitted). The "voluntariness test" requires an examination into the totality of the circumstances surrounding the confession, including "the characteristics of the accused and the details of the interrogation." *Id.* (quotation marks omitted).

In denying appellant's motion to suppress, the trial court found that appellant's statements to Wilda Willis were voluntary. The trial court found that the statements were not the result of compulsion and that appellant "spoke freely" to Wilda.

Following appellant's arrest, he contacted Wilda and requested that she meet with him. Wilda complied with his request. They only met for a short time on October 15. They were separated by plexiglass and were unable to communicate without raising their voices. During the meeting, appellant said that while he had information for Wilda, he did not want to "scream it" or "repeat it [fifty] times." He denied knowing anything about the victims, and he and Wilda discussed meeting the following day. When Wilda expressed doubt regarding whether she would be allowed to meet with him, appellant devised a plan whereby Wilda would bring a "fifty-dollar" attorney and would present herself as a paralegal. Appellant would then send the attorney out of the room and speak to Wilda alone. Appellant also instructed Wilda to bring a tape recorder and a writing pad when she returned. The trial court found that appellant's testimony that he wished to seek the advice of counsel and that he was sincerely requesting that Wilda obtain counsel for him was not credible. Rather, appellant's instruction to Wilda was a ruse in order to allow Wilda into the jail to meet with him the following day.

During the meeting, Wilda did not threaten appellant or make him any promises. When Wilda informed appellant that her daughter was "terribly upset because of what's on the news," appellant confirmed that he was aware of this. Wilda also told appellant that she wanted to help, but her offer was not conditioned upon appellant's confessing.

During the October 15 meeting, appellant denied any knowledge regarding the victims' whereabouts. However, shortly after the October 16 meeting began, appellant confessed to killing the victims. He maintained sufficient control of himself to be able to provide a version of the events intended to present his conduct in the best possible light. He also exercised some control over what portions of the meeting that Wilda recorded in an apparent attempt to record only those portions of this statement that presented him in a more favorable light.

Moreover, an examination of the characteristics of appellant does not lead us to conclude that his confession was involuntary. While appellant was incarcerated at the time of his confession, the fact of confinement alone does not render a confession involuntary. Appellant had not been questioned by police prior to his confession. While appellant alleged in his pro se motion to reconsider that officers "subjected [him] to sleep deprivation" and withheld food from him during the time leading up to his confession to Wilda, appellant failed to present any evidence during the suppression hearing to support his claims.

After examining the totality of the circumstances, particularly the characteristics of appellant and the circumstances surrounding the confession, we conclude that appellant's statements on October 15 and 16, 2002, were the product of a rational intellect and a free will. Appellant is not entitled to relief regarding this issue.

### b. Sixth Amendment Claim

Appellant contends that his statements to Wilda Willis on October 15 and 16, 2002, were given in violation of his Sixth Amendment right to counsel because he had been charged with violation of the terms of his release on a federal charge and had been appointed counsel when he gave the statements. According to appellant, because he was prohibited from committing criminal acts as a condition of his release, any statements regarding any criminal acts that he made after he was charged for violating the condition of his release violated his Sixth Amendment rights. Appellant also asserts that the basis for his violation charge was factually related or intertwined with the murder charges. He acknowledges that he did not raise this issue in the trial court and that as a result, our review is limited to plain error. *See State v. Dotson*, 450 S.W.3d 1, 48-49 (Tenn. 2014) (requiring plain error review when suppression issues are raised for the first time on appeal in capital cases).

When conducting plain error review, this court will grant relief only when the following five prerequisites are met:

> (1) the record clearly establishes what occurred in the trial court; (2) a clear and unequivocal rule of law was breached; (3) a substantial right of the accused was adversely affected: (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is necessary to do substantial justice.

*State v. Gomez*, 239 S.W.3d 733, 737 (Tenn. 2007) (internal citations and quotation marks omitted). The defendant bears the burden of persuading the appellate court that plain error exists. *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

The Sixth Amendment provides that "in all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." The Sixth Amendment right to counsel is "offense specific." *McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991); *see State v. March*, 395 S.W.3d 738, 776 (Tenn. Crim. App. 2011). A defendant's invocation of the right to counsel for an indicted offense is not an invocation of the right to counsel in future prosecutions. *McNeil*, 501 U.S. at 75. Moreover, the Sixth Amendment right to counsel does not include all offenses that are "factually related" to the indicted offenses. *Texas v. Cobb*, 532 U.S. 162, 168 (2001). Rather, the Sixth Amendment right to counsel attaches only to charged offenses and other "offenses that, even if not formally charged, would be considered the same offense" under the test enunciated in *Blockburger v. United States*, 284 U.S. 299 (1932). *Cobb*, 532 U.S. at 169. The Court in *Blockburger* held that "where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger*, 284 U.S. at 304.

Appellant's claim that the Sixth Amendment applies to uncharged offenses that are factually related to a charged offense has been rejected. *See Cobb*, 532 U.S. at 168; *State v. Bruce D. Mendenhall*, No. M2010-01381-CCA-R3-CD, 2013 WL 360525, at *52 (Tenn. Crim. App. Jan. 30, 2013), *perm. app. denied* (Tenn. June 11, 2013). Appellant does not argue that the charge for violation of the terms of his release on a pending federal charge and the murder charges regarding the victims constituted the same offense under *Blockburger*. Appellant has failed to establish that a clear and unequivocal rule of law was breached. *See Gomez*, 239 S.W.3d at 737. Therefore, he is not entitled to relief regarding this issue.

### c. Due Process Claim

Appellant maintains that his statements on October 15 and 16, 2002, were the product of a violation of his due process rights under the Fourteenth Amendment. However, "[j]ust as the Fourth and Fifth Amendments do not protect criminal suspects from having their trust betrayed by police informants, neither does the Due Process Clause of the Fourteenth Amendment." *Henry Floyd Sanders*, __ S.W.3d at __, 2014 WL 5801665, at *14. Moreover, we have held that appellant's October 15 and 16 statements were voluntary. Appellant is not entitled to relief regarding this issue.

### 2. Statements on January 1 and 3, 2003

Appellant argues that the trial court erred in denying his motion to suppress his statements to Wilda Willis on January 1 and 3, 2003. According to appellant, the introduction of his statements violated the Fifth, Sixth, and Fourteenth Amendments of the

United States Constitution and Article I, sections 8 and 9 of the Tennessee Constitution because he invoked his right to counsel before he met with Wilda.

### a. Fifth Amendment and Fourteenth Amendment Claims

Because the Fifth and Fourteenth Amendments do not protect a suspect who voluntarily offers information to a confidant who is or becomes a state agent, we must determine whether appellant's statements to Wilda on January 1 and 3, 2003, were voluntary. *See Henry Floyd Sanders*, __ S.W.3d at __, 2014 WL 5801665, at *14 (citing *Branam v. State*, 55 S.W.2d 563, 569 (Tenn. 1993)). We must examine the totality of the circumstances surrounding the statements and determine whether the statements were "the product of a rational intellect and a free will." *Fred Chad Clark, II*, __ S.W.3d at __, 2014 WL 5801658, at *9 (quotation marks omitted).

Appellant continued to call Wilda on a regular basis after he met with her on October 15 and 16, 2002. When appellant made calls from the jail in Tennessee and the federal prison in New York, a recording informed him that his calls were subject to monitoring and recording. Appellant acknowledged that he was aware that Wilda had cooperated with the police to some extent but that he continued to contact her. The trial court found that no false statements were made in an effort to induce appellant to make the calls and that the calls were voluntarily made.

Appellant requested that Wilda visit him in New York and promised her that he would provide her with information regarding Mr. Thomas and the victims. Appellant had previously told Wilda and police officers where Mr. Thomas's body could be located, and they found Mr. Thomas's body based upon appellant's instructions. Wilda complied with appellant's request for a meeting.

There is no evidence that Wilda threatened appellant or made him any promises during the meeting. Appellant proclaimed his innocence and again provided a version of the events intended to present his conduct in the best possible light. Appellant claimed that he had learned where the chainsaw had been discarded, told Wilda where to find the chainsaw, devised a plan to use the chainsaw to frame someone else for the victims' murders, and gave Wilda specific instructions in furtherance of his plan. On January 3, appellant made multiple calls to Wilda from the telephone at the federal prison, knowing that the calls were recorded, in order to ensure that she was following his plan.

After examining the totality of the circumstances, particularly the characteristics of appellant and the circumstances surrounding the confession, we conclude that appellant's

statements on January 1 and 3, 2003, were the product of a rational intellect and a free will. Appellant is not entitled to relief regarding this issue.

## 2. Sixth Amendment Claim

After the initiation of formal charges against an accused, the Sixth Amendment right to counsel attaches, guaranteeing the accused the right to rely on counsel as a medium between himself and the State at any critical confrontation with state officials. *Maine v. Moulton*, 474 U.S. 159, 176 (1985); *State v. Berry*, 592 S.W.2d 553, 557 (Tenn. 1980). In Tennessee, the adversarial judicial process is initiated at the time of filing of the formal charge, such as the indictment. *Huddleston*, 924 S.W.2d at 669. In *Moulton*, the United States Supreme Court held:

> Once the right to counsel has attached and been asserted, the State must of course honor it. This means more than simply that the State cannot prevent the accused from obtaining the assistance of counsel. The Sixth Amendment also imposes on the State an affirmative obligation to respect and preserve the accused's choice to seek this assistance. We have on several occasions been called upon to clarify the scope of the State's obligation in this regard, and have made clear that, at the very least, the prosecutor and police have an affirmative obligation not to act in a manner that circumvents and thereby dilutes the protection afforded by the right to counsel.

*Moulton*, 474 U.S. at 170-71 (footnote omitted); *see Hartman v. State*, 896 S.W.2d 94, 99-100 (Tenn. 1995).

Appellant was indicted for the victims' murder on October 23, 2002. As a result, appellant's right to counsel had attached at the time that he made the statements to Wilda in January 2003. He was entitled to rely on counsel as a "medium" between himself and the State.

The right to counsel not only applies to direct confrontations by known government officers but also to "'indirect and surreptitious interrogations'" by covert government agents and informants. *United States v. Henry*, 447 U.S. 264, 273 (1980) (quoting *Massiah v. United States*, 377 U.S. 201, 206 (1964)); *see also Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986) ("[T]he primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the direct equivalent of police interrogation."). The Court in *Moulton* held:

Knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity. Accordingly, the Sixth Amendment is violated when the State obtains incriminating statements by knowingly circumventing the accused's right to have counsel present in a confrontation between the accused and a state agent.

*Moulton*, 474 U.S. at 176 (citation omitted). "The law will not permit law enforcement officials to do by ruse, trickery, deceit and deception that which it is not permitted to do openly and honestly." *Berry*, 592 S.W.2d at 561.

There are three requirements for finding a Sixth Amendment violation: (1) the right counsel must have attached at the time of the alleged violation; (2) the informant must have been acting as a "government agent"; and (3) the informant must have deliberately elicited incriminating information from the defendant. *Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 892 (3d Cir. 1999). The United States Supreme Court has not defined the term "government agent" for Sixth Amendment purposes. *See Ayers v. Hudson*, 623 F.3d 301, 310 (6th Cir. 2010); *Matteo*, 171 F.3d at 893. Some courts have applied a bright-line rule that "[a]n informant becomes a government agent . . . only when the informant has been instructed by the police to get information about the particular defendant." *United States v. Birbal*, 113 F.3d 342, 346 (2d Cir. 1997); *see Ayers*, 623 F.3d at 310-11 (citing cases). Other courts have rejected a bright-line rule approach and have held that the determination of whether an individual is a government agent depends upon the facts and circumstances of each case. *See Ayers*, 623 F.3d at 311 (citing cases).

In *Ayers*, the Court of Appeals for the Sixth Circuit agreed with those courts that do not limit the agency relationship to cases where the government officials instructed the informant to obtain evidence from a defendant. *Id.* The Sixth Circuit reasoned:

As *Henry* illustrates, a *Massiah* violation can occur even where the State specifically instructs its informant "*not* to initiate any conversation with or question [a defendant] regarding the [offense for which he had been indicted]." *Henry*, 447 U.S. at 266 (emphasis added). "[I]t is not the government's intent or overt acts that are important; rather, it is the 'likely . . . result' of the government's acts." *Randolph v. California*, 380 F.3d 1133, 1144 (9th Cir. 2004) (quoting *Henry*, 447 U.S. at 271). Thus, we hold that although direct written or oral instructions by the State to a jailhouse informant to obtain evidence from a defendant would be sufficient to demonstrate agency, it is not the only relevant factor. A court must also analyze the facts

and circumstances of a particular case to determine whether there exists an express or implied agreement between the State and the informant at the time the elicitation took place that supports a finding of agency. *See Henry*, 447 U.S. at 271 (indicating that a "combination of circumstances is sufficient to support" a finding of agency); *Moulton*, 474 U.S. at 176; *see also [United States v.] Brink*, 39 F.3d [419,] 423-24 [(3d Cir. 1994)] (suggesting that a "tacit agreement" may be sufficient to establish agency for *Massiah* purposes). To hold otherwise would allow the State to accomplish "with a wink and a nod" what it cannot do overtly. This, the Sixth Amendment does not permit.

*Ayers*, 623 F.3d at 311-12 (footnotes omitted).

We likewise reject the bright-line rule approach in determining whether an informant was acting as a state agent. "[T]he infinite number of ways that investigators and informants can combine to elicit information from an unsuspecting defendant precludes us from establishing any litmus test for determining when an informant is acting as a government agent under *Massiah*." *Matteo*, 171 F.3d at 906 (McKee, J., concurring). Rather, we will examine the particular facts and circumstances of each case to determine whether an informant was acting as a government agent at the time that the informant elicited information from a defendant.

To establish that the informant was a government agent, "'there must be some evidence that an agreement, express or implied, between the individual and a government official existed at the time the elicitation took place.'" *Id.* at 893 (quoting *Depree v. Thomas*, 946 F.2d 784, 794 (11th Cir. 1991)). A defendant need not present direct evidence of a Sixth Amendment violation. *Ayers*, 623 F.3d at 312 n.8. Because "[d]irect proof of the State's knowledge will seldom be available," the defendant must only present evidence that "the State must have known that its agent was likely to obtain incriminating statements from the accused in the absence of counsel." *Moulton*, 474 U.S. at 176 n.12 (citation and internal quotation marks omitted).

In the present case, Wilda agreed in October 2002, before appellant was indicted, to assist the police by meeting with appellant in an attempt to obtain information from him. She wore a wire during the first meeting and provided the State with the portions of the second meeting that she had recorded. Officers also placed a recording device in the room during the second meeting and listed to the meeting in another room as it occurred.

After appellant was indicted, Wilda continued to assist officers in obtaining information from appellant. Wilda estimated that appellant made hundreds of calls to her after he was transferred to New York at the end of October 2002. She acknowledged that

she continued to question appellant about the case and reported those conversations to the police. While officers from the Johnson City Police Department and the Washington County Sheriff's Office and prosecutors with the District Attorney General's office discouraged Wilda from continuing to communicate with appellant, officers from Bradley County asked Wilda to record the conversations. The officers furnished her with a tape recorder and blank tapes with which to record the conversations. While Wilda decided to use her own tape recorder to record with conversations, she provided the recordings to officers from both Bradley County and Washington County.

Wilda testified that officers advised her against going to New York to meet with appellant. Nevertheless, Wilda maintained contact with the officers while in New York and met with them regarding the information that she had learned from appellant shortly after she returned from New York. The officers and Wilda found the chainsaw based upon the information that appellant provided to Wilda in New York. While they were searching for the chainsaw, appellant called Wilda multiple times. Wilda spoke to him in the presence of the officers and recorded the conversations using a recorder provided by the officers.

Wilda was not merely a jailhouse acquaintance but was a former wife whom appellant still trusted. *See Henry*, 447 U.S. at 270. The officers, therefore, knew that appellant would be more likely to make an incriminating statement to Wilda. *See Matteo*, 171 F.3d at 894-95 (identifying the informant's status as a trusted friend as a factor weighing in favor of an agency relationship).

Appellant also was in custody when Wilda obtained information from him. The United States Supreme Court has held that "the mere fact of custody imposes pressures on the accused; confinement may bring into play subtle influences that will make him particularly susceptible to the ploys of undercover Government agents." *Henry*, 447 U.S. at 274. The use of an informant under these circumstances "'intentionally creates a situation likely to induce [the defendant] to make incriminating statements without the assistance of counsel'" and is significant to the issue of agency. *Matteo*, 171 F.3d at 895 (quoting *Henry*, 447 U.S. at 274). While appellant initiated the contact with Wilda, "the identity of the party who instigated the meeting at which the Government obtained incriminating statements [is] not decisive or even important" to the issue of whether a Sixth Amendment violation occurred. *Moulton*, 474 U.S. at 174. Rather, we conclude that under the facts and circumstances of this case, Wilda was acting as a state agent when appellant made the statements to her on January 1 and 3, 2003.

Appellant also must establish that Wilda deliberately elicited the incriminating statements from him. The United States Supreme Court has stated that "the primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are

the equivalent of direct police interrogation." *Kuhlmann*, 477 U.S. at 459. A defendant does not establish a Sixth Amendment violation "simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police. Rather, the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." *Id.* In *Kuhlmann*, the Court concluded that no Sixth Amendment violation occurred when officers placed a man who had agreed to act as an informant in the same cell as the defendant, who then spontaneously made incriminating statement to the informant. *Id.* at 460.

Wilda testified that she was not allowed to bring a recording device into the federal prison in New York for her January 1 meeting with appellant. As a result, no recording of the meeting exists. Regardless, the evidence demonstrates that Wilda was not "merely listening" when appellant made the statements on January 1 and 3.

Wilda visited appellant intending to obtain information regarding the murders of the victims and Mr. Thomas. Appellant asked her to assist him in retrieving the chainsaw and other items and use them to frame someone else for the victims' murders, and Wilda agreed to do so. The transcript of the recordings of the telephone conversations demonstrate that Wilda engaged appellant in conversations and led him to believe that she was following the instructions that he had given her in New York. For example, Wilda told appellant that she had located the chainsaw, that she had to move brush in order to reach it, that her daughter was with her, and that she would clean the chainsaw "right now." Wilda asked appellant whether the chainsaw had a "Craftman, cross-made blade [sic] on it" and questioned him regarding the location of other items. During a second call, Wilda told appellant that she was on her way to the "second location" and confirmed that she would "secure" the chainsaw at a location other than her home. This evidence establishes that Wilda was not merely a listener but deliberately elicited incriminating information from appellant.

We conclude that appellant's statements on January 1 and 3, 2003, were obtained in violation of his Sixth Amendment right to counsel. Accordingly, the trial court erred in denying appellant's motion to suppress these statements. Because appellant's statements led to the discovery of the chainsaw, the trial court also should have suppressed the evidence of the specific chainsaw that had been recovered. *See Nix v. Williams*, 467 U.S. 431, 442 (1984) (noting that the "fruit of the poisonous tree" doctrine applies to Sixth Amendment violations).

We further conclude that the admission of appellant's statements on January 1 and 3, 2003, and evidence of the chainsaw that was recovered as a result of the statements were harmless beyond a reasonable doubt. *See Hartman*, 896 S.W.2d at 100-01 (holding that the

admission of a statement that was taken in violation of the defendant's Sixth Amendment right to counsel was harmless beyond a reasonable doubt). Appellant maintained his innocence both during his January 1 meeting with Wilda and at trial and asserted that someone else had committed the murders. Other evidence was presented at trial to establish that appellant used a chainsaw to sever Adam's head and hands. Finally, the other evidence of guilt presented at trial was overwhelming. In October 2002, appellant informed Wilda that he "blew [the victims'] brains out" at Betty Willis's home, that he cut off Adam's head and hands and threw them in the river, and that he put Samantha's body and the remaining portion of Adam's body in a storage unit. Adam's head and hands were discovered in Boone Lake. Officers located Samantha's body and the rest of Adam's body in a storage unit that was rented by Betty. Both Adam and Samantha had been shot in their heads, and officers later found the gun used to shoot the victims near Betty's home. Items connected to Betty's home were found inside the containers with the victims' bodies. Accordingly, Appellant is not entitled to relief regarding this issue.

### ISSUE III. SEARCHES OF RESIDENCE AND STORAGE UNIT

Appellant asserts that the trial court erred in denying his motion to suppress evidence seized as a result of the searches of the Brentwood Drive residence and the storage unit pursuant to search warrants without holding an evidentiary hearing. He maintains that the searches violated his rights under the Fourth Amendment of the United States Constitution and Article I, section 7 of the Tennessee Constitution.

### A. Pre-Trial Proceedings

On February 24, 2010, appellant filed a pro se motion to suppress in which he alleged that the affidavits upon which the search warrants were based included false and misleading statements. In the portion of the motion entitled "STANDING," appellant alleged that "the State initiated the procurement of the search warrants[] and ha[s] standing. Additionally, the State placed the Defendant's name on the search warrants as the primary name. The Defendant avers he has standing to initiate this action in addition to the State having standing."

Appellant stated in his motion that search warrants were issued on October 15, 16, 17, and 23, 2002. Appellant, however, only attached the affidavit of the search warrant for the Brentwood Drive address dated October 15, 2002. The affidavit provided as follows:

1.    On 10-5-02, Samuel Johnson Thomas, stepfather of Howard Hawk Willis, was reported missing from Bradley County, Tennessee. Investigators from Bradley County checked the victim's residence after

the report of his disappearance[ ] and discovered blood in the stairwell and with the use of luminol, investigators found positive responses for blood in the garage and sink area. On September 5, 2002, and September 7, 2002, Investigators Greg Underwood and Jon Eaves of the Bradley County Sheriff's Department viewed Howard Hawk Willis using the credit cards of Samuel Johnson Thomas, on a Walmart surveillance tape on Battlefield Parkway, Fort Oglethorpe, Georgia. A juvenile, Adam Chrismer, was also seen on the tape with Willis. Investigator Captain Bill Burtt of the Bradley County Sheriff's Department interviewed Kelly Willis Chancey who stated that on October 5, 2002, she called Samuel Thomas' cell phone and it was answered by her father, Howard Hawk Willis.

2. On 10-1-2002, Teresa Chrismer, . . . stated that she had spoken with her son, Adam Chrismer, 17 years of age, and that he was staying with Elizabeth Hawk "AKA Betty Willis," mother of Howard Hawk Willis, in Johnson City, Tennessee. It was later determined through investigation, that Elizabeth Hawk "AKA Betty Willis" resides at 104 Brentwood Drive, Johnson City, Tennessee.

3. On 10-11-2002, officers of the Johnson City Bureau of Police responded to Winged Deer Park located on Carroll Creek Road. Upon arrival, officers observed a severed human head in the waters of Boone Lake. Washington County Sheriff's Deputies were summoned to the scene and filed a report. Dr. Vincent Pinyard, Washington County Medical Examiner[,] ordered an autopsy of the human head.

4. On October 11, 2002, Investigators Bill Coultry, Shaunda Efaw, and Keith Fretwell, arrested Howard Hawk Willis on a federal detainer warrant. Howard Hawk Willis was arrested in the residence of Howard and Marie Holmes, 1324 Lowell Street, Johnson City, Tennessee, who are Howard Willis' uncle and aunt. During the warrant service at the residence, Investigators Coultry and Efaw observed a dark color stain in the rear cargo area of a blue 1991 Jeep Cherokee bearing Tennessee registration JWT-940. On October 13, 2002, Walker County Sheriff's Department in Georgia[ ] took a missing persons report listing Adam Chrismer as being missing by his mother, Teresa Chrismer. Theresa also stated in the report that she saw Adam and Samantha Chrismer driving a blue Jeep Cherokee.

5.  On October 12, 2002, Edward Baker found a human hand in the waters of Boone Lake while fishing. Another human hand was located within a quarter mile down stream from the first hand by a member of the Washington County Sheriff's Department search team. Both hands were turned over to Dr. Gretel Harlan by Investigator Todd Hull of the Washington County Sheriff's Department for comparison with the human head.

6.  On October 14, 2002, Investigator Todd Hull of the Washington County Sheriff's Department spoke to Detective Tom Trotter of the Walker County Sheriff's Department located in Lafayette, Georgia[,] in reference to a description of Adam Chrismer. Detective Trotter gave a physical description of Adam Chrismer. Trotter stated to Investigator Todd Hull that Adam Chrismer had his left ear pierced, a small surgical scar on his right cheek from a cyst that had been removed, a cyst growth on the temple, and a BB embedded in his left cheek from a previous injury.

7.  Investigator Todd Hull spoke with Dr. Gretel Harlan on October 14, 2002, and she told Investigator Hull that the above described features in paragraph 6 were consistent with the features on the human head recovered from Boone Lake on October 11, 2002.

8.  On October 14, 2002, Lt. Debbie Barron spoke with Teresa Chrismer who stated that [in] the last week of September she had [seen] her son Adam and Samantha in a Blue Jeep. She said [t]hat Adam said that he was going to go and do one last thing for Howard Willis. Teresa also stated that she had spoke with her son Adam on October 1, 2002, and he advised that he was currently in Johnson City at the home of the mother of Howard Willis. Teresa told Lt. Debbie Barron about the physical features of Adam Chrismer's head. Teresa stated that Adam had a BB in his left cheek, a scar on his right cheek w[h]ere a cyst had been removed, a cyst on his temple, and a pierced left ear.

The copy of the affidavit that appellant attached to his motion was not signed. However, a police report attached to appellant's motion indicates that Investigator Hull was the affiant and executing officer. Appellant alleged that the affidavit included false and misleading statements.

The State filed a response arguing that appellant failed to "provide[ ] the requisite showing to mandate an evidentiary hearing to challenge the search warrants." The State maintained that appellant failed to allege facts establishing that he had "standing" to contest the search warrants. The State further maintained that the statements challenged by appellant were not false or misleading and that the affidavit established probable cause absent the challenged statements.

During a hearing on March 16, 2010, the State argued that appellant did not have "standing" to contest the validity of the warrants. Appellant responded that while the Brentwood Drive residence belonged to his mother, he also was living there. The trial court denied the motion to suppress finding that appellant's statements in the motion regarding "standing" were conclusory and that appellant failed to include a factual basis to support his allegations.

## B. Denial of Evidentiary Hearing Regarding the Searches of the Brentwood Drive Address

Appellant argues that the trial court erred in denying him an evidentiary hearing regarding the searches of the Brentwood Drive residence. According to appellant, he alleged sufficient facts in his motion to suppress to establish that he had "standing" to challenge the search and that issuance of the search warrant on October 15, 2002, was based upon false and misleading information.

The Fourth Amendment to the United States Constitution provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." Article I, section 7 of the Tennessee Constitution similarly prohibits unreasonable searches and seizures, and our supreme court has held that this provision is identical in intent and purpose with the Fourth Amendment. *See, e.g., State v. Binette*, 33 S.W.3d 215, 218 (Tenn. 2000); *State v. Vineyard*, 958 S.W.2d 730, 733 (Tenn. 1997). "The essence of the prohibition against unreasonable searches and seizures under the Fourth Amendment is to 'safeguard the privacy and security of individuals against arbitrary invasions of government officials.'" *State v. Downey*, 945 S.W.2d 102, 106 (Tenn. 1997) (quoting *Camara v. Municipal Court*, 387 U.S. 523, 528 (1967)). The state and federal constitutional protections "are implicated only when a police officer's interaction with a citizen impermissibly intrudes upon the privacy or personal security of the citizen." *State v. Daniel*, 12 S.W.3d 420, 424 (Tenn. 2000).

When a defendant seeks to suppress evidence seized pursuant to a search warrant, the burden is on the defendant to prove by a preponderance of the evidence:

(1) the existence of a legitimate expectation of privacy in the place or property from which the items sought to be suppressed were seized; (2) the identity of the items sought to be suppressed; and (3) the existence of a constitutional or statutory defect in the search warrant or the search conducted pursuant to the warrant.

*State v. Henning*, 975 S.W.2d 290, 298 (Tenn. 1998) (citing *State v. Evans*, 815 S.W.2d 503, 505 (Tenn. 1991); *State v. Harmon*, 775 S.W.2d 583, 585-61 (Tenn. 1989)). Tennessee Rule of Criminal Procedure 41(f) requires that the trial court receive evidence on any issue of fact necessary to decide a motion to suppress. *See Evans*, 815 S.W.2d at 505. The trial court is not required to set an evidentiary hearing as a matter of course but must do so only if the motion alleges facts that, if proven, would require the granting of relief. *Id.* "Factual allegations that are general and conclusory, or based upon suspicion and conjecture will not suffice." *Id.*

The United States Supreme Court has held that the "rights assured by the Fourth Amendment are personal rights, and that they may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure." *Simmons v. United States*, 390 U.S. 377, 389 (1968). The focus of the inquiry should be placed "on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing." *Rakas v. Illinois*, 439 U.S. 128, 139 (1978). Thus, in evaluating whether a defendant's Fourth Amendment rights have been violated, we must determine (1) whether the defendant, by his conduct, has "'exhibited an actual (subjective) expectation of privacy'" and (2) whether the defendant's subjective expectation of privacy is "'one that society is prepared to recognize as reasonable.'" *State v. Ross*, 49 S.W.3d 833, 840 (Tenn. 2001) (quoting *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)).

Appellant maintains that he had an expectation of privacy in the Brentwood Drive residence because he was living there. He relies upon the following in support of his claim that his allegation of "standing" in his motion to suppress was sufficient: (1) the assertion in the motion that "the State placed the Defendant's name on the search warrants as the primary name"; (2) appellant's statement to the trial court that he was living at the Brentwood Drive home; (3) Investigator Hull's affidavit describing the address as the residence of Elizabeth Hawk and where appellant "also visits and resides";[4] (4) an investigative summary attached to the motion to suppress stating that Bradley County officers wanted to prepare search warrants for "two houses [appellant] stayed at" to search for

---

[4] This portion of the affidavit, which includes a description of the residence and the items sought, was not attached to appellant's motion to suppress.

evidence related to Mr. Thomas's disappearance; and (5) Captain Burtt's testimony during the original suppression hearing that appellant had stated that he was staying in Johnson City. Regardless of whether appellant alleged sufficient facts regarding his expectation of privacy in the home, appellant was also required to allege sufficient facts that, if proven, established the existence of a constitutional or statutory defect in the search warrant or the search conducted pursuant to the warrant in order to be entitled to an evidentiary hearing. As explained below, we conclude that appellant failed to do so.

In *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978), the United States Supreme Court held that the fruits of a search should be excluded when the affidavit in support of the search warrant includes deliberately or recklessly false statements by the affiant, which are material to the establishment of probable cause. The "fraudulent misrepresentation of a material fact will invalidate a search warrant." *State v. Little*, 560 S.W.2d 403, 406 (Tenn. 1978). Our supreme court has defined two situations in which false information within the supporting affidavit mandates the application of the exclusionary rule despite the affidavit's facial sufficiency:

> (1) a false statement made with intent to deceive the [c]ourt, whether material or immaterial to the issue of probable cause, and

> (2) a false statement, essential to the establishment of probable cause, recklessly made. Recklessness may be established by showing that a statement was false when made and that affiant did not have reasonable grounds for believing it, at that time.

*Id.* at 407. "Allegations of negligence or innocent mistakes are insufficient to invalidate the search warrant." *State v. Yeomans*, 10 S.W.3d 293, 297 (Tenn. Crim. App. 1999) (citing *Franks*, 438 U.S. at 171).

A defendant who alleges that a search warrant was procured based upon false information is not automatically entitled to an evidentiary hearing. Rather, the defendant must make a "substantial preliminary showing" of the illegality of the affidavit upon which the search warrant was based. *See Franks*, 438 U.S. at 170. In *Franks*, the United States Supreme Court explained:

> There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They

should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statements of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant. Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required. On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing. Whether he will prevail at that hearing is, of course, another issue.

*Id.* at 171-72 (footnote omitted). Unlike the requirements set forth in *Franks*, however, our supreme court has held that a defendant who establishes that a false statement was made with the intent to deceive the court need not establish that the false statement was material to the issue of probable cause. *See Little*, 560 S.W.2d at 407.

Appellant takes issue with multiple statements in the first paragraph of the affidavit, which provides as follows:

On 10-5-02, Samuel Johnson Thomas, stepfather of Howard Hawk Willis, was reported missing from Bradley County, Tennessee. Investigators from Bradley County checked the victim's residence after the report of his disappearance, and discovered blood in the stairwell and with the use of luminol, investigators found positive responses for blood in the garage and sink area. On September 5, 2002, and September 7, 2002, Investigators Greg Underwood and Jon Eaves of the Bradley County Sheriff's Department viewed Howard Hawk Willis using the credit cards of Samuel Johnson Thoma[ ] on a Walmart surveillance tape on Battlefield Parkway, Fort Oglethorpe, Georgia. A juvenile, Adam Chrismer, was also seen on the tape with Willis. Investigator Captain Bill Burtt of the Bradley County Sheriff's Department interviewed Kelly Willis Chancey who stated that on October 5, 2002, she called Samuel Thomas' cell phone and it was answered by her father, Howard Hawk Willis.

Appellant states that Mr. Thomas was reported missing on September 23, 2002, rather than October 5, 2002. Appellant attached to his motion the missing persons report dated September 23 that states that Mr. Thomas was last seen on September 5, 2002. Appellant, however, failed to make a substantial preliminary showing that Investigator Hull, as the

-98-

affiant, made a false statement with the intent to deceive the court. When this sentence is viewed in relation to the remainder of the paragraph, it is clear that Investigator Hull was attempting to allege that appellant and Adam Chrismer were seen using Mr. Thomas's credit cards on the day of and after Mr. Thomas had been last seen alive. At most, appellant made a substantial preliminary showing that the statement was recklessly made.

Appellant next contends that the affidavit omitted evidence that he had permission to use Mr. Thomas's credit cards. "Although *Franks* and *Little* concerned only 'false statements,' many courts have recognized that the same rationale should extend to material omissions in an affidavit." *Yeomans*, 10 S.W.3d at 297. This court has recognized that "an affidavit omitting potentially exculpatory information is less likely to present a question of impermissible official conduct than one which affirmatively includes false information." *Id.* In support of his claim, appellant points to Detective Efaw's testimony during a prior suppression hearing that Mr. Thomas's family members informed her that appellant possessed Mr. Thomas's credit cards. This testimony, however, does not indicate that appellant had consent to use the cards. Appellant also notes that he informed Betty Willis during a telephone conversation from the jail on October 12, 2002, that he had permission to use Mr. Thomas's credit cards. Appellant, however, failed to specifically identify this portion of the conversation in his motion to suppress. Nevertheless, we conclude that the omission of appellant's self-serving statement during a telephone conversation that he knew was being recorded was neither deceitful nor reckless.

Appellant challenges the statement in the affidavit that Kelly Willis Chancey informed Captain Burtt that on October 5, 2002, she called Mr. Thomas's cellular telephone and that appellant answered. Appellant attached to his motion an affidavit signed by Mrs. Chancey that stated that the call occurred on September 5, 2002. The State notes Captain Burtt was not the affiant. The police, however, cannot "insulate one officer's deliberate misstatement merely by relaying it through an officer-affiant personally ignorant of its falsity." *Franks*, 438 U.S. at 164 n.6. Nevertheless, appellant failed to make a preliminary substantial showing that the misstatement was made with the intent to deceive the court. A review of the affidavit and the material attached to appellant's motion to suppress indicates that Investigator Hull, as the affiant, was attempting to allege that appellant was with Mr. Thomas at some point on the date of Mr. Thomas's disappearance and that Investigator Hull misstated the date of the telephone call. At most, appellant made a substantial preliminary showing of a false statement that was recklessly made.

Appellant challenges the omission of the information in Mrs. Chancey's affidavit that when appellant answered Mr. Thomas's cellular telephone, appellant told her that he was leaving and to call back in ten minutes. According to the affidavit, Mrs. Chancey called back and spoke to Mr. Thomas, who said that appellant had just left. Appellant, however, failed

to challenge this omission in his motion to suppress. Therefore, he failed to make a substantial preliminary showing that the omission of this information was deceitful or reckless.

Appellant challenges the truthfulness of the statement in the affidavit that "[o]n 10-2-2002, Teresa Chrismer . . . stated that she had spoken with her son, Adam Chrismer, 17 years of age, and that he was staying with Elizabeth Hawk 'AKA Betty Willis,' mother of Howard Hawk Willis, in Johnson City, Tennessee." Appellant does not claim that Teresa Chrismer did not make the statement. Rather, he asserts that Adam was not staying with Betty Willis on that date. "The deliberate falsity or reckless disregard whose impeachment is permitted . . . is only that of the affiant, not of any nongovernmental informant." *Frazier*, 438 U.S. at 171. Appellant is not entitled to an evidentiary hearing in order to challenge the truthfulness of information provided by Teresa Chrismer, a nongovernmental informant.

Appellant contests the statement that investigators "observed a dark color stain in the rear cargo area of a blue 1991 Jeep Cherokee." He alleged in his motion to suppress that "forensic testing on the Jeep" yielded "no evidence of any large dark colored stain in the rear cargo area." Appellant failed to attach affidavits or any other reliable statements concerning forensic testing and failed to explain their absence. *See Franks*, 438 U.S. at 171. Furthermore, any negative results of forensic tests would not have established that the investigators' earlier observations were untrue.

Appellant next argues that the following passage was untruthful: "On October 13, 2002, Walker County Sheriff's Department in Georgia[ ] took a missing persons report listing Adam Chrismer as being missing by his mother, Teresa Chrismer. Teresa also stated in the report that she saw Adam and Samantha Chrismer driving a blue Jeep Cherokee." Appellant states that according to the missing persons report, Teresa did not state that she saw the victims driving a blue Jeep Cherokee. Rather, the report provides that Teresa was told by Samantha's mother, Patty Leming, that she saw the victims driving a blue Jeep Cherokee on October 4, 2002. Appellant failed to make a substantial preliminary showing that the misstatement was the result of deception or a reckless disregard for the truth. We note that the affidavit later provides that "[o]n October 14, 2002, Lt. Debbie Barron spoke with Teresa Chrismer who stated that on the last week of September[,] she saw her son[,] Adam[,] and Samantha in a Blue Jeep." In light of this information, we conclude that appellant has shown that the misstatement regarding the information included in the missing persons report was merely the result of negligence or an innocent mistake. Such allegations do not warrant an evidentiary hearing. *See Franks*, 438 U.S. at 171.

Appellant argues that Teresa's statements regarding the victims' driving a blue Jeep were false. Appellant, however, is not entitled to a hearing to challenge the truthfulness of information provided by a nongovernmental informant. *See id.*

Finally, appellant challenges the omission of evidence that officers had previously conducted a consent search of the Brentwood Drive residence and found no evidence of a crime. Appellant failed to attach affidavits or reliable statements concerning the consent search. *See id.* In his motion, he cited to a transcript of a telephone conversation between him and Betty Willis from jail on October 12, 2002. This conversation provided little detail regarding the parameters of the search. Such detail is particularly important in light of the State's response to the motion to suppress in which it stated that during the search, officers were not allowed into the garage where the victims' personal effects were later found during the execution of the search warrant on October 15, 2002. Accordingly, appellant has failed to make a substantial preliminary showing that the omission of the information regarding the consent search was deliberate or reckless.

We must next determine whether the affidavit is sufficient to support a finding of probable cause absent the alleged reckless statements. *See Franks*, 438 U.S. at 171-72. Probable cause generally requires "a reasonable ground for suspicion, supported by circumstances indicative of an illegal act." *State v. Johnson*, 854 S.W.2d 897, 899 (Tenn. Crim. App. 1993). To make a sufficient showing of probable cause, an affidavit "must set forth facts from which a reasonable conclusion might be drawn that the evidence is in the place to be searched." *State v. Smith*, 868 S.W.2d 562, 572 (Tenn. 1993) (citation omitted).

The only misstatements about which appellant arguably made a substantial preliminary showing of recklessness involved the date on which Mr. Thomas was reported missing and the date on which Mrs. Chancey called Mr. Thomas's cellular telephone. When those statements are disregarded, the remaining portion of the affidavit establishes that appellant was seen with Adam in early September 2002 using Mr. Thomas's credit cards. In late September, Teresa Chrismer saw Adam and Samantha in a blue Jeep Cherokee, and Adam told Teresa that he had one last task to complete for appellant. A blue Jeep Cherokee was parked at the home of Marie Holmes where appellant was arrested on October 11, 2002. The Jeep had a dark stain in the rear cargo area. On October 1, Adam told Teresa that he was living at Betty Willis's home, which investigators determined was located on Brentwood Drive. Ten days later, a human head was discovered in Boone Lake, and the head matched Adam's description.

Appellant contends that the information in the affidavit was insufficient to establish probable cause that evidence connected to Mr. Thomas and Samantha would be found in the Brentwood Drive residence. The record, however, does not indicate that any evidence

-101-

related to Mr. Thomas's disappearance was seized from the home. Moreover, the homicides of Adam and Samantha were related in that any evidence seized that was relevant to Samantha's homicide was also relevant to Adam's homicide. The affidavit set forth facts from which a reasonable conclusion might be drawn that evidence of Adam's disappearance would be discovered at the Brentwood Drive residence.

In arguing that the affidavit failed to establish probable cause, appellant maintains that the information provided by Teresa Chrismer was not entitled to the presumption of reliability generally afforded to information from citizen informants because officers failed to state in the affidavit that Teresa was "motivated solely by a sense of civic duty." "Information provided by a citizen/bystander witness known to the [police] is presumed to be reliable, and the prosecution is not required to establish either the credibility of the informant or the reliability of his information." *State v. Cauley*, 863 S.W.2d 411, 417 (Tenn. 1993) (citing *State v. Melson*, 638 S.W.2d 342, 354-56 (Tenn. 1982)). Two reasons exist for applying the presumption of reliability in these circumstances. First, "[c]itizen informants, whether they be victims or witnesses, have necessarily gained their information through first-hand experience." *State v. Luke*, 995 S.W.2d 630, 636 (Tenn. Crim. App. 1998) (citing *Melson*, 630 S.W.2d at 354-56). Second "[t]he criminal informant provides information in exchange for some consideration--whether it be monetary or the granting of some exemption or privilege--while the citizen informant acts in the interest of society or personal safety." *Id.* (citing *State v. Smith*, 867 S.W.2d 343, 347 (Tenn. Crim. App. 1993)). "[A]lthough Tennessee decisions have recognized the interests that typically motivate citizen informants and justify the presumption of reliability, no Tennessee decision has conditioned application of the presumption of reliability upon a showing that the citizen informant was in fact motivated by one or both of these interests." *Dotson*, 450 S.W.3d at 51-52. Rather, our supreme court has held that the presumption of reliability applies if the State "establishes simply that the information was provided by a known citizen informant." *Id*. at 52.

Accordingly, we conclude that even absent the two misstatements that were alleged to have been made in a reckless manner, the information in the affidavit was sufficient to establish probable cause for issuance of the search warrant for the Brentwood Drive residence on October 15, 2002. Appellant failed to established that he was entitled to an evidentiary hearing on his motion to suppress.

## C. Probable Cause

Appellant contends that the affidavit failed to establish probable cause on its face. However, he failed to raise this issue in his motion to suppress. Nevertheless, we will review the issue for plain error. As we have held, the information in the affidavit was sufficient to establish probable cause for the issuance of the search warrant. Therefore, a clear and

unequivocal rule of law was not breached, and appellant failed to establish plain error. *See Gomez*, 239 S.W.3d at 737.

### D. Expectation of Privacy in the Search of the Storage Unit

Appellant submits that the trial court erred in denying him the opportunity to establish "standing" to challenge the officers' search of the storage unit where the victims' bodies were recovered. Appellant did not set forth any facts in his motion to suppress to establish that he had an expectation of privacy in the storage unit and did not argue to the trial court that he had an expectation of privacy in the unit. Furthermore, appellant failed to set forth any argument either in his motion to suppress or on appeal challenging the legality of the search of the storage unit. Appellant is not entitled to relief regarding this issue.

### ISSUE IV. DENIAL OF A CONTINUANCE

Appellant asserts that the trial court erred in denying his multiple motions to continue the trial. The decision of whether to grant a continuance is left to the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion and prejudice to the defendant. *State v. Vaughn*, 279 S.W.3d 584, 598 (Tenn. Crim. App. 2008) (citing *State v. Odom*, 137 S.W.3d 572, 589 (Tenn. 2004); *State v. Blair*, 145 S.W.3d 633, 640 (Tenn. Crim. App. 2004)). On appeal, appellant bears the burden of demonstrating that harm ensued from the denial of the requested continuance. *Id.* (citations omitted); *see also Baxter v. State*, 503 S.W.2d 226, 230 (Tenn. Crim. App. 1973). An appellant may demonstrate an abuse of discretion by establishing that he was denied a fair trial or that one could reasonably conclude that a different result would have been reached had the motion been granted by the trial court. *Vaughn*, 279 S.W.3d at 598 (citing *Odom*, 137 S.W.3d at 589; *State v. Thomas*, 158 S.W.3d 361, 392 (Tenn. 2005); *State v. Goodwin*, 909 S.W.2d 35, 44 (Tenn. Crim. App. 1995)).

Appellant argues that the trial court erred in failing to rule upon his pro se motion filed on June 3, 2008, in which he requested that the trial court reconsider its previous denial of his motion to continue the trial. In April 2008, the trial court found that appellant forfeited his right to counsel, required appellant to proceed pro se at trial, appointed advisory counsel, and scheduled jury selection for July 10 and 11, 2008. On May 20, 2008, appellant filed a pro se motion to continue the trial, which the trial court denied. On June 3, 2008, appellant filed a motion to reconsider. Before the trial court ruled on the motion, this court entered an order on June 27, 2008, granting appellant's application for an interlocutory appeal and staying the trial. By staying the trial, this court essentially granted appellant's request that the trial be continued from the July 10, 2008 date. Appellant is not entitled to relief regarding this issue.

Appellant next contends that the trial court erred in denying his pro se motion to continue the trial filed on April 7, 2010, his pro se motion to reconsider filed on May 5, 2010, and his pro se motion for a seven-day continuance filed on the first day of trial. The record reflects that appellant was first appointed counsel in 2003, approximately seven years prior to trial. During a prior pretrial hearing, the trial court told appellant, "You've had three investigators, or maybe this is the fourth one. You've had two mitigation experts that have quit. You have had three lead counsel and two secondary counsel who have put hundreds of hours in the case." The trial court previously found that appellant manipulated the right to counsel for purposes of delay. This court affirmed the trial court's finding and described appellant's conduct as "egregiously manipulative and abusive of the judicial process." *Willis*, 301 S.W.3d at 652. Although appellant claimed in his motion to continue that the State had just turned over additional evidence to him, the trial court stated that the appropriate remedy for any discovery violations would be to disallow the evidence. Although appellant claimed that he did not have sufficient time to prepare the case since being required to proceed pro se, the trial court rejected this claim, noting that appellant "has been the author of his own representation. He's been in charge, whether he admits it or not, it's been his lawsuit." The trial court further stated that the trial would occur over multiple days and that appellant would have sufficient time to subpoena witnesses. Accordingly, we conclude that the trial court did not abuse its discretion in denying appellant's request to continue the trial.

Furthermore, appellant failed to establish prejudice. Appellant claims that he was unable to present evidence through a Wal-Mart surveillance video that someone else purchased the Rubbermaid totes in the days before the victims' bodies were discovered. Investigator Hull, however, testified at trial that the quality of the video surveillance tapes was poor and that he was not able to determine the identity of the person who purchased the items. Appellant also claims that the denial of a continuance prevented him from presenting evidence that the two people who were with him at Wilda Willis's home on October 4, 2002, were not the victims and from securing the presence of five out-of-state witnesses. Appellant fails to specify what the testimony of the five out-of-state witnesses would have been and fails to demonstrate that the evidence would have been obtained with a continuance. Moreover, multiple witnesses testified at trial to seeing appellant with the victims on October 4, 2002. Appellant is not entitled to relief regarding this issue.

## ISSUE V. STAYING THE INVESTIGATION DURING THE INTERLOCUTORY APPEAL

During the same hearing on April 17, 2008, in which the trial court required appellant to proceed pro se at trial, the trial court denied appellant's pro se motion to be transferred to Riverbend Maximum Security Institution so that he may have access to a law library. Rather, the trial court ordered that appellant should leave a list of case law, statutes, and other

reasonable legal treatises necessary for his defense at the desk at the jail by noon every Thursday. The trial court further ordered that an investigator with the Washington County Public Defender's Office deliver the requested materials to the front desk of the jail by noon the following Monday.

On April 18, 2008, the trial court appointed advisory counsel. During a hearing on May 28, the trial court granted appellant's request for expanded telephone privileges, allowed him to have possession of a cassette player and compact disc player to listen to recordings provided by the State, and ordered the trial court clerk's office to provide copies of pleadings filed "[f]rom this point forward" to the parties. On June 10, the trial court entered an order granting appellant funds to hire an investigator.

On June 27, 2008, this court entered an order granting appellant's application for interlocutory appeal and staying the trial pending further orders of a court with appropriate jurisdiction. During a hearing on July 2, the trial court suspended appellant's expanded telephone privileges, funding for the investigator, and the other privileges that the trial court had previously granted until appellant's interlocutory appeal was resolved. The trial court noted that multiple attorneys, three or four investigators, and two mitigation experts had expended "hundreds of hours" on appellant's behalf. The trial court further noted that one of appellant's prior investigators reported that appellant was sending him "on wild goose chases." The trial court stated that appellant "wasted a lot of taxpayers' money" and that if this court decided that appellant should be appointed counsel, the new counsel would be required to "start over."

On July 6, 2009, this court filed its opinion affirming the trial court's order requiring appellant to proceed pro se at trial. *See Willis*, 301 S.W.3d at 645. During a hearing on August 21, 2009, the trial court confirmed its prior order suspending appellant's privileges until the Tennessee Supreme Court issued a ruling. On November 23, the Tennessee Supreme Court denied appellant's application for permission to appeal. Appellant's privileges were restored on March 16, 2010. Jury selection was scheduled to begin on June 7, 2010, in Knox County, and the trial was scheduled to begin on June 14.

Appellant submits that the trial court's suspension of his privileges until his interlocutory appeal was resolved violated his right to manage and conduct his own defense pursuant to the Fifth and Sixth Amendments. Appellant relies upon the United States Supreme Court's decisions in *Faretta v. California*, 422 U.S. 806 (1975), and *McKaskle v. Wiggins*, 465 U.S. 168 (1984), regarding the rights of a defendant who proceeds pro se at trial.

In *Faretta*, the Court considered whether a criminal defendant who wished to proceed pro se at trial could be required to present his defense exclusively through counsel. 422 U.S. at 807. The Court noted that the United States Court of Appeals for the Second Circuit had held that "implicit in the Fifth Amendment's guarantee of due process of the law, and implicit also in the Sixth Amendment's guarantee of a right to the assistance of counsel, is 'the right of the accused personally to manage and conduct his own defense in a criminal case.'" *Id.* at 817 (quoting *United States v. Plattner*, 330 F.2d 271, 274 (2nd Cir. 1964)). While the Court in *Faretta* concluded that a criminal defendant has the right to self-representation, the Court did not rely upon the Fifth Amendment. *See id.* at 818. Rather, the Court concluded that a defendant has the right to mount his own defense personally under the Sixth Amendment. *Id.* at 819.

The United States Supreme Court later held in *McKaskle* that

[a] defendant's right to self-representation plainly encompasses certain specific rights to have his voice heard. The pro se defendant must be allowed to control the organization and content of his own defense, to make motions, to argue points of law, to participate in voir dire, to question witnesses, and to address the court and the jury at appropriate points in the trial.

465 U.S. at 174.

The record reflects that appellant was accorded all of these rights. Appellant filed multiple pro se motions prior to trial. On November 13, 2009, while appellant's interlocutory appeal was pending, appellant filed a ninety-seven-page motion to suppress his statements, in which he attempted to revisit the trial court's prior rulings. Appellant attached to the motion transcripts from prior proceedings, police reports, letters, previously filed pleadings, and transcripts of telephone conversations. This motion demonstrates that contrary to appellant's assertions, he had access to transcripts of prior proceedings, the pleadings that had previously been filed, and discovery from the State and that he was able to review the materials while his interlocutory appeal was pending and in preparing his defense. Moreover, the fee claims of appellant's prior counsel were included in the appellate record and indicate that counsel spent many hours meeting with appellant about the case. As early as 2004, appellant was aware of the evidence that the State intended to present at trial based upon the State's "Proposed Evidence List" and a "Notice of Intent to Use Statements" filed on July 14, 2004. Prior to trial, the court warned the prosecution that any failure to provide appellant with discovery in a timely manner would result in the exclusion of the evidence at trial. While appellant claimed in the trial court that he was unable to review the voluminous discovery and documents between the time when his privileges were restored and the trial,

the record on appeal establishes that appellant had access to this information prior to and while his interlocutory appeal was pending.

During the trial, appellant conducted the defense's voir dire of prospective jurors. He made the opening statement and closing argument to the jury. He cross-examined the State's witnesses and lodged objections. Appellant selected witnesses for the defense, examined them, and chose not to testify. During the penalty phase, he chose not to present mitigating evidence.

In determining whether a defendant's right to self-representation has been respected, "the primary focus must be on whether the defendant had a fair chance to present his case in his own way." *McKaskle*, 465 U.S. at 177. We conclude that despite the trial court's actions in suspending appellant's privileges, appellant had a fair chance to present his case in his own way. Once appellant's interlocutory appeal concluded and Judge Blackwood was designated to hear the case, Judge Blackwood not only restored appellant's privileges but increased the amount of time that appellant could have each day to access a telephone and a private room to interview witnesses and prepare for trial. Appellant's defense at trial was that he did not kill the victims and that his confession was false and the result of coercion. During the trial, appellant cross-examined the State's witnesses in an effort to challenge the State's evidence and to support his defense theory. Appellant was able to obtain funding to retain an expert in forensic entomology and presented the expert as a witnesses at trial in an effort to challenge the State's evidence regarding the time of the victims' deaths. Appellant also presented multiple witnesses at trial to challenge the State's evidence and to support his claim that Betty Willis alone killed the victims. There is nothing in the record establishing that appellant did not have a fair chance to present his case in his own way.

Appellant next contends that the trial court's temporary suspension of funding for the investigator and his other privileges resulted in the denial of his constitutional right to meaningful access to the courts. "The constitutional right of access to court 'includes the requirement that prison authorities assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law.'" *State v. Goodwin*, 909 S.W.2d 35, 42 (Tenn. 1995) (quoting *Bounds v. Smith*, 430 U.S. 817, 828 (1977)). This requirement is met when an inmate is provided with either the "legal tools necessary for [the preparation of] a defense or the assistance of an attorney." *Id.* at 42 n.1 (citing *Martucci v. Johnson*, 944 F.2d 291, 295 (6th Cir. 1991)). "'A prisoner whose access to the courts is otherwise protected is not deprived of a constitutional right, even if his access to a law library itself is restricted.'" *State v. Kenneth L. Anderson*, No. W2012-01039-CCA-R3-CD, 2013 WL 5531703, at *9 (Tenn. Crim. App. Oct. 4, 2013), *perm. app. denied* (Tenn. Feb. 11, 2014) (quoting *Lloyd v. Corr. Corp. of America*, 855 F. Supp. 221, 223 (W.D. Tenn. 1994)). "'[R]estricted access to the

law library is not per se denial of access to the courts.'" *Id.* (quoting *Lloyd*, 855 F. Supp. at 223).

This court has previously held that the provision of standby counsel affords a defendant the legal tools necessary for the preparation of a defense equivalent to access to an adequate law library. *See id.*; *Lawrence Ralph Jr. v. State*, No. M2011-02067-CCA-R3-PC, 2012 WL 6645037, at *9 (Tenn. Crim. App. Dec. 20, 2012), *perm. app. denied* (Tenn. Mar. 5, 2013). While the trial court in the present case suspended appellant's privileges and funding for his investigator while his interlocutory appeal was pending, appellant was still afforded advisory counsel. Furthermore, as noted by the trial court, the appellant had multiple investigators who had worked on the case during the years in which the case had been pending. Once appellant's privileges were restored, his investigator continued investigating the case, enabling appellant to prepare his defense for the trial. Under these circumstances, we conclude that appellant was not denied his right to access to the courts.

## ISSUE VI. SUFFICIENCY

Appellant argues that the evidence is insufficient to support his convictions. The standard for appellate review of a claim challenging the sufficiency of the State's evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (citing *Johnson v. Louisiana*, 406 U.S. 356, 362 (1972)); *see* Tenn. R. App. P. 13(e); *State v. Davis*, 354 S.W.3d 718, 729 (Tenn. 2011). To obtain relief on a claim of insufficient evidence, appellant must demonstrate that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977).

On appellate review, "'we afford the prosecution the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences which may be drawn therefrom.'" *Davis*, 354 S.W.3d at 729 (quoting *State v. Majors*, 318 S.W.3d 850, 857 (Tenn. 2010)); *State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). In a jury trial, questions involving the credibility of witnesses and the weight and value to be given the evidence, as well as all factual disputes raised by the evidence, are resolved by the jury as trier of fact. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). This court presumes that the jury has afforded the State all reasonable inferences from the evidence and resolved all conflicts in the testimony in favor of the State; as such, we will not substitute our own inferences

drawn from the evidence for those drawn by the jury, nor will we re-weigh or re-evaluate the evidence. *Dorantes*, 331 S.W.3d at 379; *Cabbage*, 571 S.W.2d at 835; *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Because a jury conviction removes the presumption of innocence that appellant enjoyed at trial and replaces it with one of guilt at the appellate level, the burden of proof shifts from the State to the convicted appellant, who must demonstrate to this court that the evidence is insufficient to support the jury's findings. *Davis*, 354 S.W.3d at 729 (citing *State v. Sisk*, 343 S.W.3d 60, 65 (Tenn. 2011)).

Appellant was convicted of the premeditated first degree murder of Adam, the premeditated first degree murder of Samantha, and felony murder of Samantha in the perpetration of a kidnapping. First degree murder includes the "premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (Supp. 2002). "Premeditation" is defined as

> an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* at § 39-13-202(d).

Felony murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any . . . kidnapping." *Id.* at § 39-13-202(a)(2). At the time that the offenses were committed, "kidnapping" was defined as false imprisonment

> (1)  Under circumstances exposing the other person to substantial risk of bodily injury; or
> (2)  Where the confinement of another is in a condition of involuntary servitude.

*Id.* at § 39-13-303(a) (Supp. 2002). "A person commits the offense of false imprisonment who knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty." *Id.* at § 39-13-302(a) (Supp. 2002).

Appellant argues that the State failed to present sufficient evidence to corroborate his statement to Wilda Willis on October 16, 2002. Our supreme court recently adopted the "modified trustworthiness standard" for determining whether an extrajudicial confession is

sufficiently corroborated. *State v. Bishop*, 431 S.W.3d 22, 58 (Tenn. 2014). Under this standard, a defendant's extrajudicial confession is sufficient to support a conviction if the State presents "independent proof of facts and circumstances which strengthen or bolster the confession and tend to generate a belief in its trustworthiness, plus independent proof of loss of injury." *Id.* (citation omitted). Our supreme court explained:

> When a defendant challenges the admission of his extrajudicial confession on lack-of-corroboration grounds, the trial court should begin by asking whether the charged offense is one that involves a tangible injury. If the answer is yes, then the State must provide substantial independent evidence tending to show that the defendant's statement is trustworthy, plus independent prima facie evidence that the injury actually occurred. If the answer is no, then the State must provide substantial independent evidence tending to show that the defendant's statement is trustworthy, and the evidence must link the defendant to the crime.

*Id.* at 58-59 (footnote and citations omitted).

In presenting independent prima facie evidence that the injury actually occurred, the State is not required to establish that the injury resulted from a criminal act or link the defendant to the injury. *Id.* at 59. In cases of felony murder, the "loss or injury" at issue is not the predicate felony but the death that occurred during the commission of the felony. *Id.* at 62. In the present case, the State clearly established that the injuries occurred. The fact of the victims' deaths and the identities of the victims were undisputed.

The State also must present substantial independent evidence that the defendant's confession is trustworthy. *Id.* at 59. To establish trustworthiness, the independent evidence must corroborate essential facts included in the defendant's statement. *Id.* The independent corroborating evidence need not establish by itself the offense beyond a reasonable doubt or by a preponderance of the evidence. *Id.* at 60 n.33. The independent evidence also need not establish each element of the offense. *Id.* However, independent evidence that only corroborates collateral circumstances surrounding the confession is insufficient to establish trustworthiness. *Id.* at 60.

On October 16, 2002, appellant informed Wilda Willis that he "blew [the victims'] brains out" at Betty Willis' home, that he cut off Adam's head and hands and threw them in the river, and that he put Samantha's body and the remaining portion of Adam's body in a storage building. Adam's head and hands were discovered in Boone Lake. Officers located Samantha's body and the rest of Adam's body in a storage unit that was rented by Betty. Both of the victims were shot in the head at close range, and officers later found the gun used to

-110-

shoot the victims near Betty's home. Items connected to Betty's home were found inside the containers with the victims' bodies. We conclude that the State presented significant independent evidence that corroborated appellant's description of the events immediately following the killing of the victims. *See id.* at 60 (noting that "[o]ne way the State can effectively bolster the defendant's admission or confession is to present independent evidence that 'parallel[s] the defendant's confession' or corroborates the defendant's account of what happened immediately before or after the crime").

Appellant identifies portions of his statement that conflicted with other evidence and details that he states were uncorroborated. The State, however, is not required to present independent evidence corroborating every detail of a defendant's confession. Rather,

> once the State presents independent evidence establishing the prima facie trustworthiness of the defendant's extrajudicial confession, the existence of contradictory evidence does not necessarily render the confession untrustworthy. Instead, contradictory evidence raises a credibility issue to be resolved by the factfinder.

*Id.* at 61.

We conclude that the victims' deaths and identities were proven and that appellant's confession was trustworthy. Accordingly, appellant's extrajudicial confession was sufficient to support his convictions for two counts of first degree premeditated murder and one count of felony murder.

### ISSUE VII.  DENIAL OF EXPERT SERVICES

Appellant asserts that the trial court erred in denying his request for funds for a crime scene reconstructionist and a false confession expert. The State responds that appellant failed to establish particularized need for the expert services.

In May 2010, approximately one month prior to trial, appellant filed ex parte motions seeking funding to retain Dr. Neal Haskell, a forensic entomologist; Dr. Richard J. Ofshe, an expert in false confessions; and Wayne N. Hill, Sr., a crime scene reconstructionist. Appellant stated that Mr. Hill's services were "crucial to the defense to disprove the State[']s theory in regards [sic] to the crime scene being at 104 Brentwood Drive, Johnson City[,] Tennessee." Appellant attached to his motion Mr. Hill's curriculum vitae and affidavit, in which he described his qualification and his hourly rate. Appellant stated that Dr. Ofshe's services were "crucial to his defense to disprove the State[']s case in regards [sic] to the alleged confession being false." Appellant attached Dr. Ofshe's curriculum vitae and set

forth his hourly rate. Appellant also attached a statement from Dr. Ofshe in which he set forth his qualification and his general procedures in analyzing an interrogation.

During a hearing on the motions, appellant maintained that an expert in false confessions was necessary because officers intentionally withheld counsel and abused him after he had invoked his *Miranda* rights. In support of his request for funding for a crime scene reconstructionist, appellant argued that no blood or gunshot residue was found in the Brentwood Drive home and that palm prints and footprints that did not belong to him were found in the storage unit. Appellant stated that the experts informed him that they were available to testify at the trial scheduled for the following month. Appellant acknowledged that neither expert had reviewed the evidence.

The trial court granted appellant funds to retain Dr. Haskell but denied appellant's request for funds to retain Dr. Ofshe and Mr. Hill. The trial court found that appellant failed to establish particularized need for the funding and failed to set forth statements that the evidence would be admissible at trial. The court further found that the experts failed to indicate in their affidavits that they would be available for the trial.

The Tennessee Supreme Court has held that "[w]hile a State need not provide an indigent defendant with all the assistance his wealthier counterpart might buy, . . . fundamental fairness requires a State to provide an indigent defendant with the 'basic tools for an adequate defense on appeal.'" *State v. Barnett*, 909 S.W.2d 423, 426 (Tenn. 1995) (quoting *Ake v. Oklahoma*, 470 U.S. 68, 77 (1985)). The trial court's obligation to afford an indigent defendant with the benefit of expert assistance does not arise unless the defendant makes a threshold showing of a "particularized need" for the expert assistance. *See* Tenn. Sup. Ct. R. 13, § 5(c)(1); *Barnett*, 909 S.W.2d at 430-31. Particularized need is established:

> When a defendant shows by reference to the particular facts and circumstances that the requested services relate to a matter that, considering the inculpatory evidence, is likely to be a significant issue in the defense at trial and that the requested services are necessary to protect the defendant's right to a fair trial.

Tenn. Sup. Ct. R. 13, § 5(c)(2).

Particularized need cannot be established and the trial court should deny requests for funding when the motion for funding includes only:

> (A) undeveloped or conclusory assertions that such services would be beneficial;

(B) assertions establishing only the mere hope or suspicion that favorable evidence may be obtained;

(C) information indicating that the requested services relate to factual issues or matters within the province or understanding of the jury; or

(D) information indicating that the requested services fall within the capability and expertise of appointed counsel.

*Id.* at (c)(4). Unsupported assertions that an expert is necessary to counter proof offered by the State is not sufficient to establish particularized need. *Barnett*, 909 S.W.2d at 431. The defendant must reference facts and circumstances of the particular case and demonstrate that the appointment of the expert is necessary to ensure a fair trial. *Id.* The issue of whether a defendant has made the threshold showing is to be determined on a case-by-case basis. *Id.*

Whether the defendant has shown a "particularized need" for the requested services rests within the sound discretion of the trial court, and such a decision will not be disturbed on appeal absent a showing of abuse of discretion. *See State v. Dellinger*, 79 S.W.3d 458, 469 (Tenn. 2002); *State v. Cazes*, 875 S.W.2d 253, 261 (Tenn. 1994). In order to demonstrate on appeal that the trial court abused its discretion in denying a request for investigative or expert assistance, the defendant must show that the denial of the requested services prevented him from receiving a fair trial. *See Dellinger*, 79 S.W.3d at 469; *State v. Black*, 815 S.W.2d 166, 179-80 (Tenn. 1991).

In his motions, Appellant failed to cite to particular facts and circumstances demonstrating that the requested services related to a matter that was likely to be a significant issue in the defense at trial and that the requested services were necessary to protect his rights to a fair trial. Rather, appellant only included unsupported allegations that the experts were necessary to counter proof offered by the State, which are insufficient to establish particularized need. *See Barnett*, 909 S.W.2d at 431.

With regard to appellant's request for a crime scene reconstructionist, we note that the State's case did not depend upon a reconstruction of the crime scene at the Brentwood Drive address. Rather, the State focused upon evidence that items recovered from the Brentwood Drive home matched those found in the storage unit. Appellant failed to refer to any particular facts or circumstances indicating that Mr. Hill would dispute this evidence. Appellant also failed to demonstrate why he needed an expert to establish absence of blood in the home. He was able to establish the absence of blood at the home and the presence of unidentified palm prints and footprints in the storage unit during his cross-examination of the State's witnesses at trial. Accordingly, appellant failed to establish a particularized need for

a crime scene reconstructionist or that the trial court's denial of the services prevented him from receiving a fair trial.

During the hearing on the motions for expert services, appellant maintained that an expert on false confessions was necessary because officers intentionally withheld counsel and abused him after he invoked his *Miranda* rights. Appellant did not cite to any facts during the hearing to support his claims. There was little indication as to what an examination by Dr. Ofshe might reveal. We note that appellant refused to be evaluated by a mental health expert, and as a result, Dr. Ofshe had no evidence to consider regarding appellant's state of mind at the time of his confession. Moreover, appellant cross-examined witnesses at trial regarding the circumstances of his confession. Therefore, appellant failed to establish a particularized need for an expert on false confessions or that the trial court's denial of the services prevented him from receiving a fair trial. The trial court did not abuse its discretion in denying the motions for expert services.

## ISSUE VIII. DEPRIVATION OF CONSTITUTIONAL RIGHTS

Appellant maintains that the trial court failed to apply a "higher standard of due process to all aspects of the instant case." He submits that the trial court erred in (1) denying him access to a law library; (2) denying him a full evidentiary hearing regarding the ineffective assistance of counsel; (3) denying him the opportunity to consult with advisory counsel regarding the appointment of counsel; (4) appointing attorney James Bowman as advisory counsel; and (5) denying him the opportunity to present proof of ineffective assistance of appellate counsel.

### A. Access to a Law Library

Appellant argues that the trial court erred in denying his motion to be transferred to Riverbend Maximum Security Institute for the use of the law library. He claims that the trial court's denial of the motion violated his constitutional right to access to the courts. This court has previously held that the provision of standby counsel affords a defendant the legal tools necessary for the preparation of a defense equivalent to access to an adequate law library. *See Kenneth L. Anderson*, 2013 WL 5531703, at *9; *Lawrence Ralph Jr.*, 2012 WL 6645037, at *9. Because appellant had access to advisory counsel throughout the trial process, he was not denied his right to access to the courts.

### B. Denial of Full Evidentiary Hearing

Appellant asserts that the trial court denied him a full evidentiary hearing on his claims that prior counsel were ineffective before concluding that appellant waived and

forfeited his right to counsel. This court, however, noted in our opinion regarding appellant's interlocutory appeal that "[t]he trial court gave the defendant ample opportunity to show via argument, documents, and testimony that he was justified in complaining about counsel's performance. Nevertheless, the defendant neither articulated nor established any basis for complaint against any of his attorneys." *Willis*, 301 S.W.3d at 652. Moreover, appellant failed to identify any evidence that he was unable to present to the trial court or explain how the evidence would have demonstrated that he did not abuse the attorney-client relationship. Appellant is not entitled to relief regarding this issue.

### C. Denial of the Opportunity to Consult with Advisory Counsel and Present Evidence of Ineffective Assistance of Appellate Counsel

After this court affirmed the trial court's finding that appellant waived and forfeited counsel, appellant filed a pro se motion in the trial court requesting that he be appointed counsel. Appellant claimed that appellate counsel was ineffective in the interlocutory appeal. During a hearing on March 16, 2010, appellant informed the trial court that he needed to confer with advisory counsel regarding the motion. Instead, the trial court denied the motion, finding that the matter had already been litigated in this court. We have concluded that the trial court correctly denied the motion because appellant's claim was barred by the law of the case doctrine. *See Memphis Publ'g Co.*, 975 S.W.2d at 306. Consultation with advisory counsel would not have changed this result.

Moreover, the trial court did not err in denying appellant the opportunity to present evidence of ineffective assistance of appellate counsel to support his request for appointment of counsel. Appellant correctly states that ineffective assistance of counsel claims can be raised, and evidence on these issues can be heard at the motion for new trial stage. *See Thompson v. State*, 958 S.W.2d 156, 161-62 (Tenn. Crim. App. 1997). However, there is no authority for litigating such claims during pretrial proceedings. Furthermore, we have held that appellant's allegations of ineffective assistance of appellate counsel in his motion for appointment of counsel were insufficient to establish an exception to the law of the case doctrine. *See Memphis Publ'g Co.*, 975 S.W.2d at 306. Appellant is not entitled to relief regarding this issue.

### D. Appointment of Attorney James Bowman as Advisory Counsel

Appellant submits that the trial court erred in appointing attorney James Bowman as advisory counsel when Mr. Bowman was appellant's original counsel and was allowed to withdraw. "'[T]here is no constitutional right to the appointment of advisory counsel where a defendant has knowingly and intelligently waived the right to counsel.'" *State v. Carruthers*, 35 S.W.3d 516, 551 (Tenn. 2000) (quoting *State v. Small*, 988 S.W.2d 671, 675

(Tenn. 1999)). The appointment of advisory counsel is a matter within the trial court's discretion, and the trial court's decision regarding the appointment of advisory counsel will not be overturned on appeal absent an abuse of discretion. *Small*, 988 S.W.2d at 675.

Mr. Bowman filed a motion to withdraw based upon the appellant's failure to cooperate in the investigation and their disagreement regarding the focus of the investigation. *See Willis*, 301 S.W.3d at 646. Appellant also filed a pro se motion to remove counsel and to appoint new counsel. The trial court reviewed the appellant's complaints regarding counsel, found the complaints to be baseless, and denied appellant's motion to remove counsel. The trial court later granted Mr. Bowman's motion to withdraw finding,

> [I]t appears to the court that what [appellant] is doing - he's manipulative. He's looking - he's come within less than a month of a trial date, and he wanted things reheard [on the motion to suppress] he couldn't get heard. He managed to do that through the back door . . . . [T]he courts find in this case that [appellant] has unreasonably requested counsel to withdraw. At this point I don't think the court has any option but to allow [counsels'] motion to be relieved as counsel.

*See id.* at 646-47.

Unlike Mr. Bowman's prior role as lead counsel, advisory counsel is defined as "an attorney who functions in a purely advisory role, without actively participating in the trial." *Small*, 988 S.W.2d at 672 n.1. A pro se defendant who is permitted advisory counsel "may consult counsel for guidance and advice, but otherwise handles the defense of the case on his or her own." *Id.* As a result, the prior disagreements between counsel and appellant regarding the direction of the investigation, which motions should be filed, and the theory of the defense were no longer at issue because those decisions were solely the appellant's responsibility. Appellant had the option of consulting with Mr. Bowman but was not obligated to follow Mr. Bowman's advice regarding the matters.

Appellant acknowledged in the trial court that unlike his previous attorneys, he had not sued Mr. Bowman. Although appellant claimed that Mr. Bowman was ineffective, the trial court found that appellant's claims were baseless and were made in an effort to delay the trial. Under these circumstances, we conclude that the trial court did not abuse its discretion in appointing Mr. Bowman as advisory counsel.

## ISSUE IX.  ADMISSION OF PHOTOGRAPHS

Appellant argues that the trial court erred in admitting "gruesome" photographs during the guilt and penalty phases of the trial that "had limited probative value and were unduly inflammatory."  The admissibility of relevant photographs of victims and the crime scene is within the sound discretion of the trial court, and the court's ruling on admissibility will not be disturbed on appeal absent a showing of an abuse of that discretion.  *State v. Carruthers*, 35 S.W.3d 516, 576-77 (Tenn. 2000); *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993); *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978).  As our supreme court stated in *Carruthers*, the modern trend is to vest more discretion in the trial court's rulings on admissibility.  35 S.W.3d at 577 (citing *Banks*, 564 S.W.2d at 949).

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Tenn. R. Evid. 401.  Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."  Tenn. R. Evid. 403.  The court must determine the relevance of the visual evidence and weigh its probative value against any undue prejudice.  *Id.*  The term "unfair prejudice" has been defined as "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."  *Banks*, 564 S.W.2d at 950-51.

In *Banks*, our supreme court provided trial courts with guidance for determining the admissibility of relevant photographic evidence.  The trial court should consider: the accuracy and clarity of the picture and its value as evidence; whether the picture depicts the body as it was found; the adequacy of testimonial evidence in relating the facts to the jury; and the need for the evidence to establish a prima facie case of guilt or to rebut the defendant's contentions.  *Id.* at 951.

While appellant claims that the trial court erred in admitting "gruesome" photographs, appellant fails to identify in his brief the photographs that he alleges were erroneously admitted.  Nevertheless, photographs of a victim's body are admissible in a murder trial if they are relevant to the issues at trial, notwithstanding their gruesome and horrifying character.  *See Banks*, 564 S.W.2d at 950-51.  The photographs admitted by the trial court during the guilt phase were relevant to the issue of premeditation, to supplement the testimony of the medical examiner regarding the victims' injuries, and to supplement the testimony of Dr. Vass and Dr. Watson regarding the time of the victims' deaths.  Appellant failed to establish that the probative value of the photographs was substantially outweighed by the danger of unfair prejudice.  Accordingly, the trial court did not abuse its discretion in admitting them.

The State presented two photographs during the penalty phase of the trial. One photograph depicted Adam's decapitated head, and the other photograph depicted Adam's body lying on the autopsy table without his head and hands. Appellant objected to the admission of these photographs, arguing that they were unfairly prejudicial and cumulative. The trial court overruled the objection, finding that the photographs were relevant to establish the mutilation aggravating circumstance. *See* Tenn. Code Ann. § 39-13-204(i)(13) (Supp. 2002). When the State presented the photographs to the jury, one juror became sick, requiring a recess.

We note that photographs of murder victims are prejudicial by their very nature. However, prejudicial evidence is not excludable per se. If this were true, all evidence of a crime would be excluded at trial. Rather, what is excluded is evidence that is unfairly prejudicial; in other words, evidence that has an undue tendency to suggest a decision on an improper basis, frequently, though not necessarily, an emotional one. *Banks*, 564 S.W.2d at 951. Moreover, "photographs are not necessarily rendered inadmissible because they are cumulative of other evidence or because descriptive words could be used." *State v. Derek Williamson*, No. M2010-01067-CCA-R3-CD, 2011 WL 3557827, at *9 (Tenn. Crim. App. Aug. 12, 2011) (citing *Collins v. State*, 506 S.W.2d 179, 185 (Tenn. Crim. App. 1973)), *perm. app. denied* (Tenn. Dec. 14, 2011). In this case, the photographs were gruesome because the crimes depicted in the photographs were gruesome. Notwithstanding their gruesome nature, the photographs were relevant to support the aggravating circumstance that appellant knowingly mutilated Adam's body after death as alleged by the State. *See* Tenn. Code Ann. § 39-13-204(i)(13) (Supp. 2002). We conclude that appellant has failed to establish that the probative value of the photographs was substantially outweighed by the danger of unfair prejudice. Further, it does not affirmatively appear that the "admission of the photographs has affected the results of the trial." *See Banks*, 564 S.W.2d at 953. Appellant is not entitled to relief on this issue.

### ISSUE X. STATEMENTS DURING CLOSING ARGUMENTS

Appellant contends that the prosecution engaged in misconduct during closing arguments in both phases of the trial. "[A]rgument of counsel is a valuable privilege that should not be unduly restricted." *Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975). Tennessee courts give great latitude to counsel arguing their cases to the jury. *Id.* Thus, "trial judges have wide discretion in controlling the argument of counsel, and their action will not be reviewed absent abuse of that discretion." *Id.* However, the comments of counsel during closing argument "'must be temperate, must be predicated on evidence introduced during the trial of the case, and must be pertinent to the issues being tried.'" *State v. James Rae Lewter*, No. M2010-01283-CCA-RM-CD, 2011 WL 1197597, at *4 (Tenn. Crim. App. Mar. 31, 2011) (quoting *State v. Gann*, 251 S.W.3d 446, 459 (Tenn. Crim. App. 2007)).

"A criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument." *Banks*, 271 S.W.3d at 131 (citing *United States v. Young*, 470 U.S. 1, 11-13 (1985); *State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001) (holding that a prosecutor's improper closing argument does not automatically warrant reversal)). To establish reversible error and succeed on a claim of prosecutorial misconduct, the appellant must show that "the argument of the prosecutor was so inflammatory or the conduct so improper that it affected the verdict to his detriment." *State v. Farmer*, 927 S.W.2d 582, 591 (Tenn. Crim. App. 1996) (citing *Harrington v. State*, 385 S.W.2d 758, 759 (Tenn. 1965)). When determining whether the argument affected the jury's verdict, we consider the following five factors:

> (1) the conduct complained of viewed in context and in light of the facts and circumstances of the case; (2) the curative measures undertaken by the court and the prosecution; (3) the intent of the prosecutor in making the improper statement; (4) the cumulative effect of the improper conduct and any other errors in the record; and (5) the relative strength or weakness of the case.

*Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976).

> This court has previously recognized five general areas of prosecutorial misconduct:
>
> 1. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.
>
> 2. It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.
>
> 3. The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.
>
> 4. The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.
>
> 5. It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

*State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003) (citations omitted).

Appellant takes issue with the prosecutor's multiple references to his "coldness" following the murders. According to appellant, the following comments by the prosecutor during closing arguments in the guilt phase were improper:

> There's one thing he can't explain in this case and this we want you to absolutely pay attention to. He can't explain the coldness in his voice as he talks about these victims.

> . . . .

> You have the tapes. You can make your own judgment as to his emotions, or attitude as he says the words, I blew their brains out. You can assess whether or not he was cold, or sympathetic towards these victims, especially Adam, when he relates the story to how he cut Adam's head and his hands off and threw them off a bridge that was near--near where those items were found. You can assess the lack of concern that he had as he talks to his mother on different jail calls in that time period. . . . [W]hen [appellant's] mother says they found Adam's head and his hands what reaction does this defendant have. Okay. His coldness does him in. Within two months this defendant had gone from paying for professional portraits where he's standing with his hand on Samantha's shoulder with Adam right there in the picture. It looks like a family portrait. Two months later they're dead and the state submits this defendant doesn't care.

> . . . .

> No where we submit did he show even the least bit of concern for those young people.

> . . . .

> How in the world could someone go from shooting somebody to cutting them up unless there are absolutely cool headed and calm, and can reflect? . . . He knows where his head is, and he didn't care to tell the boy's own mother. That is a coldness that is off the charts, Ladies and Gentlemen--off the charts. That's the kind of coldness that it takes to accomplish these types of murders, these types of gruesome and grizzly events that have happened in our community. That's the kind of coldness this defendant has shown.

-120-

Appellant also takes issue with the prosecutor's comment during closing arguments in the penalty phase that "[w]ithout being able to see [the photographs] you could not gauge the shocking nature of the defendant's lack of emotion about what happened."

Appellant argues that in characterizing his demeanor as "cold," the prosecutor improperly expressed his personal opinion regarding the evidence. "Expressions by the prosecutor are a form of unsworn, unchecked testimony and tend to exploit the influence of the prosecutor's office and undermine the objective detachment which should separate a lawyer from the cause for which he argues." *Goltz*, 111 S.W.3d at 6-7 (citation omitted). During closing arguments, prosecutors must not interject their personal beliefs or opinions; however, whether a prosecutor's doing so qualifies as misconduct is often dependent upon the specific terminology used. *Gann*, 251 S.W.3d at 460. "For example, argument predicated by the words 'I think' or 'I submit' does not necessarily indicate an expression of personal opinion." *Id.* (citing *United States v. Stulga*, 584 F.2d 142, 147 (6th Cir. 1978)).

We conclude that the prosecutor's comments did not constitute improper personal opinions. Rather, the prosecutor argued that appellant's mental state could be inferred from the evidence, which is permissible. The prosecutor also prefaced some of the comments with qualifying language such as "the state submits" or "we submit." Moreover, after appellant objected to the prosecutor's initial comments, the trial court instructed the jury that the prosecutor's comments were not evidence. Appellant is not entitled to relief regarding this issue.

Appellant asserts that the prosecutor made additional comments that were improper and constituted prosecutorial misconduct. Appellant, however, failed to object to these comments at trial. Therefore, the issues have been waived. Tenn. R. App. P. 36(a). Nonetheless, we will review the issues for plain error.

According to appellant, the prosecutor improperly argued that premeditation for first degree murder may be inferred by appellant's coolness after the killings. Appellant argues that his state of mind after the homicides was not relevant in assessing premeditation. However, calmness immediately after the killing is a circumstance that may be indicative of premeditation. *See State v. Jackson*, 173 S.W.3d 401, 409 (Tenn. 2005) (citation omitted). The prosecutor's argument was not improper.

Appellant submits that by arguing that the sentence "shall be death," the prosecutor suggested that the imposition of death is mandatory when the aggravating circumstances outweigh the mitigating circumstances. The prosecutor, however, was simply repeating the language in Tennessee Code Annotated section 39-13-204(g)(1). The prosecutor also asked the jury to follow the law and to consider the law as instructed by the trial court. The trial

court then instructed the jury regarding the applicable law. Accordingly, a clear and unequivocal rule of law was not breached, and the issue does not rise to the level of plain error.

Finally, appellant maintains that the prosecutor sought to inflame the jury's passions to seek death by stating:

> [O]ne thing that makes this [mutilation] aggravator that the state argues should weigh very heavily in your decision, imagine what it sounded like, what it looked like, image that first cut into the dead body of that young man, and experiencing the sight, the smell, the--the sensory impression, the sound of those bones being cut, image the cold callousness that it took to do it again, and again, and again, over and over. It's off the charts. The coldness, the lack of any concern for that young man and what he represented to others is absolutely off the charts, Ladies and Gentlemen. We submit there's only one factor, but it's a big one.

Although the prosecutor's statements may have been inflammatory, we conclude that the issue does not rise to the level of plain error in light of the strong evidence supporting the aggravating circumstances and the lack of evidence supporting the mitigating circumstances.

## ISSUE XI. JURY INSTRUCTIONS DURING THE GUILT PHASE

Appellant challenges three jury instructions that the trial court provided during the penalty phase as erroneous or inaccurate. Appellant did not object to the instructions at trial but raised the issues in his motion for new trial. "An erroneous or inaccurate jury charge, as opposed to an incomplete jury charge, may be raised for the first time in a motion for a new trial and is not waived by the failure to make a contemporaneous objection." *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005). Therefore, we will review each of the issues raised by appellant.

Appellant challenges the "moral certainty" language in the reasonable doubt instruction. He argues that the language understates the level of proof and certainty required by the due process clause of the Fourteenth Amendment and necessary for a reliable determination of guilt of a capital offense under the Eighth Amendment. Our supreme court, however, has upheld the "moral certainty" language. *See State v. Rimmer*, 250 S.W.3d 12, 30 (Tenn. 2008) (citing *State v. Hall*, 976 S.W.2d 121, 159 (Tenn. 1998) (appendix)).

Appellant next challenges the jury instruction on premeditation, which included the phrase "capable of premeditation." The trial court instructed the jury as follows:

The mental state of the accused at the time he allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Appellant argues that this instruction allowed the jury to convict him of premeditated murder based upon a mere ability to premeditate. This instruction, however, constituted a correct statement of the law. *See* Tenn. Code Ann. § 39-13-202(d) (Supp. 2002). Moreover, this court has suggested that the failure to include this language could be error. *See State v. Brandon Compton*, No. E2005-01419-CCA-R3-CD, 2006 WL 2924992, at *8 (Tenn. Crim. App. Oct. 13, 2006).

Finally, appellant claims that the instruction to render the verdict "as you think justice and truth dictate" allowed the jurors to convict even if they had reasonable doubt regarding appellant's guilt. The trial court instructed the jury as follows:

You can have no prejudice or sympathy, allow anything but the law and the evidence to have any influence upon your verdict. You must render your verdict with absolute fairness and impartiality as you think justice and truth dictate.

The trial court instructed the jurors to base their decision on the law and the evidence rather than any sympathy or prejudice. Our supreme court has upheld this "no sympathy" instruction. *See State v. Cribbs*, 967 S.W.2d 773, 795-96 (Tenn. 1998); *State v. Bigbee*, 885 S.W.2d 797, 814 (Tenn. 1994).

## ISSUE XII. FAILURE TO INCLUDE AGGRAVATING CIRCUMSTANCES IN THE INDICTMENT

Appellant maintains that the failure to charge the aggravating circumstances relied upon by the State rendered the indictment constitutionally defective. The Tennessee Supreme Court has rejected this claim. *See State v. Berry*, 141 S.W.3d 549, 558-61 (Tenn. 2004).

## ISSUE XIII. TRIAL COURT'S REMOVAL OF JURORS WHO WERE NOT "DEATH QUALIFIED"

Appellant asserts that the trial court erred in denying his "Motion to Preclude Removing for Cause Jurors Who Are Not Death Qualified." The motion sought to preclude the exclusion for cause of any prospective juror who opposed the death penalty. Appellant

specifically challenged the exclusion of jurors who were not "death qualified" and the use of a "death qualified" jury as violating his constitutional rights. Our state appellate courts have repeatedly rejected state and federal constitutional challenges to the process of "death qualification," including those raised by the appellant in this case. *See, e.g., State v. Reid*, 91 S.W.3d 247, 289-90 (Tenn. 2002) (rejecting state constitutional challenge to removal for cause of prospective jurors who oppose the imposition of the death penalty because of "sincerely held" religious, moral, or philosophical beliefs); *State v. Hall*, 958 S.W.2d 679, 717 (Tenn. 1997) (appendix) (rejecting claim that the manner of selecting "death qualified" jurors unconstitutionally results in juries that are prone to conviction); *State v. Jones*, 789 S.W.2d 545, 547 (Tenn. 1990) (rejecting claim that "death qualification" of jury violated the Sixth Amendment by depriving the defendant of a fair and impartial jury).

Appellant also asserts that a number of prospective jurors were improperly excused based upon their personal views opposing the death penalty. He maintains that the following jurors were improperly excused: Mr. Berry, Ms. Crowe, Mr. McMahan, Mr. Robson, Mr. Arnold, and Ms. Barnett. Appellant did not raise this issue in his motion for new trial. Accordingly, the issue is waived. *See* Tenn. R. App. P. 36(a). Nonetheless, we will review the issue for plain error.

In capital cases, potential jurors may not be excluded simply because they express "general objections to the death penalty" or express reservations in its application. *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968). Exclusion is proper only when potential jurors' views will "prevent or substantially impair the performance of their duties in accordance with their instructions or their oaths." *Wainwright v. Witt*, 469 U.S. 412, 424 n.5 (1985). Accordingly, "the extremes must be eliminated--i.e., those who, in spite of the evidence, would automatically vote to convict or impose the death penalty or [those who would] automatically vote to acquit or impose a life sentence." *Morgan v. Illinois*, 504 U.S. 719, 734 n.7 (1992) (quoting *Smith v. Balkcom*, 660 F.2d 573, 578 (5th Cir. 1981)) (internal quotation marks omitted).

A juror's bias regarding the death penalty does not need to be proven with "'unmistakable clarity,'" but "the trial judge must have the 'definite impression' that the potential juror is incapable of following the law." *State v. Sexton*, 368 S.W.3d 371, 392 (Tenn. 2012) (quoting *State v. Austin*, 87 S.W.3d 447, 473 (Tenn. 2002)). A trial court's finding of juror bias based upon views of the death penalty is accorded a presumption of correctness, and the trial court's finding will not be overturned absent "convincing evidence" that the ruling was erroneous. *Austin*, 87 S.W.3d at 473.

When questioned by the State during voir dire, Mr. Berry stated that he was opposed to the death penalty due to his religious views. He said his "gut reaction" would be to vote

-124-

against the death penalty regardless of the aggravating circumstances. When questioned by appellant, Mr. Berry stated that there were no circumstances where he would consider imposing the death penalty. The trial court granted the State's challenge for cause finding that Mr. Berry's personal views would substantially impair his ability to be faithful to his oath as a juror. The trial court did not err in removing Mr. Berry for cause.

In response to questioning by the State, Ms. Crowe stated that she "could not sign off on" the death penalty and that she lacked the courage to do so. The State challenged Ms. Crowe for cause, and the trial court granted the challenge. The trial judge stated that he observed Ms. Crowe's demeanor and found that her views regarding the death penalty would substantially impair her ability to faithfully perform her oath. The trial court did not err in this regard.

During voir dire, Mr. McMahan affirmed his answers in the juror questionnaire that he believed that death is never an appropriate form of punishment. He stated that he was morally opposed to the death penalty and that he could not imagine any circumstances where he would impose the death penalty. Based upon these answers, the trial court did not err in excluding Mr. McMahan for cause.

Mr. Robson stated that based upon his religious beliefs, he would impose a life sentence rather than a death sentence regardless of the law. Appellant stated that he did not object to Mr. Robson's being excused for cause. The trial court properly excused Mr. Robson for cause.

Mr. Arnold said he would never impose the death penalty regardless of the law. The trial court properly excused Mr. Arnold for cause.

When questioned by the trial court, Ms. Barnett said she did not know that she could impose the death penalty. She affirmed that she had moral dilemmas regarding the death penalty that would likely affect her judgment. She said she could not imagine signing her name to a verdict that imposed the death penalty and that she would not be able to do so. Because Ms. Barnett affirmed that she was not capable of following the law, the trial court did not err in striking her for cause.

Appellant failed to establish that the trial court breached a clear and unequivocal rule of law in removing these prospective jurors for cause. *See Gomez*, 239 S.W.3d at 737. Accordingly, the trial court's rulings do not constitute plain error, and appellant is not entitled to relief regarding these issues.

# ISSUE XIV.  CONSTITUTIONALITY OF TENNESSEE'S CAPITAL SENTENCING STATUTES

Appellant makes the following challenges regarding the constitutionality of Tennessee Code Annotated sections 39-13-204 and 39-13-206:

(1)  Tennessee Code Annotated section 39-13-204(c) permits the introduction of unreliable evidence in the State's proof of aggravation or rebuttal on mitigation in violation of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and Article I, sections 8, 9, and 16 of the Tennessee Constitution.  This claim has been rejected.  *See State v. Schmeiderer*, 319 S.W.3d 607, 636 (Tenn. 2010) (appendix)).

(2)  Section 39-13-204(c) mandates that a trial court permit a victim's representative to testify before the jury in sentencing and, therefore, is a violation of the separation of powers doctrine in Article II, section 2 of the Tennessee Constitution.  This argument has been rejected.  *See State v. Thomas*, 158 S.W.3d 361, 408 (Tenn. 2005) (appendix).

(3)  Imposition of the death penalty has been imposed discriminatorily on the basis of race, gender, geographic region, and economic and political status.  Appellant has presented no evidence of discrimination in his case.  This argument has been rejected by our supreme court.  *See State v. Hester*, 324 S.W.3d 1, 78 (Tenn. 2010); *Banks*, 271 S.W.3d 90, 155-58 (Tenn. 2008).

(4)  The prosecutors' unlimited discretion in determining whether to seek the death penalty violates the state and federal guarantees of equal protection and results in the same "wanton and freakish" imposition of the death penalty that was condemned in *Furman v. Georgia*, 408 U.S. 238 (1972).  Our supreme court also has rejected this argument.  *See State v. Brimmer*, 876 S.W.2d 75, 86 (Tenn. 1994).

(5)  Imposition of a death sentence by electrocution or lethal injection is cruel and unusual punishment.  Our supreme court has upheld execution by electrocution and by lethal injection.  *See Banks*, 271 S.W.3d at 160; *State v. Black*, 815 S.W.2d 166, 179 (Tenn. 1991) (electrocution).

(6)  By prohibiting the jury from being informed of the consequences of its failure to reach a unanimous verdict in the penalty phase, section 39-13-204(h) violates the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United

States Constitution and Article I, section 16 of the Tennessee Constitution. This argument has been rejected. *See Terry v. State*, 46 S.W.3d 147, 170 (Tenn. 2001); *Brimmer*, 876 S.W.2d at 87.

(7)   By requiring the jury to unanimously agree that the aggravating circumstances outweigh the mitigating circumstances, section 39-13-204(f) impinges upon appellant's right to have each juror consider and give effect to his mitigating evidence. This argument has been rejected. *See State v. Nichols,* 877 S.W.2d 722, 735 (Tenn. 1994).

(8)   Section 39-13-204 fails to require the jury to make the ultimate determination that death is appropriate. This argument has been rejected by our supreme court. *Hall*, 958 S.W.2d at 718; *Brimmer*, 876 S.W.2d at 87.

(9)   Section 39-13-204 fails to require that the jury make findings of fact regarding the presence or absence of mitigating circumstances, thereby preventing effective review on appeal. This argument has also been rejected. *See Sexton*, 368 S.W.3d at 427-28 (Tenn. 2012).

## ISSUE XV.  FAILURE TO ADVISE APPELLANT REGARDING LIMITATION ON CROSS-EXAMINATION

Appellant asserts that the trial court erred in failing to advise him that if he testified during the penalty phase regarding mitigating circumstances, he could not be cross-examined regarding the facts of the murders unless he "opened the door." In *State v. Cazes*, 875 S.W.2d 253, 266 (Tenn. 1994), our supreme court held that

> only in the limited sphere of a death penalty sentencing hearing, a capital defendant's testimony regarding mitigating factors that are wholly collateral to the merits of the charges against him does *not* operate as a complete waiver of the privilege against self-incrimination. Accordingly, a defendant has a right to limited cross-examination if he or she wishes to testify about only collateral mitigating circumstances at the penalty phase of a capital trial. We reiterate, however, that even in such special situations, a defendant may be completely and thoroughly cross-examined about all testimony given or fairly raised by that defendant on direct examination.

(Emphasis in original) (footnote omitted). The failure to explain this evidentiary ruling on the record, however, does not invalidate appellant's waiver of the right to testify. *See Rimmer*, 250 S.W.3d at 29.

## ISSUE XVI.  WAIVER OF MITIGATION PROOF

Appellant contends that the trial court failed to make an adequate inquiry into his competency to waive his right to present mitigation evidence.  After the State rested its case during the penalty phase, appellant told the trial court that he was not going to present any mitigation evidence.  The trial court then held a jury-out hearing during which the court questioned appellant and his advisory counsel regarding appellant's decision.  The trial court found that appellant knowingly and voluntarily waived his right to present mitigation evidence.  Appellant fails to identify in his brief how the trial court's questioning of him was inadequate.   Rather, appellant acknowledges that the trial court's line of questioning essentially followed the requirements set forth in *Zagorski v. State*, 983 S.W.2d 654 (Tenn. 1998).  Accordingly, appellant is not entitled to relief regarding this issue.

## ISSUE XVII:  JURY INSTRUCTIONS DURING THE PENALTY PHASE

Appellant submits that the trial court erred in failing to instruct the jury that an individual juror can still vote for a life sentence in the absence of mitigating evidence or if aggravating circumstances outweigh mitigating circumstances.  Appellant did not request this instruction at trial and did not raise the issue in his motion for new trial.  Therefore, this issue is waived, and our review is limited to plain error.  *See Faulkner*, 154 S.W.3d at 58.

The trial court accurately and correctly instructed the jury regarding its duties, the burden of proof, and the applicable law.  "When the instructions given by the trial judge are a correct statement of the law, and the instructions fully and fairly set forth the applicable law, it is not error for a trial judge to refuse to give a special instruction requested by a party."  *State v. Bohanan*, 745 S.W.2d 892, 897 (Tenn. Crim. App. 1987).  A substantial right of appellant was not adversely affected, and therefore, appellant failed to establish plain error.  *See Gomez*, 239 S.W.3d at 737.

Appellant submits that the trial court's instruction in accordance with Tennessee Code Annotated section 39-13-204(f)(2) required the jury to unanimously agree that mitigating circumstances outweighed the aggravating circumstances in order to return a verdict for life and, therefore, infringed upon appellant's right to have each juror consider and give effect to mitigating evidence.  This argument has been rejected by our supreme court.  *See Terry*, 46 S.W.3d at 170; *Brimmer*, 876 S.W.2d at 87.

Appellant argues that Tennessee Code Annotated section 39-13-204(h), which prohibits the trial court or counsel from informing the jury about the effect of a deadlock, infringes upon the juror's providence and prevents jurors from learning that they can give effect to their convictions by their individual votes for a life sentence.  The constitutionality

of section 39-13-204(h) has been upheld. *See State v. Hall*, 958 S.W.2d 679, 718 (Tenn. 1997) (appendix).

Appellant complains that the jury instruction on the "heinous, atrocious, or cruel" aggravating circumstance was unconstitutionally vague. The trial court instructed the jury on this aggravating circumstances in accordance with Tennessee Code Annotated section 39-13-204(i)(5). Our supreme court has held that this aggravating circumstance is not vague or overbroad. *See State v. Middlebrooks*, 995 S.W.2d 550, 556-57 (Tenn. 1999).

Appellant submits that the trial court's instruction regarding the mutilation aggravating circumstance failed to narrow the class of persons eligible for the death penalty. In order to comply with the Eighth Amendment, aggravating circumstances must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U.S. 862, 877 (1983). Only if the aggravating circumstance applies to every defendant who has committed the particular crimes does the aggravating circumstance fail to narrow the class of death-eligible defendants. *Arave v. Creech*, 507 U.S. 463, 474 (1993).

The application of aggravating circumstance (i)(13) requires evidence that the defendant knowingly mutilated the victim's body after death. The term "mutilation" is not statutorily defined. Rather, this court has noted the dictionary definition of mutilation as "'to cut up or alter radically so as to make imperfect.'" *State v. Thompson*, 43 S.W.3d 516, 525 (Tenn. Crim. App. 2000) (quoting Webster's Third New International Dictionary, 1493 (1993)); *see State v. Jordan*, 325 S.W.3d 1, 71 (Tenn. 2010). This court also noted that "the legislative intent underlying mutilation as an aggravating circumstance must be 'that the General Assembly . . . meant to discourage corpse desecration.'" *Thompson*, 43 S.W.3d at 525-26 (quoting *State v. Price*, 46 S.W.3d 785, 828 (Tenn. Crim. App. 2000)); *see Jordan*, 325 S.W.3d at 71.

Constitutional narrowing is accomplished because during the penalty phase, the State was required to prove that appellant knowingly mutilated Adam Chrismer after his death. Not every defendant who is guilty of first degree murder mutilated the victim after the victim's death. Therefore, this aggravating circumstance narrows the class of death-eligible defendants. Appellant is not entitled to relief regarding this issue.

Finally, appellant asserts that the victim impact jury instruction was vague and confusing in that it permitted consideration of victim impact evidence but not as an aggravating circumstance. Appellant cites to no applicable authority to support his claim. Moreover, the instruction provided to the jury was recommended by our supreme court in

*State v. Nesbit*, 978 S.W.2d 872, 892 (Tenn. 1998), and was again approved in *State v. Reid*, 91 S.W.3d 247, 283 (Tenn. 2002). Appellant is not entitled to relief.

### ISSUE XVIII. ADMISSION OF VICTIM IMPACT EVIDENCE

Appellant argues that Tennessee Code Annotated section 39-13-204(c), which provides that a trial court "shall" permit a victim's representative to testify before the jury in sentencing, is a violation of the separation of powers doctrine in Article II, section 2 of the Tennessee Constitution. We addressed and rejected this argument earlier in this opinion when appellant advanced the argument in connection with his challenge to the constitutionality of Tennessee's capital sentencing statutes. Appellant also argues that the legislative mandate and the Tennessee Supreme Court's decision in *State v. Nesbit*, 978 S.W.2d 872 (Tenn. 1998), "renders death sentencing in Tennessee unconstitutional since this factor is rife with discrimination and violates equal protection guarantees of the state and federal constitutions." This argument has been rejected. *See State v. Odom*, 137 S.W.3d 572, 602-03 (Tenn. 2004) (appendix).

### ISSUE XIX. MANDATORY REVIEW

When reviewing a conviction for first degree murder and an accompanying sentence of death, Tennessee Code Annotated section 39-13-206(c)(1) requires this court to review the record to determine whether:

(A) The sentence of death was imposed in any arbitrary fashion;
(B) The evidence supports the jury's finding of statutory aggravating circumstance or circumstances;
(C) The evidence supports the jury's finding that the aggravating circumstance or circumstances outweigh any mitigating circumstances; and
(D) The sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

### A. Manner in Which Death Sentences Were Imposed

In accordance with the trial court's instructions, the jury unanimously determined that the State proved beyond a reasonable doubt that aggravating circumstances applied to each of the murders committed by appellant and that these aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt. The record reveals that the sentencing hearing was conducted pursuant to the applicable statutory provisions and the

rules of criminal procedure. We conclude that appellant's sentences of death were not imposed in an arbitrary fashion.

## B. Evidence Supporting Aggravating Circumstances

In determining whether the evidence supports the jury's findings of statutory aggravating circumstances, we must determine, after viewing the evidence in the light most favorable to the State, whether a rational trier of fact could have found the existence of the aggravating circumstances beyond a reasonable doubt. *State v. Rollins*, 188 S.W.3d 553, 571 (Tenn. 2006) (citing *State v. Reid*, 164 S.W.3d 286, 314 (Tenn. 2005)).

### 1. Adam Chrismer

In sentencing appellant to death for the premeditated first degree murder of Adam Chrismer, the jury applied one aggravating circumstance: appellant knowingly mutilated the victim's body after death. *See* Tenn. Code Ann. § 39-13-204(i)(13) (Supp. 2002). The evidence presented in this case established that after appellant killed Adam, he severed Adam's head and hands with a chainsaw. We conclude that this evidence is sufficient to establish this aggravating circumstance.

### 2. Samantha Chrismer

In sentencing appellant to death for the premeditated first degree murder and felony murder of Samantha Chrismer, the jury applied four aggravating circumstances: (1) the murder was especially heinous, atrocious, or cruel, in that it involved torture or serious physical abuse beyond that necessary to produce death; (2) the murder was committed for the purpose of avoiding, interfering with, or preventing a lawful arrest or prosecution of appellant or another; (3) appellant knowingly committed the murder while having a substantial role in committing first degree murder of Adam Chrismer; and (4) appellant knowingly committed the murder while having a substantial role in committing or attempting to commit kidnapping. *See* Tenn. Code Ann. § 39-13-204(i)(5), (6), (7) (Supp. 2002).

#### a. (i)(5): Heinous, Atrocious, or Cruel

The jury found that Samantha's murder was "especially heinous, atrocious, or cruel, in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn. Code Ann. § 39-13-204(i)(5). This aggravating circumstance may be applied if the evidence is sufficient to support *either* torture *or* serious physical abuse beyond that necessary to produce death. *See id.* The evidence present at trial establishes that appellant kidnapped Samantha. After appellant killed Adam, appellant kept Samantha alive for more

than one day. During that time Samantha was stripped of her clothing, and her hands and feet were bound with zip-ties. The zip-ties around her feet were so tight that they caused bruising. A knotted cloth gag was stuffed into Samantha's mouth, knocking out some of her teeth. Samantha was beaten as illustrated by the bruising on her right leg, chest, breast, and shoulder. Appellant then shot Samantha twice in the head at close range. We conclude that this evidence is sufficient to establish the (i)(5) aggravating circumstance.

### b. (i)(6): Murder Committed to Avoid Arrest

The jury also found that the State had established that appellant killed Samantha in order to avoid his arrest and prosecution. *See* Tenn. Code Ann. § 39-13-204(i)(6). This aggravating circumstance focuses upon a defendant's motives in killing the victim. *Reid*, 164 S.W.3d at 315; *Terry*, 64 S.W.3d at 162. Although there must be some "particular proof" supporting this aggravating circumstance, *State v. Hartman*, 42 S.W.3d 44, 58 (Tenn. 2001), the State need not prove that the defendant's desire to avoid prosecution was his sole motive in murdering the victim, *Terry*, 46 S.W.3d at 162. "While this aggravating circumstance is not limited to killing of eyewitnesses or those who could identify the defendant, . . . the killing of a witness to a crime because that person witnessed a crime may, depending on the circumstances, constitute a killing for purpose of avoiding arrest or prosecution." *Banks*, 271 S.W.3d at 149 (citations omitted).

Appellant's course of action, both before and after he killed the victims, establishes that he killed Samantha to eliminate her as a witness to Adam's murder. Appellant told Wilda Willis that Samantha came to Betty Willis' house on Saturday afternoon prior to the murders. Appellant did not kill Samantha at that time. According to appellant, Adam arrived the following day, and appellant and Adam argued and became involved in an altercation. Appellant then shot Adam in Samantha's presence. Despite appellant's claims to the contrary, the evidence establishes that appellant did not kill Samantha immediately after he killed Adam. Rather, appellant bound and gagged Samantha and kept her alive for more than a day before killing her. Appellant also made elaborate efforts to conceal the crimes. *See id.* at 149-51 (noting evidence of the defendant's effort to conceal the crimes in determining that the evidence was sufficient to support the (i)(6) aggravating circumstance). Appellant severed Adam's head and hands and disposed of them in a lake. Appellant stuffed both of the victims' bodies into plastic containers and placed the containers in a storage unit. When questioned by several people regarding the victims, appellant denied any knowledge of their location.

Evidence that appellant became involved in an altercation with Adam, killed Adam first, kept Samantha alive for a period of time, and dismembered Adam's head and hands and disposed of them in a lake without doing the same to Samantha would allow a reasonable

juror to conclude that Adam was appellant's primary target and that one of appellant's motives for killing Samantha was to eliminate her as a witness to the murder. We conclude that viewing the evidence in the light most favorable to the State, a reasonable juror could have found that the proof established the (i)(6) beyond a reasonable doubt.

### c. (i)(7): Felony Murder

The jury found that appellant knowingly committed Samantha's murder while appellant had a substantial role in committing the kidnapping of Samantha. *See* Tenn. Code Ann. § 39-13-204(i)(7). The jury found as a separate aggravating circumstance that appellant knowingly committed Samantha's murder while appellant had a substantial role in committing first degree murder of Adam. *See id.*

The aggravating circumstance in subsection (i)(7) may be applied if:

[t]he murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit, or was fleeing after having a substantial role in committing or attempting to commit, any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect, rape of a child, aggravated rape of a child, aircraft piracy, or unlawful throwing, placing or discharging of a destructive device or bomb.

The evidence presented at trial established that appellant committed the murder while committing kidnapping and first degree murder. Subsection (i)(7), however, does not include any language that allows for the treatment of this single aggravating circumstance as multiple and separate aggravating circumstances based upon the number of felonies committed. The Tennessee Supreme Court has treated the fact that a murder was committed during the course of multiple felonies as a single aggravating circumstance and has held that a trial court, in charging the jury on this aggravating circumstance, must limit the instruction to only those felonies that are raised by the evidence. *See State v. Morris*, 24 S.W.3d 788, 798-99 (Tenn. 2000) (considering (i)(7) as a single aggravating circumstance when the murder occurred while the defendant was committing first degree murder, rape, burglary, or kidnapping); *State v. Buck*, 670 S.W.2d 600, 608-09 (Tenn. 1984) (holding that the jury charge for the (i)(7) aggravating circumstance should have been limited to rape, robbery, and kidnapping).

In the present case, the State relied upon the (i)(7) aggravating circumstance in that appellant knowingly committed Samantha's murder while appellant had a substantial role in committing the kidnapping of Samantha. The State also relied upon the (i)(7) aggravating circumstance as a separate aggravator in that appellant knowingly committed Samantha's

murder while appellant had a substantial role in committing the first degree murder of Adam. The trial court instructed the jury to each as separate aggravating circumstances, and the jury found them as separate aggravating circumstances. The trial court should have instructed the jury on a single (i)(7) aggravating circumstance based upon the multiple felonies of kidnapping and first degree murder. *See State v. Rickey Alvis Bell, Jr.*, No. W2012-02017-CCA-R3-DD, 2014 WL 2541171, at *52-53 (Tenn. Crim. App. May 30, 2014), *appeal argued* (Tenn. March 4, 2015) (holding that the language in subsection (i)(7) does not provide for the treatment of the single aggravating circumstance as multiple and separate aggravating circumstances based upon the number of underlying felonies committed); *see also Tanzi v. State*, 964 So. 2d 106, 117 (Fla. 2007) (holding that the trial court erred in treating the single felony murder aggravator as multiple and separate aggravators based upon the number of felonies committed). The evidence presented at the trial is sufficient to establish the (i)(7) aggravating circumstance as a single aggravating circumstance. Because the language in subsection (i)(7) does not permit the treatment of this single aggravating circumstance as multiple and separate aggravating circumstances based upon the number of felonies committed, the jury's finding of two separate aggravating circumstances under (i)(7) is not supported by the record.

### d. Effect of Error

We must determine whether the error affecting the jury's consideration of an invalid aggravating circumstance in a capital sentencing proceeding is harmless beyond a reasonable doubt. *See Strouth v. State*, 999 S.W.2d 759, 760 (Tenn. 1999); *see also Rice*, 184 S.W.3d at 678 n.4 ("In this State, the mere submission of an invalid aggravating circumstance to the jury amounts to constitutional error, . . . and that error remains subject to a harmless error analysis."). Specifically, we must consider whether the jury's consideration of the (i)(7) aggravating circumstance as two separate aggravators was harmless beyond a reasonable doubt. The error is harmless beyond a reasonable doubt if "the sentence would have been the same had the jury given no weight to the invalid . . . factor." *State v. Howell*, 868 S.W.2d 238, 262 (Tenn. 1993). However,

> [i]n order to guarantee the precision that individualized sentencing considerations demand and provide a principled explanation for our conclusion in each case, it is important, when conducting harmless error review, to completely examine the record for the presence of factors which potentially influence the sentence ultimately imposed. These include, but are not limited to, the number and strength of remaining valid aggravating circumstances, the prosecutor's argument at sentencing, the evidence admitted to establish the invalid aggravator, and the nature, quality and strength of mitigating evidence.

*Id.* at 260-61.

With regard to the first factor, the number and strength of the remaining valid aggravating circumstances, our supreme court has recognized that "the effect of aggravating circumstances on sentencing usually increases with the number of circumstances proven." *Id.* at 261. However, the qualitative nature, substance and persuasiveness, and quantum of proof supporting the remaining aggravating circumstances is more crucial. *Id.* While the statute does not assign relative importance to the various statutory aggravating circumstances, some aggravating circumstances may be more qualitatively persuasive and objectively reliable by their nature and based upon the proof in certain cases. *Id.*

In the present case, the (i)(5) and (i)(6) aggravating circumstances found by the jury were valid. As we have noted, there was extensive evidence presented at trial establishing that Samantha's murder was especially heinous, atrocious, or cruel and that appellant killed Samantha in order to avoid his arrest and prosecution. *See* Tenn. Code Ann. § 39-13-204(i)(5), (6) (Supp. 2002).

The second factor in the harmless error analysis is the extent to which the prosecutor emphasized the invalid aggravating factor during closing argument. *Howell*, 868 S.W.2d at 261. This factor, however, is not the "prime factor" in determining whether the error was harmless beyond a reasonable doubt. *Id.* During closing argument, the prosecutor reviewed each of the aggravating circumstances upon which the State relied regarding Samantha's murder. The prosecutor primarily emphasized the evidence supporting the (i)(5) and (i)(6) aggravating circumstances. While the prosecutor discussed evidence that appellant murdered Adam and kidnapped Samantha, the prosecutor also related the evidence to the (i)(5) and (i)(6) aggravating circumstances.

The third factor in the harmless error analysis is whether the invalid aggravating circumstance "was established by evidence that was materially inaccurate or admissible only to support the invalid aggravator, or whether the evidence was otherwise admissible in either the guilt or sentencing phases of the proceeding." *Id.* The Tennessee Supreme Court has recognized that "an aggravating factor which duplicates the elements of the underlying crime has less relative tendency to prejudicially affect the sentence imposed than invalid aggravating factors which interject inadmissible evidence in the sentencing calculus, or which require the sentencing jury to draw additional conclusions from the guilt phase evidence." *Id.* The State relied upon evidence that was otherwise admitted during the guilt phase of the trial to support the (i)(7) felony murder aggravating circumstances.

The final factor in the harmless error analysis is the mitigating evidence that was presented during the penalty phase. *Id.* at 262. The trial court instructed the jury regarding

the following mitigating circumstances: (1) appellant had no significant history of prior criminal activity; (2) appellant was an accomplice in the murder committed by another person and appellant's participation was relatively minor; (3) any residual doubt regarding appellant's guilt or degree of his participation in the crimes; (4) the extension of mercy for appellant; (5) the need for closure by the parties; (6) the possibility that appellant's self-representation resulted in his failure due to lack of skill or experience to present relevant evidence relating to his guilt or innocence or the appropriate punishment; and (7) any other mitigating factor raised by the evidence. Appellant, however, waived the presentation of mitigating evidence during the penalty phase and did not present an opening statement or closing argument during the penalty phase. Based upon the consideration of these four factors, we conclude that the jury's consideration of the (i)(7) aggravating circumstance as two separate aggravators was harmless beyond a reasonable doubt.

### C. Weighing the Verdict as to Each Victim

We next turn to our inquiry of whether a reasonable juror could find beyond a reasonable doubt that the aggravated circumstances proven by the State with respect to each victim's murder outweigh the mitigating circumstances. The proof supporting the aggravating and mitigating circumstances is set forth above. We conclude that a rational juror could have found that the aggravating circumstance established by the State regarding the first degree murder of Adam Chrismer outweighed the mitigating circumstances. With regard to the first degree murder of Samantha Chrismer, we conclude that the jury's consideration of the (i)(7) aggravating circumstance as two separate aggravators was harmless beyond a reasonable doubt and that a rational juror could have found that the remaining aggravating circumstances established by the State outweighed the mitigating circumstances.

### D. Proportionality Review

When this Court conducts the proportionality review required by Tennessee Code Annotated section 39-13-206(c)(1)(D), we do not function as a "super jury" that substitutes our judgment for the judgment of the sentencing jury. *See State v. Godsey*, 60 S.W.3d 759, 782 (Tenn. 2001). Rather, we must take a broader perspective than the jurors to determine whether the defendant's sentences are "'disproportionate to the sentences imposed for similar crimes and similar defendants.'" *State v. Thacker*, 164 S.W.3d 208, 232 (Tenn. 2005) (citing *Bland*, 958 S.W.2d at 668. The pool of cases upon which we draw in conducting this analysis are "first degree murder cases in which the State sought the death penalty, a capital sentencing hearing was held, and the jury determined whether the sentence should be life imprisonment, life imprisonment possibility of parole, or death." *Rice*, 184 S.W.3d at 679 (citations omitted).

The purpose of our review of other capital cases is not to identify cases that correspond precisely with the particulars of the case being analyzed. *State v. Copeland*, 226 S.W.3d 287, 306 (Tenn. 2007). Rather, our task is to "'identify and invalidate the aberrant death sentence.'" *Thacker*, 164 S.W.3d at 233 (quoting *Bland*, 958 S.W.2d at 665). A sentence is not disproportionate because other defendants have received a life sentence under similar circumstances. *Carruthers*, 35 S.W.3d at 569 (citations omitted). A death sentence is excessive or disproportionate where "'the case taken as a whole is plainly lacking in circumstances consistent with those in cases where the death penalty has been imposed.'" *Thacker*, 164 S.W.3d at 233 (quoting *Bland*, 958 S.W.2d at 668).

This Court uses "'the precedent-seeking method of comparative proportionality review, in which we compare a case with cases involving similar defendants and similar crimes.'" *State v. Copeland*, 226 S.W.3d at 305 (quoting *State v. Davis*, 141 S.W.3d 600, 619-20 (Tenn. 2004)). We examine "the facts and circumstances of the crime, the characteristics of the defendant, and the aggravating and mitigating circumstances involved, and we compare this case with other cases in which the defendants were convicted of the same or similar crimes." *State v. Stevens*, 78 S.W.3d 817, 842 (Tenn. 2002).

In conducting this comparison with regard to the nature of the crime, we generally consider

> (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the victim's age, physical condition, and psychological condition; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effect upon non-decedent victims.

*Rimmer*, 250 S.W.3d at 35 (quoting *Reid*, 213 S.W.3d at 820 (internal quotation marks omitted); *see Rollins*, 188 S.W.3d at 575. We also compare the defendant's "'(1) prior criminal record, if any; (2) age, race, and gender; (3) mental, emotional, and physical condition; (4) role in the murder; (5) cooperation with authorities; (6) level of remorse; (7) knowledge of the victim's helplessness; and (8) potential for rehabilitation.'" *Rimmer*, 250 S.W.3d at 35 (quoting *Reid*, 213 S.W.3d at 820); *Rollins*, 188 S.W.3d at 575.

Appellant asserts that the comparative proportionality review adopted in *State v. Bland*, 958 S.W.2d 651 (Tenn. 1997), is unconstitutionally flawed. He seeks to modify proportionality review to broaden the pool of cases to be considered. The Tennessee Supreme Court recently rejected this claim and affirmed the comparative proportionality review adopted in *Bland*. *See State v. Pruitt*, 415 S.W.3d 180, 217 (Tenn. 2013).

In the present case, the evidence established that appellant had befriended the teenage victims, whom he had met through his daughter. Appellant later shot Adam Chrismer in the head, used a chainsaw to cut off Adam's head and hands, and threw them into a lake. Appellant then kept Samantha Chrismer alive for more than a day. He stripped Samantha of her clothing, bound her hands and feet, and stuffed a cloth gag into her mouth. Appellant then shot Samantha twice in the head. He stuffed each of the victims' bodies into separate plastic containers. He then placed the containers inside a storage unit for several days until police officers discovered the victims' partially decomposed bodies. Bruising was noted on Samantha's right leg, shoulder, and chest.

Little personal information regarding appellant was presented at trial. Appellant was divorced and had a daughter who was a teenager at the time of the murders. Prior to trial, appellant served a period of incarceration in federal prison in New York. His mother had a history of mental health issues and died before the trial.

We conclude that the death sentences in this case are not excessive or disproportionate when compared to the penalty imposed in similar cases. The Tennessee Supreme Court has upheld the death penalty in numerous cases involving killings in the course of a kidnapping. *See State v. John T. Freeland, Jr.*,__ S.W.3d __, No. W2011-01828-SC-DDT-DD, 2014 WL 4631221 (Tenn. 2014); *Carruthers*, 35 S.W.3d at 570-71; *State v. Bates*, 804 S.W.2d 868, 872 (Tenn. 1991); *State v. Alley*, 776 S.W.2d 506, 508-09 (Tenn. 1989); *State v. Thompson*, 768 S.W.2d 239, 243 (Tenn. 1989); *State v. King*, 718 S.W.2d 241, 244 (Tenn. 1986).

The death penalty also has been upheld in similar cases where a defendant killed the victim and either dismembered the victim's body or disposed of the body in a secluded location. *See John T. Freeland, Jr.*, __ S.W.3d at __; *State v. Davidson*, 121 S.W.3d 600, 622 (Tenn. 2003); *Terry*, 46 S.W.3d at 164; *State v. Bondurant*, 4 S.W.3d 662, 665 (Tenn. 1999); *State v. Smith*, 868 S.W.2d 561, 580 (Tenn. 1993). Finally, the death penalty has been upheld in a double murder case where the sole aggravating circumstance was that the defendant committed one murder while he was in the course of committing, attempting to commit, or escaping after committing another murder. *See State v. Wright*, 756 S.W.2d 669, 672-73 (Tenn. 1988).

In completing our review, we need not conclude that this case is exactly like prior cases in every respect, nor must this court determine that this case is "more or less" like other death penalty cases. *State v. Thomas*, 158 S.W.3d 361, 383 (Tenn. 2005). Rather, this court need only identify aberrant death sentences by analyzing whether a capital case plainly lacks circumstances similar to those cases in the pool of cases in which a death sentence has been upheld. The penalty imposed by the jury in the present case is not disproportionate to the penalty imposed for similar crimes.

## ISSUE XX.  CUMULATIVE ERROR

Appellant asserts that the cumulative effect of the errors at trial rendered both the guilt and penalty phases of his trial fundamentally unfair.  We have concluded that one error was committed in each phase of the trial and that each error was harmless beyond a reasonable doubt.  We conclude that the cumulative effect of these errors did not render both phases of the trial fundamentally unfair.

## CONCLUSION

After review of the record and the applicable law, we affirm appellant's judgments.

_____
ROGER A. PAGE, JUDGE